**RECORD NOS. 21-2390(L); 21-2434 XAP**

*In The*
# United States Court Of Appeals
## For The Fourth Circuit

# EVA PALMER,

*Plaintiff – Appellant/Cross-Appellee,*

v.

# LIBERTY UNIVERSITY, INC.,

*Defendant – Appellee/Cross-Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT LYNCHBURG**

_____

**BRIEF OF APPELLANT/CROSS-APPELLEE**

_____

Richard F. Hawkins, III
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, VA 23220
(804) 308-3040

*Counsel for Appellant/Cross-Appellee*

GibsonMoore Appellate Services, LLC
206 East Cary Street ♦ P.O. Box 1460 (23218) ♦ Richmond, VA 23219
804-249-7770 ♦ www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2390     Caption: Eva Palmer v. Liberty University, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Eva Palmer
(name of party/amicus)

who is _____ appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?   ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____   Date: _____12/16/21_____

Counsel for: Eva Palmer

- 2 -

**Print to PDF for Filing**

# TABLE OF CONTENTS

**Page:**

TABLE OF AUTHORITIES ....................................................................... v

STATEMENT OF SUBJECT MATTER
AND APPELLATE JURISDICTION ....................................................... 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............. 1

STATEMENT OF THE CASE ................................................................. 3

    A.    STATEMENT OF FACTS RELEVANT TO THE
        ISSUES ....................................................................... 4

          1.    Palmer's Long And Successful Employment
              History With Liberty ....................................................... 4

          2.    Liberty's Faculty Evaluation Criteria And The
              "Faculty Portfolio Tool" .................................................. 6

          3.    Promotion Criteria For Faculty Members At
              Liberty ........................................................................... 9

          4.    After Several Years Of Hard Work And Diligence,
              Liberty Promoted Palmer To Full Professor In
              December 2016 ............................................................. 11

              a.    Palmer Initially Applied For Promotion In
                    2013 And 2014 But Was Unsuccessful ............... 11

              b.    In This Same Time Frame, Palmer's
                    "Faculty Portfolio" Evaluations Emphasized
                    Areas Where She Needed To Improve ................ 12

              c.    Liberty Denied Palmer Promotion For The
                    Third Time In 2015, And Dean Mintle
                    Spearheaded A Plan For Her To Eventually
                    Succeed ............................................................ 14

i

    d. Palmer Improved In 2016 And Was Ultimately Promoted To Full Professor ............ 20

  5. What Liberty's Promotion Of Palmer To Full Professor Necessarily Meant ....................... 22

  6. Liberty Never Told, Or Even Hinted To, Palmer That She Needed To Improve Her Digital Literacy Or Face Possible Non-Renewal ................... 23

  7. Despite Giving Her Strong Performance Ratings, And Mere Months After It Promoted Her To Full Professor, Liberty Started The Non-Renewal Process For Palmer ..................................... 23

  8. Liberty Moved Forward To Separate Palmer, But In Doing So, It Repeatedly Called Her Separation A "Retirement" And Also Made Unfounded Assumptions About Her Alleged Unwillingness To Embrace Change ..................................... 25

  9. Palmer Committed No Misconduct In Between 2016-2017 and 2017-2018 ........................... 30

  10. With All This Said, Liberty Told Palmer Her Contract Would Not Be Renewed. It Then Continued To Offer All Of The Same Courses That Palmer Had Previously Taught And Replaced Her With Younger Employees ................... 31

 B. STATEMENT OF THE RELEVANT PROCEDURAL HISTORY .......................................... 33

 C. RULINGS PRESENTED FOR REVIEW ............................. 34

SUMMARY OF ARGUMENT .................................................. 35

ARGUMENT ......................................................................... 36

 I. STANDARD OF REVIEW ................................. 36

II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LIBERTY ON PALMER'S ADEA CLAIM .................................... 37

    A.  Standards Applicable To ADEA Claims ...................... 37

    B.  Palmer Provided Direct Evidence Of Age Discrimination ................................................ 39

        1.  "Retirement" Comments .................................... 41

        2.  Hayes' Comment, Based On Unfounded Assumptions That Palmer Would Have "Great Difficulty With Any Changes" ................ 43

    C.  Palmer Satisfied All Of The Criteria Necessary For Establishing Circumstantial Evidence Of Age Under The *McDonnell Douglas* Test ........................... 45

        1.  The Record, When Viewed In Favor Of Palmer, Showed That Palmer Was Either Meeting Liberty's Legitimate Employment Expectations *Or* That Such Expectations Were Not Legitimate .......................................... 47

            a.  The "Legitimate Employment Expectations" Prong Does Not Require An Employee To Be "Perfect" And Must Be Carefully Applied ....................... 47

            b.  The Record Evidence Overwhelmingly Showed That Palmer Was Meeting Liberty's Expectations Or That Such Expectations Were Not Legitimate .......... 48

            c.  Precedent From This Court Confirms, If Not Magnifies, The District Court's Error As To This Prong ........................... 53

2. The Facts, Viewed Favorably To Palmer, Showed That Liberty's Alleged Reason For Not Renewing Her Contract Was Pretextual.....55

    a. All Of The Prior *Prima Facie* Case Evidence Proves Pretext............................56

    b. Hayes' Muddled *Post Facto* Explanation Of Palmer's Promotion Proves Pretext............................57

    c. The Fact That Professor Phillips Has Not Had To Teach Graphic Design Shows Pretext.............................58

    d. Liberty's Age-Related Comments Prove Pretext.............................59

    e. The District Court Erred...........................60

D. The District Court Erred When It Applied, *As A Matter Of Law*, The "Same Actor Inference...............61

E. As A Final Matter, A Genuine Dispute Of Material Fact Existed As To "But For" Causation.....64

CONCLUSION AND REQUEST FOR RELIEF....................................65

REQUEST FOR ORAL ARGUMENT....................................................65

CERTIFICATE OF COMPLIANCE.......................................................66

iv

TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Adams v. Greenbrier Oldsmobile/GMC/ Volkswagen, Inc.*,
172 F.3d 43 (4th Cir. 1999) ........................................................ 63

*Arthur v. Pet Dairy*,
593 Fed. Appx. 211 (4th Cir. Feb. 9, 2015) ........................ 38, 40, 64

*Bienkowski v. Am. Airlines, Inc.*,
851 F.2d 1503 (5th Cir. 1988)..................................................... 44

*Brinkley v. Harbour Recreation Club*,
180 F.3d 598 (4th Cir. 1999)....................................................... 48

*Brooks v. Woodline Motor Freight, Inc.*,
852 F.2d 1061 (8th Cir.1988)....................................................... 43

*Bryant v. Aiken Regional Medical Centers, Inc.*,
333 F.3d 536 (4th Cir. 2003)....................................................... 46

*Burns v. AAF-McQuay, Inc.*,
96 F.3d 728 (4th Cir. 1996) ........................................................ 38

*Clawson v. FedEx Ground Package Sys. Inc.*,
451 F. Supp. 2d 731 (D. Md. 2006)............................................. 62

*Cline v. Roadway Express, Inc.*,
689 F.2d 481 (4th Cir.1982) ........................................................ 39

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003) ...................................................................... 39

*Dockins v. Benchmark Commc'ns*,
176 F.3d 745 (4th Cir.1999) ........................................................ 40

*E.E.O.C. v. Baltimore Cty.,*
   747 F.3d 267 (4th Cir. 2014).......................................................... 37

*E.E.O.C. v. Sears Roebuck and Co.,*
   243 F.3d 846 (4th Cir. 2001).......................................................... 58

*El-Hage v. Levitt,*
   2007 WL 9782573 (D. Md. Sept. 19, 2007) ................................... 52

*Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,*
   53 F.3d 55 (4th Cir.1995) ............................................................... 46

*Evans v. Eaton Corp. Long Term Disability Plan,*
   514 F.3d 315 (4th Cir. 2008).......................................................... 37

*Evans v. Techs. Applications & Serv. Co.,*
   80 F.3d 954 (4th Cir.1996) ............................................................. 53

*Fife v. MetLife Group, Inc.,*
   411 F. Supp. 3d 149 (D. Mass. 2019) ............................................ 59

*Foster v. Summer Village Community Association, Inc.,*
   520 F. Supp.3d 734 (D. Md. 2021) ................................................. 51

*Fuentes v. Perskie,*
   32 F.3d 759 (3d Cir.1994)............................................................... 56

*Fuller v. Phipps,*
   67 F.3d 1137 (4th Cir.1995) ........................................................... 39

*Gross v. FBL Fin. Serv. Inc.,*
   537 U.S. 167 (2009) ....................................................................... 38

*Haynes v. Waste Connections, Inc.,*
   922 F.3d 219 (4th Cir. 2019) ............................................ 48, 56, 59

*Jackson v. Cal–W. Packaging Corp.,*
   602 F.3d 374 (5th Cir.2010) .......................................................... 40

vi

*Jacobs v. N.C. Admin. Office of the Courts,*
   780 F.3d 562 (4th Cir. 2015) ........................................................ 50

*King v. CVS Caremark Corp.,*
   2 F. Supp. 3d 1252 (N.D. Ala. 2014) ........................................... 59

*Linkous v. StellarOne Bank,*
   2013 WL 2423076 (W.D. Va. June 4, 2013) ................................. 51

*Proud v. Stone,*
   945 F.2d 796 (4th Cir. 1991) ................................................. 2, 35, 61

*MacDonald v. UPS,*
   430 Fed. Appx. 453 (6th Cir. 2011) .............................................. 42

*Machinkchick v. PB Power, Inc.,*
   398 F.3d 345 (5th Cir. 20015) ....................................................... 44

*Marlow v. Chesterfield County School Bd.,*
   749 F. Supp. 2d 417 (E.D. Va. 2010) ........................................... 60

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973) ..................................................... 34, 38, 45, 48

*Murry v. Jacobs Tech., Inc.,*
   2012 WL 1145938 (M.D.N.C. Apr. 5, 2012), *aff'd,*
   568 F. App'x 265 (4th Cir. 2014) .................................................. 52

*Palmer v. Liberty University, Inc.,*
   6:20cv0031 (W.D. Va.) ............................................................ 57, 62

*Reed v. Buckeye Fire Equip.,*
   241 F. App'x 917 (4th Cir. 2007) .................................................. 52

*Rishel v. Nationwide Mut. Ins. Co.,*
   297 F. Supp. 2d 854 (M.D.N.C. 2003) .......................................... 52

*Sempowich v. Tactile Systems Technology, Inc.,*
   19 F.4th 643 (4th Cir. 2021) .................................................. *passim*

*Skaggs v. Van Alstyne Independent School Dist.*,
    2017 WL 77825 (E.D. Tex. Jan. 9, 2017) ..................................... 43

*Spagnuolo v. Whirlpool Corp.*,
    641 F.2d 1109 (4th Cir.), *cert. denied*,
    454 U.S. 860, 102 S. Ct. 316, 70 L. Ed. 2d 158 (1981).................. 39

*Spriggs v. Diamond Auto Glass*,
    242 F.3d 179 (4th Cir. 2001)............................................................ 36

*Texas Dep't of Community Affairs v. Burdine*,
    450 U.S. 248 (1981) ........................................................................ 46

*Tolan v. Cotton*,
    134 S. Ct. 1861 (2014) ................................................................... 50

*United States ex rel. JDJ & Associates LLP v. Natixis*,
    2017 WL 4357797 (S.D.N.Y. Sept. 29, 2017) ............................... 51

*Vessels v. Atlanta Independent School System*,
    408 F.3d 763 (11th Cir. 2005).......................................................... 59

*Warch v. Ohio Cas. Ins. Co.*,
    435 F.3d 510 (4th Cir. 2006)................................................ 46, 48, 55

*Waters v. Logistics Management Institute*,
    716 Fed. Appx. 194 (4th Cir. Feb. 8, 2018) ................................... 46

*Westmoreland v. TWC Administration, LLC*,
    924 F.3d 718 (4th Cir. 2019)...................................................... 32, 38

*White v. W.R. Winslow Mem'l Home, Inc.*,
    211 F.3d 1266 (Table), 2000 WL 346497 (March 15, 2000)........... 56

**Statutes:**

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 1331 ...................................................................................... 1

29 U.S.C. § 621, *et seq* ..................................................................... *passim*

29 U.S.C. § 623(a)(1) ................................................................ 37

29 U.S.C. § 631(a) ...................................................................... 37

**Constitutional Provisions:**

U.S. Const. amend. I ................................................................ 33

**Rules:**

Fed. R. Civ. P.  30(b)(6) ....................................................... 11, 57

**Other Authorities:**

https://www.eeoc.gov/reports/state-age-discrimination-and-older-
workers-us-50-years-after-age-discrimination-employment;
*The State of Age Discrimination in the U.S. 50 Years After the Age
Discrimination In Employment Act (ADEA)*; EEOC;
Victoria A. Lipnic; (June 2018) .............................................. 37

https://www.liberty.edu/news/2017/03/21/gutierrez-appointed-to-
new-co-provost-position/ (visited on April 13, 2022) ............................. 15

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

Appellant Eva Palmer filed this age discrimination action in the United States District Court for the Western District of Virginia, JA2[1]; JA8-13, under the ADEA.[2] The District Court, thus, had federal question jurisdiction under 28 U.S.C. § 1331.

On December 10, 2021, the District Court entered its final order in this case. JA1516. Three days later, Palmer timely filed her Notice of Appeal. JA1517-1518.[3] This Court, therefore, has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether certain statements made by Liberty officials during the time frame when Liberty was deciding not to renew Palmer's contract – such as her Department Chair describing her non-renewal as "retiring" and her Dean speculating that she "would have great difficulty with any [teaching] changes" – were direct evidence of age discrimination.

---

[1] "JA" refers to the Joint Appendix filed herewith.

[2] "ADEA" refers to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*.

[3] Appellee Liberty University, Inc. ("Liberty") separately filed a Notice of Appeal on December 27, 2021, JA1519-1521.

2.    Whether the evidence raised a genuine dispute of material fact as to whether Palmer was satisfying Liberty's legitimate employment expectations at the time of her non-renewal, which is not an "onerous burden," where such evidence showed, *inter alia*, that in the school year immediately prior to her non-renewal, she had (i) been promoted to Full Professor, the highest possible rank, (ii) received an almost $30,000 salary increase due to her promotion, and (iii) received "meets" or "exceeds" expectations for all of the categories in that year's performance evaluation.

3.    Whether the evidence raised a genuine dispute of material fact as to whether Liberty's proffered nondiscriminatory reason for not renewing Palmer's employment contract was a pretext for age discrimination.

4.    Whether the "same actor inference" from *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991), should have been applied here, where, *inter alia*, (i) different individuals were in involved, on the one hand, in the decision to promote Palmer to Full Professor, and, on the other, in the decision not to renew her faculty employment contract; and (ii) Liberty did not even invoke the inference until its summary judgment *reply* brief.

## STATEMENT OF THE CASE

This is an age discrimination case. At the end of the 2017-2018 school year, Palmer, aged 79 and a 32-year teaching veteran of Liberty, was involuntarily separated from the University. JA1345-1346; JA1497. Liberty justified this decision by saying that Palmer had failed to develop a digital arts skillset despite being allegedly told to do so several times. *See* JA1497. Palmer, however, countered that she had *just been promoted* the preceding year based on the *very same criteria* – including developing a digital arts skillset – that now allegedly required her dismissal. *See* JA1482-1484. Believing that she had been the victim of unlawful age discrimination, Palmer filed a one-count Complaint against Liberty under the ADEA. JA8-13.

The following sets forth the facts that about Palmer's long history at Liberty, including details about the criteria that were used to promote her to Full Professor in 2016-2017 and how those very same criteria also showed that she *was*, in fact, meeting all necessary expectations at the time of her separation. The following also sets forth the District Court's decision to grant Liberty's summary judgment motion on the merits of Palmer's ADEA claim despite the existence of these criteria.

3

## A.    STATEMENT OF FACTS RELEVANT TO THE ISSUES

### 1.    Palmer's Long And Successful Employment History With Liberty

Palmer graduated from Old Dominion University in 1968 with a B.S. Ed. Degree, and a concentration in art. JA1345. She obtained a Master's Degree in Fine Arts from James Madison University ("JMU") in 1974 and, later, in 1991, she obtained a Masters of Fine Arts degree in Art, also from JMU. *Id.*

Palmer began working as a faculty member at Liberty in 1986, where she continued in faculty roles until the end of the Spring Semester 2018. *Id.*. Even before then, for seven years prior to her faculty employment (1979-1986) at Liberty, Palmer worked at the Christian Academy which was affiliated with Liberty. *Id.*

In total, Palmer worked for Liberty or Liberty-related entities for thirty-nine (39) years of her life. JA1346. She was forty (40) when she began working at the Christian Academy; forty-seven (47) when she began working as a Liberty faculty member; and seventy-nine (79) when Liberty involuntarily ended her employment in 2018. *Id.* When she filed her opposition to Liberty's summary judgment motion below, Palmer was eighty-two (82) years old. *Id.*

Over the years, Palmer advanced steadily through the ranks. She initially began as a *part*-time Art Instructor in 1986. *Id.* A few years later, she was promoted to a *full*-time Art Instructor. *Id.* In 1992, Palmer was promoted to "Assistant Professor," and, in 2006, to "Associate Professor." *Id.* Finally, in the fall of 2016, Palmer obtained the highest professional rank available at Liberty when she was promoted to "full" Professor at the University. *Id.*

In her role as a faculty member at Liberty, especially in the final years of her employment, Palmer consistently performed at a high level and obtained numerous professional achievements and accolades. *Id.* Among other things,

- In June 2014, Palmer presented a paper titled "*Ancient Greek Vases: Reflections on the Greek Culture*" at the Ninth International Conference on the Arts in Society at Sapienza University of Rome, Italy;

- In June 2015, she together with two colleagues, presented a paper at the Tenth International Conference on the Arts in Society, in London, England;

- In 2015, she showed her work at a Christians in the Visual Arts conference, entered her work in a juried show in North Carolina, and served as a judge for a juried show in Danville, Virginia;

- In June 2016, she presented a paper at the Eleventh International Conference on the Arts in Society in Los Angeles, California; and

- In June 2017, she gave a presentation about the Dead Sea Scrolls at the Twelfth International Conference on the Arts in Society, in Paris, France;

*Id.*

She also served as a member of Liberty's Faculty Senate for many years and founded and sponsored Zeta Chi, the Liberty chapter of Kappa Pi, the international art fraternity. *Id. See also* JA1350-1352. And, as well, Palmer consistently received "Meets" or "Exceeds" expectations on her annual faculty evaluations. *See, e.g.,* 938-949.

2. **Liberty's Faculty Evaluation Criteria And The "Faculty Portfolio Tool"**

Faculty members at Liberty are evaluated annually based on nine specific criteria. JA1331-1332. These criteria are expressly set forth in Liberty's Faculty Handbook and are as follows:

(1) *Operational elements of instruction/administration*
Focused on teaching: "When teaching do you record grades in Blackboard, return assignments and answer e-mail in a timely fashion, ***use technology in a manner appropriate to the discipline***, and meet all instruction-related deadlines.

(2) *Operational elements of instruction/administration*
If you primarily perform administrative duties, how well do you meet deadlines, attend and participate in required meetings, complete projects, respond to e-mail in a timely fashion and perform other required duties?

6

(3) *Interaction*

When teaching, what active steps do you take to engage students, either during class or via e-mail/Blackboard to enhance student learning? Is the time you spend engaging the students "worthwhile" (i.e., no busy work)? How do you attempt to make the material understandable and interesting?

(4) *Interaction*

Outside the classroom or online section, how to you engage with students (i.e., advising, mentoring)? In what ways are you regularly accessible to your students?

(5) *Interaction*

When performing administrative duties, do you relate well to colleagues, work effectively in teams, and contribute to the life of the University as a whole?

(6) *Knowledge of discipline/duties*

When teaching, do you display an appropriate level of ***mastery of the material taught*** in the class? How have you ***improved your subject-area expertise*** in the past year?

(7) *Knowledge of discipline/duties*

If performing administrative duties, do you demonstrate familiarity with best practices and national trends? How do you actively improve your knowledge of and ability to perform your job duties?

(8) *Integration of Biblical Worldview*

In what ways do you actively integrate Biblical worldview in her/her teaching/administrative responsibilities?

(9) Please evaluate the extent to which you participate in departmental, school, and University-wide activities, meetings, and events (Include institutional and professional service)

> Is your level of participation appropriate given the type of contract/assignment you hold and the scope of administrative responsibilities delegated to you?

*Id.* (emphasis added). These criteria "fall within the three categories on which residential faculty are evaluated: teaching, research/scholarship, and institutional service." JA1332.

The annual evaluation process is documented through Liberty's "Faculty Portfolio Tool." JA1331. The tool lists all nine of the above criteria and provides for both a self-evaluation and an evaluation by the faculty member's Chair.  For **_each_** of the nine criteria, both the faculty member and the Chair must pick one of four "ratings": (i) Unsatisfactory; (ii) Below Expectations; (iii) Meets Expectations; and (iv) Exceeds Expectations *See* JA1353.  *See also* 938-949. When the evaluation process is completed, **red** circular checkmarks are placed in the rating columns applicable to the rating choices.

The Faculty Portfolio Tool is linked to an internal database,[4] and it displays ratings in the following format for active faculty members.

---

[4] *See* JA1355-1362 (explaining the Faculty Portfolio Tool).

JA1353.  The above graphic shows the type of images that someone would have seen for Palmer's ratings if they had accessed Palmer's Faculty Portfolio Tool at the time she was employed at Liberty.

### 3. Promotion Criteria For Faculty Members At Liberty.

Liberty has four ranks for its faculty members: Instructor, Assistant Professor, Associate Professor, and Professor (commonly called "Full" Professor). *See* 1327-1329.  Of these ranks, "Full" Professor is the highest, *see* JA1310-1311, and may be sought after a faculty member has met the following prerequisites:

> Promotion to rank of professor is based upon scholarly and professional achievements subsequent to attaining the rank of associate professor. An earned doctoral degree from an accredited institution in an area relevant to the faculty member's area of teaching or a terminal professional master's degree or evidence of outstanding contributions in the faculty member's professional or academic field (e.g., as recognized by one's peers, nationally) is required. The faculty member must have at least five (5) years of successful teaching experience at the associate professor rank or fifteen (15) years of significant work experience in a professional area relevant to the faculty member's teaching assignment. ***After***

9

> **_demonstrated teaching excellence as evidenced by the completion of the Faculty Portfolio Tool cycle_**, faculty members may apply for promotion in the fifth year at the rank of associate professor. There must be demonstrated recent scholarly or professional productivity (professional productivity may include significant accomplishment in a faculty member's teaching field) in significant regional or national forums. This includes, but is not limited to: the writing of successful textbooks, scholarly monographs, scholarly articles in journals published with peer review, numerous articles in non-refereed professional magazines, numerous articles in high quality magazines aimed at segments of the general public, successful artistic performances (as recognized by other professionals in one's field), books, articles, and creative performances actually published, presented, or under contract. Some evidence of leadership and service to the University on various committee assignments or service to the community-at-large on behalf of the University will be considered. **_There must be evidence of highly desirable professional_** and personal **_qualities_** and active participation in at least one of the national professional associations in one's field.

JA1328-1329 (emphasis added).

Promotion to the rank of Professor is not made lightly. "Great care is taken in determining whether . . . to promote a . . . faculty member to the rank of [full] professor." JA1311. And in order to be promoted, the faculty member must especially show "excellence in teaching." As the Faculty Handbook makes clear,

> Concurrent with Liberty's mission as a **_teaching institution_**, demonstration of **_teaching excellence_** is the **_primary consideration_** for faculty promotion. Teaching

10

> excellence is demonstrated through the material submitted
> into the Faculty Portfolio Tool.

JA1327 (emphasis added).

Indeed, as Liberty explained in its 30(b)(6) deposition, if a faculty member has ***not*** demonstrated excellence in teaching, he would not be promoted. JA1308. In other words, promotion necessarily evidences teaching excellence.

Further, in deciding whether or not to promote a faculty member, the Promotion Committee has access to the faculty member's *entire* Faculty Portfolio Tool profile. JA1313.

Promotion to full Professor is a significant achievement. It is "is evidence of a faculty member's highest level of success at Liberty University," JA1311, and it is "evidence of excellence in teaching." JA1312. Again, if a faculty member seeking promotion to Professor had *failed* to show excellence in teaching, she would ***not*** have been promoted. JA1308.

### 4. After Several Years Of Hard Work And Diligence, Liberty Promoted Palmer To Full Professor In December 2016.

#### a. Palmer Initially Applied For Promotion In 2013 And 2014 But Was Unsuccessful.

With the above criteria in mind, Palmer began a multi-year journey to achieve the rank of "Full" Professor" at Liberty in 2013. JA1350. She

was initially unsuccessful. Indeed, Palmer was denied promotion in 2013, 2014, and 2015. JA1350. This, even though the Promotion Committee for Liberty actually _recommended_ her for promotion in 2013 and 2014. *See* JA977 (2013); JA1381-1383 (2014). Its recommendation in 2014 was unanimous and was based on its assessment of all of the relevant criteria, including "Teaching Excellence." JA1382. In concluding that Palmer met the "Teaching Excellence" requirement, the Committee said "[t]here were numerous documents attesting to the qualify of [Palmer's] teaching from a variety of sources including **_administrators_**, colleagues, clergy as well as from former students." *Id.* (emphasis added).

Dean Hayes, however, did not agree with the recommendation. In a November 17, 2014 memorandum, he said he did not "wholeheartedly concur with the recommendation . . . to promote Professor Palmer . . . to Professor" and that she needed to improve "her professional and scholarly activity." JA1384. He wrote: "It is recommended that Professor Palmer revisit the promotion process after . . . [a pattern of professional and scholarly productivity] is firmly established." *Id.*

> **b.**    **In This Same Time Frame, Palmer's "Faculty Portfolio" Evaluations Emphasized Areas Where She Needed To Improve.**

Not surprisingly, during this same time frame, Palmer's annual "Faculty Portfolio" evaluations reflected concerns about certain areas

where she needed to improve. Among them was her understanding and use of "digital technology."

On this point, things started promisingly for Palmer in 2013-2014. In her 2013-2014 Faculty Portfolio evaluation, for example, Chair Smith wrote the following in the box corresponding to the first "Portfolio" question:

> Eva continues to grow in her ***use of technology***, utilizing it in classes for interaction and grading. ***I recommend that she continue to take technology courses through CRE as they become available.***

JA938. (emphasis added). For this same category, Smith rated Palmer as "***Meets Expectations***," *Id.* (emphasis added). Palmer's Dean at the time, Dean Mintle, also wrote: "Thanks for your work in the Department Eva." *Id.*

This rating meant that Palmer was performing at a satisfactory level as to her technological and digital arts proficiency. JA1331; JA938-949. As noted above, the first evaluative "Faculty Portfolio" criterion expressly encompasses an assessment of whether the faculty issue is "us[ing] ***technology*** in a manner ***appropriate to the discipline***." JA938 (emphasis added). As such, a rating of "Meets Expectations"

corresponds to a satisfactory assessment of that faculty member's technological literacy.

Things then went s bit downhill in 2014-2015 and 2015-2016. Notably, in her 2014-2015 Faculty Portfolio evaluation, Chair Smith gave Palmer a "Below Expectations" for "Category 1" – i.e., the category applicable to technology use. JA940. For that same category, he wrote in her evaluation: "I recommend that Eva Palmer further develop her skills in essential areas related to digital technology and communications." *Id.*

Likewise, Palmer received a "Below Expectations" rating from Chair Smith for "Category 1" in her 2015-2016 "Faculty Portfolio" evaluation, JA943. This time, however, Chair Smith did not include any narrative comments as to this category.

In any event, both evaluations indicated that Palmer needed to improve in this area.

> ### c. Liberty Denied Palmer Promotion For The Third Time In 2015, And Dean Mintle Spearheaded A Plan For Her To Eventually Succeed.

In 2015, unlike in 2014 and 2013, Liberty's Promotion Committee did not recommend Palmer for promotion. JA1385. It said: "we believe

there has not been enough time [for her[ to satisfy her Chair's requests from last year." *Id.* In doing so, it explained: "Because of the shift in emphasis of scholarly or ***professional productivity*** to align with teaching assignments we believe we did not see sufficient recent creative work related to [Palmer's] discipline." *Id.* (emphasis added). Dean Mintle concurred with the Committee's recommendation. *Id.*

As part of the denial process for 2015, Dean Mintle reached out to Dean Hayes and Chair Smith to compile a list of goals with which Palmer had failed to comply as part of her promotion application.  JA1386. He did so at the request of Dr. Ben Gutierrez[5], the then-Vice President for Undergraduate Education, who told him that he would "sign-off" on the Committee's recommendation to deny Palmer's application for promotion but needed some "back-up." *Id.*

In response to Dean Mintle's request, Dean Hayes wrote an e-mail to Dean Mintle and Chair Smith in which he summed up Palmer's prior-year deficiencies in two succinct points:

1. Professor Palmer has not satisfied administrative requests to address ***issues regarding* operational elements of**

---

[5] https://www.liberty.edu/news/2017/03/21/gutierrez-appointed-to-new-co-provost-position/ (visited on April 13, 2022).

> ***instruction, affecting teaching effectiveness and student evaluations***;
>
> 2. Professor Palmer has not demonstrated a sufficient scholarly or created body of work expected of a full professor.

JA1387 (emphasis added).

Dean Hayes then specifically addressed these two points by cutting and pasting previous comments from both him and Chair Smith "directly from the Faculty Portfolio Tool" and placing them into the body of his e-mail that followed his two points. *Id*. In green, he highlighted comments that related to scholarly and creative work, and in yellow, he highlighted comments that related to "elements of instruction. *Id*.

Among the comments that Hayes highlighted in yellow were those from Smith that related to Palmer's need to improve vis-a-vis technology. Notably, Hayes' highlighted the following passages from Palmer's 2013-2014 and 2014-2015 faculty evaluations:

- <u>2013-2014</u> (from Chair Smith): "1. Operational elements of instruction" – "Meets Expectations'"

- <u>2013-2014</u> (from Chair Smith): "Eva continues to grow in her use of technology, utilizing it in classes for interaction and grading. I recommend that she continue to take technology courses through CTE as they become available."

- <u>2014-2015</u> (from Chair Smith): "1. Operational elements of instruction" – "Below Expectations'"

- <u>2014-2015</u> (from Chair Smith): "I recommend that Eva Palmer further develop her skills in essential areas related to digital technology and communication"

- <u>2015-2016</u> (from Chair Smith): "1. Operational elements of instruction" – "Below Expectations"

JA1387-1388. In other words, these technological issues were specifically part of the criteria that Palmer needed to meet in order to be promoted to Full Professor. They were, in turn, included as part of the Professional Development Plan developed for that purpose.

Following this exchange of e-mails, the three men began to develop a plan of expectations for Palmer in order for her to achieve promotion. But Dean Mintle was firm that the expectations for Palmer needed to be "clearly expressed." In an e-mail to both Smith and Hayes relating to a proposed list of talking points for Palmer, he said:

> If I were Eva, I would need a more clearly expressed list of expectations re ***"Improve Teaching Effectiveness***." The dean ***certainly does not hold Student Evaluations in terribly high esteem*** (until there is a preponderance of evidence suggesting a problem/issue). In other words: what SPECIFICALLY must she do to demonstrate improvement in the classroom?

JA1389 (emphasis added).

17

Thereafter, Palmer, Dean Hayes, and Chair Smith put together a Professional Development Plan ("PDP") to help her achieve promotion. The plan was not a disciplinary plan – i.e., one designed to punish someone for poor performance. JA1399. Such punitive plans were, in fact, sometimes used in Palmer's Department. For example, Ron Sumner, a professor in Palmer's department (who, incidentally, was recommended for non-renewal at the same time as Palmer), had _actually been placed on an improvement plan_ prior to his dismissal. Also at that time, he was explicitly told that if he failed to meet certain identified performance expectations, his contract would likely not be renewed the following year. JA1392-1398.[6] No such warnings, however, were ever given to Palmer, and this plan did not do so either. JA1399.

Instead, Palmer's plan was entirely for purposes of her promotion, and it focused on what she needed to do so that she could attain the rank of full Professor. JA1399; JA1400-1402. Indeed, in the very first sentence of the PDP, Palmer wrote that she appreciated having the opportunity

---

[6] Indeed, in his deposition, JA1398, Chair Smith said he "explicitly" used the word "non-renewal" in a meeting with Sumner to discuss his expectations at Liberty.

"to have definite, well-defined goals in mind ***as I seek promotion*** from
n Associate Professor to Professor."  JA1400 (emphasis added).

To be sure, Palmer stated in the PDP that she would endeavor to
"develop her skills in creating course content in PowerPoint, Adobe
applications, etc." JA1401. But the plan, which was approved by both
Smith and Hayes, said _nothing_ about Palmer having to meet a certain
threshold of knowledge, coursework, or skills in order to accomplish her
so-called technological development. Nor did it identify any benchmarks
(such as "Must be proficient in Adobe Suite by 11/1/16") that Palmer had
to satisfy in order to "complete" the plan.  And perhaps most importantly,
the PDP contained no deadlines for Palmer to meet as to any of the items
contained therein.

In short, the plan simply identified the areas – including technology
-- where Palmer needed to _sufficiently_ improve in order to be promoted to
Full Professor. And regarding technology, Palmer did what was required.
As she stated in her deposition: "I was told to improve my computer skills,
and I did.  I continued to do that." JA1197.

### d. Palmer Improved In 2016 And Was Ultimately Promoted To Full Professor.

Ultimately, in the fall of 2016, Liberty decided Palmer had satisfied the criteria from her PDP and promoted her to Full Professor. JA1365. In doing so, it adopted the recommendations from both the Promotion Committee and Palmer's Dean, Dean Hayes. It says:

**Chair of Promotion Committee's Comments and Recommendation:**

It is the belief that Ms. Palmer has satisfactorily demonstrated her fulfillment of the requirements for promotion to the rank of Professor. Her length of service, terminal degree that is appropriate to the field, involvement in community and national organizations, and service to the University are clear. Ms. Palmer set a goal in the past year to not just be active creatively but to enter work into national and international juried art shows. She has achieved that goal with six new works. It is for these reasons ***and the weight of the other evidence provided*** that we recommend Ms. Palmer for promotion to the rank of Professor.

\*\*\*

**Dean's Comments And Recommendation:**

Professor Palmer has ***satisfactorily*** completed a ***three-year plan*** to increase both the quantity and quality of her creative output, exhibit her work, present at peer-reviewed conferences, publish as appropriate, ***improve her teaching***, and meaningful participate in her department, school, and university functions. She is thus recommended to be promoted to Professor.

JA1376 (emphasis added).

Palmer's 2016-2017 "Faculty Portfolio" reflected this professional and teaching success. Specifically, _unlike_ Palmer's evaluations from the prior two years, in _this_ evaluation, Chair Smith rated Palmer as "**_Meets Expectations_**" in Category 1 – i.e., the category relating to technology and digital skills. JA945. Thus, if Palmer had opened her "Faculty Portfolio Tool" at that time, she would have seen a bright **red** checkmark in the box corresponding to "Meets Expectations" on the question relating to technology. Given that the prior two years had been low ratings, this new positive rating affirmatively told Palmer that she was progressing just fine as to her technological skills.

The comments from both Chair Smith and Dean Hayes also were positive. Indeed, neither mentioned any alleged deficiencies for Palmer regarding the development of her skills in technology or digital arts.  To the contrary, both administrators praised Palmer.  Chair Smith wrote:

> Eva Palmer is to be commended for her recent advancement to full professor. **_Her work over the last couple of years is commendable and has helped inform her teaching and research_**.  Eva has presented at national and international conferences and continues to grow professionally. Eva also spends time mentoring students in studio art. Eva and two other SADA faculty were recently awarded an Illuminate Grant.  This will benefit our students, faculty, department, and school. Very good work. I recommend that Eva review her

21

student evaluations in areas that are <2.5 and devise a plan for improving these areas. Thanks for your work Eva!"

JA945 (emphasis added). And for Dean Smith:

Professor Palmer is to be congratulated for her recent promotion. ***Her work for the SADA department is appreciated by her chair and her peers***. She is an active participant in school and university committees; and her service as a club advisor is noted and appreciated. Professor Palmer has high marks from some student evaluations and low marks for others. Based on her comments, there may be a bit of a disconnect between her perspective and her student evaluations regarding clear communication, teaching style, and timely and helpful feedback. As she has sought promotion, Professor Palmer's creative and scholarly output has greatly increased, and she is strongly encouraged to continue this work.

JA946 (emphasis added).

### 5. What Liberty's Promotion Of Palmer To Full Professor Necessarily Meant.

Palmer's promotion necessarily meant that as of the end of the 2016-2017 school year and at the start of the 2017-2018 school year, she was performing at a high and satisfactory level of "teaching excellence." JA1312. Teaching, of course, is the most important criteria for promotion, and if Palmer had not been teaching at a high level, she would not have been promoted. Palmer's promotion also meant that she had *sufficiently*

satisfied the criteria – *including the criteria for digital and technological literacy* – contained in her PDP.

**6. Liberty Never Told, Or Even Hinted To, Palmer That She Needed To Improve Her Digital Literacy Or Face Possible Non-Renewal.**

As well, during this exact same time frame, Liberty never told – or even hinted to – Palmer that she needed to improve her digital literacy skills or else face dismissal. JA1347; JA1197. Indeed, both Chair Smith and Dean Hayes testified they never expressly said anything to Palmer that would have communicated to her such a message. JA1363-1364; JA1391-1392. Further, Dean Hayes could identify no communications where anyone at Liberty told Palmer that her classes were suffering from such dwindling enrollment that she might be replaced. JA1370.

**7. Despite Giving Her Strong Performance Ratings, And Mere Months After It Promoted Her To Full Professor, Liberty Started The Non-Renewal Process For Palmer.**

On January 23, 2017, at the beginning of the Spring Semester in 2017, Palmer's "School" -- the School of Communications & Creative Arts – celebrated her success and congratulated her on her promotion to Full Professor at a School-wide faculty meeting. JA1337; JA1365-1368. After

four years of perseverance and hard work, Palmer had finally reached the summit of her professional mountaintop at Liberty.

As well, just a few months later, on June 8, 2017, Palmer reaped the fruits of her labor when she signed her new "Faculty Contract." JA1377-1380. Unlike her 2016 contract, JA1372-1376, which titled her as an "Associate Professor of Art," JA1372, Palmer's new contract titled her as a "Professor of Art." JA1377. It also gave her a substantial raise. Whereas she had received a salary of $60,603 for the 2016-2017 school year, JA1372, Palmer now received a salary of $89,957.92, JA1377, for the 2017-2018 school year, an increase of ***$29,354.92***.

But less than four months later, Liberty made plans to terminate Palmer. Specifically, on September 29, 2017 – while Palmer was in the *very first semester of her very first year as a newly-minted Full Professor,* less than ten months after Liberty had promoted her to Full Professor, only eight months after Liberty had celebrated her promotion, and a mere four months after she had just signed her new Faculty Contract -- Dean Hayes decided that Palmer's employment should be non-renewed. *See* JA1403-1404; JA1369.

24

Hayes memorialized his decision in a document titled: "Personnel Needs/Request for FY 19." JA1404. Indeed, the document not only listed Palmer for non-renewal, it also showed that the School and Department intended to eliminate two _other older_ professors in Palmer's department, each of whom was at least fifty years old. *Id. See also* JA1347. But the document gave no reason as to _why_ Palmer's contract at Liberty would not be renewed. Instead, it simply noted that Liberty would save at least $63,035 dollars by not renewing her contract. JA1404.

> **8.    Liberty Moved Forward To Separate Palmer, But In Doing So, It Repeatedly Called Her Separation A "Retirement" And Also Made Unfounded Assumptions About Her Alleged Unwillingness To Embrace Change.**

Two months later, Dean Hayes and Chair Smith came up with some alleged reasons for Palmer's non-renewal. Specifically, in a memo dated November 30, 2017, JA1410-1411, Hayes wrote that Palmer's contract should not be renewed, in large part, because she had allegedly failed to develop "cross-over skills in studio and digital art." JA924. He explained that "[Chair] Smith has recommended for several years that Eva Palmer gain further skills with digital design software. To date this hasn't happened." *Id.*

25

To help support his assertion, Hayes copied and pasted – word-for-word – Smith's prior "Faculty Portfolio Tool" evaluation comments for Palmer from 2013-2014 and 2014-2015 where, in essence, he had told her to develop her skills in digital technology and communications.  JA1410-1411.  But these were the ***very same comments*** that were previously incorporated into Palmer's PDP, which, of course, she had satisfied when she was promoted.  JA1387-1388.  And conspicuously, Hayes did ***not*** include in his memo the fact that Chair Smith had just given Palmer a "Meets Expectations" in 2016-2017 for the very same category from which Hayes' "cut-and-paste" comments were taken.  JA945.

Dean Hayes' memo also conspicuously omitted other key types of documentation.  Dean Hayes' November 30, 2017 memo was written in direct response to an e-mail from Liberty's Senior Director for Academic Planning & Operations, where he asked Hayes to provide support for his non-renewal requests.  JA986.  In doing so, the Director expressly listed the types of items that qualified as "supporting documentation" – such as "documented ***warnings***," "***warnings that have taken place***" and "***corrective*** plan(s) of action."  JA986 (emphasis added).  Dean Hayes, however, provided nothing that remotely resembled such warnings or

anything that would have told Palmer she had better "shape up" or else be fired. That's, of course, because they did not exist.

Even odder, in this same time frame, Chair Smith sent a document to Hayes on November 15, 2017 where he listed Palmer as "Retiring," rather than calling her exit a "Non-Renewal" (which was an explicit option on the form). JA1341. This description is significant, because the guidelines for completing the form expressly state that by choosing the word "Retiring," the user is intending to identify someone who is "retiring at the end of the academic year." JA1339. Importantly, Palmer had never discussed retirement with Smith or Hayes – or anyone at Liberty – at any time. JA1347,

This incorrect characterization of Palmer's separation continued up through, and including, the final decision to end Palmer's employment. Specifically, in the final paperwork that was distributed as to Palmer's non-renewal, Liberty said it should "consider transition to retirement" for her. *See* JA1406-1408.

As a final odd comment about Palmer that occurred in this time, in January, 2018, Liberty's Provost, Dr. Scott Hicks, JA926, spoke with Dean Hayes about possible alternatives to non-renewal for the persons,

including Palmer, that Hayes had recommended for separation. JA926. One option was to give the members of this group one year's notice and see if they could make "substantial changes" during that time to address her alleged deficiencies. *Id. See also* JA1409 & JA991. This alternative contemplated that "[i]f there is a substantial change . . . perhaps there is no non-renewal process." JA1409 & JA991.

Dean Hayes, however, flatly rejected this option for Palmer. He wrote: "Professor Palmer . . will have great difficulty ***with any changes*** and this would most likely exacerbate the negative student experiences." *Id.*[7] (emphasis added). But this was pure speculation. But no evidence existed that Palmer would have resisted making the changes necessary to keep her job. Quite the opposite, Palmer's history with Liberty showed

---

[7] In his November 5, 2021 Declaration that he submitted to the District Court to support Liberty's summary judgment motion, Dean Hayes claims that he rejected this option because "[a]s Ms. Palmer had not followed through over many years on our recommendations to develop digital skills and become digitally literate, I had little confidence she would be able to within a semester as it would require extensive hours of instruction and learning on her part." JA926. <u>Almost four years earlier</u>, however, he made no such contemporaneous statements in his January 10, 2018 e-mail to Dr. Hicks. *See* JA1409 & JA991. And, again, this whole notion is belied by Palmer's multi-year effort at improving <u>*just about everything about herself*</u> at Liberty in order to attain promotion to Full Professor.

that she was fully willing and able to work diligently in order to achieve a desired goal -- namely, getting promoted to Full Professor. There was no reason to think she would not have employed the same strong work ethic and efforts simply to *keep her job*.

Moreover, Palmer was certainly *not* resistant to learning or using new technologies, as her teaching methods changed significantly during her 32 years at Liberty. JA1347. She started, for example, with overhead projectors and slide projectors in 1986, but then began using PowerPoint and Blackboard (a computer-based system) when such products became available at Liberty. *Id.* In fact, she used PowerPoint and Blackboard in conducting/administering her classes; including, introduction to courses, announcements, assignments and recording grades as well as using computers for research. *Id.* She also used computers and PowerPoint for her presentations at international conferences and for publishing her works. *Id.*

Palmer also had never rejected teaching or creating on-line courses at Liberty. JA1347-1348. To be sure, Chair Smith asked her to develop a such a course. However, after learning from Dean Mintle that developing the course optional (and not something that was required), Palmer opted

29

to decline developing the course <u>at that time</u>. *Id.* She did so because she was already incredibly busy with teaching a full-time schedule and trying to meet the requirements for promotion. *Id.* If Smith had believed that Palmer was incapable of teaching or creating an on-line course, he never would have asked her to do so in the first place.

Finally, Palmer was fully capable of teaching classes beyond the traditional studio arts classes. Notably, while at Liberty, Palmer taught: Drawing I, II, III, IV; Painting I, II, III, IV; Esthetics; Art Appreciation; Arts and Ideas; Humanities; 2-D Design; 3-D Design, and was well qualified to teach upper-level courses including ceramics. JA1348. In fact, Palmer's concentration was in ceramics for both her MA and MFA, and she taught ceramics and design courses at Central Virginia Community College. *Id.*

### 9. Palmer Committed No Misconduct In Between 2016-2017 and 2017-2018.

As a final point, Palmer did not engage in any kind of conduct between her promotion and her non-renewal that would have justified her non-renewal. Her skills did not deteriorate. JA1348. Her evaluations did not get worse. And she did not engage in any misconduct. *Id.*

**10.    With All This Said, Liberty Told Palmer Her Contract Would Not Be Renewed.   It Then Continued To Offer All Of The Same Courses That Palmer Had Previously Taught And Replaced Her With Younger Employees.**

With all this said, Liberty sent Palmer a letter in April 2018 that told her, _for the first time in 32 years_, that it would not issue her an employment contract for the upcoming academic year.  JA926.  Even so, it continued to offer _all of the classes_ that she had previously taught. JA1320-1321.

As well, notwithstanding that Liberty had previously claimed that Palmer's contract should not be renewed because she was allegedly unable to teach crossover courses, _at least one professor_ in Palmer's former department – Christopher Phillips -- has not taught **_any_** courses in graphic design since Palmer was let go.  JA1413-1414.  In fact, a basic review of Mr. Phillips' coursework since August 2018 shows he has taught **_zero classes_** during that time that require extra-special digital skills. JA1419.

Liberty also replaced Palmer with younger employees. Of note, Dean Hayes specifically told the Provost's office in January 2018 that he would be requesting "replacements" for Palmer, as well as the two other

art professors who were being let go. JA1425. And, indeed, in the next two semesters, he _did_ replace Palmer (and the two other non-renewed professors) with three individuals who are indisputably younger than Palmer. *See* JA1426-1428 (Liberty Web Profile for Brianna O'Neal, who was hired at the base rank of Instructor); JA1429-1431 (Liberty Web Profile for Audra Rygh, who was hired at the base rank of Instructor); and JA 1432-1434 (Liberty Web Profile for Joel Cockrell, who was hired at the base rank of Instructor). As anyone with eyes can observe, all three of these newly hired individuals are substantially younger than Palmer.[8] *See also* JA1348.

As for one other issue, in the District Court below, Liberty tried to claim Palmer's "official" replacement was Caleb Havertape, However, Havertape was hired _more than seventeen months_ after Palmer had left. JA1418. So, he was at least the fourth hire in the Department since Palmer had been non-renewed. In the meantime, Palmer's courses had been taught primarily by Mr. Cockrell, JA1417, who, as noted above, was

---

[8] *See, e.g., Westmoreland v. TWC Administration, LLC*, 924 F.3d 718, 724 (4th Cir. 2019) (crediting witness testimony about the relative age of old and new employees because the witness conceded he "could assume by looking at them that Westmoreland's replacement was younger")

one of the *young* hires Liberty made after it non-renewed Palmer. Even more, as Hayes explained in his summary judgment declaration to the District Court, Liberty hired at least one adjunct faculty member to teach some of Palmer's courses. JA927.

## B.    Statement Of The Relevant Procedural History

After Palmer exhausted her administrative remedies with the EEOC, she filed a one-count Complaint against Liberty alleging age discrimination in violation of the ADEA. JA8-13.

Initially, Liberty moved for summary judgment on the ground that Palmer's ADEA claim was barred by the "ministerial exception" under the First Amendment. JA24-26. Palmer opposed Liberty's motion, but, at the same time, she also cross-moved for summary judgment on the same issue, arguing that the "ministerial exception" did not apply to her as a matter of law. JA253-254. The District Court heard oral argument on the two motions, JA883-910, and issued an order (along with a memorandum opinion) that denied Liberty's motion and granted Palmer's motion. JA1442-1459.[9]

---

[9] Liberty has challenged this ruling in its cross-appeal, but it is not part of Palmer's appeal-in-chief here or addressed in this brief.

Liberty also filed a second summary judgment motion as to the merits of Palmer's ADEA claim. JA911-912. After full briefing and oral argument, *see, e.g.,* JA4-5; JA1460-1489, the District Court granted Liberty's motion and dismissed the Complaint. JA1516. This appeal followed. JA1517-1518.

## C. RULINGS PRESENTED FOR REVIEW

In granting Liberty's summary judgment motion, the District Court considered four legal issues: "(1) whether Palmer has established direct evidence of discrimination; (2) if she has not established direct evidence, whether she has established sufficient indirect evidence to make out a *prima facie* employment discrimination case under the analysis laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); (3) if she has made out a *prima facie* case, whether Liberty has proffered a legitimate nondiscriminatory reason for not renewing her contract; and (4) if Liberty has proffered a legitimate nondiscriminatory reason, whether that reason is merely a pretext for age-based discrimination." JA1498. Issues (1), (2), and (4) are presented for review, and Palmer contends the District Court's analysis of each of these three issues – which includes its

34

application of *Proud v. Stone*, *supra* and its analysis of "but for" causation -- was erroneous.

## SUMMARY OF ARGUMENT

The District Court committed four errors below when it granted Liberty's motion for summary judgment on the merits of Palmer's ADEA wrongful termination claim.

First, the District Court erred by concluding that comments calling Palmer's non-renewal a "Retirement" or "Retiring" and a comment saying that Palmer should not be offered an opportunity to improve her digital teaching skills because she would not "change" were not direct evidence of age discrimination. This is so because they were made (i) by employees involved in the decision-making process; (ii) during the decision-making process; (iii) about Palmer; and (iv) related to age.

Second, the District Court erred by concluding that Palmer failed to present facts showing circumstantial evidence of age discrimination. It wrongly viewed the positive evidence of Palmer's strong performance and, especially, her promotion, when concluding that she had failed to show she was meeting Liberty's employment expectations and thus failed to meet the third prong of her *prima facie* case. It similarly failed to

properly view much of this same evidence – together with facts about Professor Phillips and the ageist comments from Chair Smith and Dean Hayes – when concluding that Palmer had failed to raise an issue of fact as to whether Liberty's proffered reason for her non-renewal was pretext.

<u>Third</u>, the District Court erred in applying the "same actor inference" to this case, where (i) the issue was not timely raised; (ii) the individual actors involved in promoting Palmer and then recommending that Palmer be dismissed were not the same; and (iii) genuine issues of fact existed as to whether the inference was rebutted.

<u>Fourth</u>, based on all of the record evidence, the District Court erred in concluding that Palmer failed to raise an issue of material fact as to whether age was the "but-for" cause of Liberty's decision not to renew her contract.

<b>ARGUMENT</b>

## I. STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment de novo." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001). Under this standard, the decision below is neither binding on this Court nor entitled to any deference. "De novo review … signals no

36

need to protect the primacy of another decisionmaker, because the reviewing court can perform the task as capably as the decisionmaker under review." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 n.1 (4th Cir. 2008).

## II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO LIBERTY ON PALMER'S ADEA CLAIM.

### A.  Standards Applicable To ADEA Claims

"The ADEA prohibits employers from refusing to hire, discharging, or otherwise discriminating against any person who is at least 40 years of age 'because of' the person's age." *E.E.O.C. v. Baltimore Cty.*, 747 F.3d 267, 272 (4th Cir. 2014) (citing 29 U.S.C. §§ 623(a)(1), 631(a)). Its passage "has helped to bring equality and fairness to the workplace for older workers."[10] Even so, even after "50 years of a federal law whose purpose is to promote the employment of older workers based on ability, age discrimination remains too common and too accepted."[11]

---

[10]https://www.eeoc.gov/reports/state-age-discrimination-and-older-workers-us-50-years-after-age-discrimination-employment; *The State of Age Discrimination in the U.S. 50 Years After the Age Discrimination In Employment Act (ADEA)*; EEOC; Victoria A. Lipnic; (June 2018).

[11] *Id.*

"An employee who alleges that her employer violated [the ADEA] 'must prove by a preponderance of the evidence (which may be direct or circumstantial) that age was the but-for cause of the challenged employer decision.'" *Westmoreland*, 924 F.3d at 725 (quoting *Gross v. FBL Fin. Serv. Inc.*, 537 U.S. 167, 177-178 (2009)). In the wrongful termination context, this means that "the employee must prove that the employer *would not have fired her* in the absence of age discrimination," *id.* (emphasis in original), although she need not prove that her age was the "sole cause" of the adverse action. *Arthur v. Pet Dairy*, 593 Fed. Appx. 211, 220 (4th Cir. Feb. 9, 2015).

A plaintiff can prove an ADEA claim in one of two ways, either "(1) under ordinary principles of proof using any direct or indirect evidence relevant to and sufficiently probative of the issue, or (2) under a judicially created proof scheme originally used in the Title VII context in *McDonnell Douglas Corp. v. Green* ... and subsequently adapted for use in ADEA cases." *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citations omitted). Here, Palmer proved (or at least raised genuine disputes of material fact about) age discrimination under both methods of proof, and the District Court erred when it held she did not.

## B.     Palmer Provided Direct Evidence Of Age Discrimination.

The first issue for this Court is whether Palmer presented direct evidence of age discrimination.  The District Court said "No," but it was wrong.

This Court defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor ..." *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 485 (4th Cir.1982) (citing *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1113 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981)). Stated otherwise, it is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir.1995), *abrogated on other grounds, Desert Palace, Inc. v. Costa*, 539 U.S. 90, 95 (2003) (evidentiary standard for mixed-motive jury instruction).

In the context of ADEA claims, "[d]erogatory comments about an employee's age may be direct evidence of age discrimination, provided they _concern the employee's age_ and sufficiently _demonstrate that the employer's age-related animus affected the employment decision at issue_."

*Arthur*, 593 Fed.Appx. at 218 (emphasis added). *See Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 751 (4th Cir.1999) (finding ADEA plaintiff met burden to "present affirmative evidence of age-based animus" by offering "his testimony regarding the comments relating to his age" made by decisionmaker for employer).

In determining whether comments constitute "direct evidence," this Court has looked to the four-part test created by the Fifth Circuit. *Arthur*, 593 Fed. Appx. at 219 (citing *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir.2010)). Under this test, "[c]comments must be '1) related to the protected class of persons of which the plaintiff is a member; 2) proximate in time to the complained-of adverse employment decision; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'" *Id.* (quoting *Jackson*, 602 F.3d at 380).

Here, Palmer provided two types of comments from certain Liberty officials that satisfy all of these test criteria and thus constitute direct evidence of age discrimination.

40

### 1.    "Retirement" Comments.

The first comments that are direct evidence of age discrimination are those that referred to Palmer as "retiring," even though she had never told anyone at Liberty she wished to retire.  JA1347.  The first comment was written by Chair Smith on his non-renewal form, JA1341, where he described Palmer's non-renewal as "_Retiring_." The second comment then flowed from the first and involved the Provost's comments on a March 16, 2018 personnel document (just a month before Palmer was sent her non-renewal letter in April of 2018, JA926) where he said Palmer was being "Consider[ed]" for a "transition to _retirement_."  JA1407.  Both comments were: (i) comments related to age; (ii) proximate in time to Palmer's non-renewal; (iii) made by individuals with authority over Palmer's non-renewal; and (iv) related directly to her non-renewal.

For its part, the District Court held these comments were _not_ direct evidence age discrimination, reasoning that these comments appeared to have been made *after* Liberty had already decided not to renew Palmer's contract. JA1507. But this is not accurate. Instead, the actual final decision not to renew Palmer's contract necessarily occurred *after* Chair Smith sent his list of proposed non-renewal candidates on November 15,

41

2017 and *after* Hayes, to whom Chair Smith sent his proposed list of non-renewal candidates, JA1340, sent his separate November 30, 2017 memo, *see* JA1410-1411, trying to justify the non-renewal of Palmer's contract. Moreover, no final decision had been made even as late as January 2018, when Hayes nixed the option of allowing Palmer to have an extra year to try to improve her digital skillset in order to avoid being separated from employment.  JA1409 & JA991.

In short, the non-renewal decision-making process was still ongoing as of November 2017 when it was then infected with age-bias when Chair Smith improperly injected the idea of retirement – i.e., age considerations – into the process.

The District Court also improperly minimized the capacity for comments about "retirement" to qualify as direct evidence of age discrimination.  JA1507. This too was wrong. Indeed, while courts have held that an employer's neutral "inquiries into retirement plans do not generally constitute evidence of discrimination," *MacDonald v. UPS*, 430 Fed. Appx. 453, 460 (6th Cir. 2011), Chair Smith's "retiring" comment was not neutral. He did not simply *ask* Palmer about retirement. Instead, he characterized Palmer's non-renewal in a stereotypically ageist way and,

thus, whether consciously or not, evidenced age bias. *See Skaggs v. Van Alstyne Independent School Dist.*, 2017 WL 77825 at *11 (E.D. Tex. Jan. 9, 2017) ("Comments that demonstrate discriminatory animus often reflect biased or stereotypical understandings about age.")."[A]ge discrimination is often subtle and 'may simply arise from an unconscious application of stereotyped notions of ability rather than from a deliberate desire to remove older employees from the workforce.' " *Brooks v. Woodline Motor Freight, Inc.*, 852 F.2d 1061, 1064 (8th Cir.1988)).

### 2. Hayes' Comment, Based On Unfounded Assumptions That Palmer Would Have "Great Difficulty With Any Changes"

The second item of direct evidence was Dean Hayes' comments that Palmer should not be given an extra year to develop her digital arts skills because he believed – based on unfounded assumptions – that she would "have great difficulty with any changes, and this would most likely exacerbate negative student experiences." JA1409 & JA991. Even more so than a remark or two about "retirement," this comment reflects exactly the kind of age-based bias the ADEA was designed to prohibit. It plainly constitutes direct evidence of age discrimination, and the District Court erred when it held it did not.

43

Indeed, as courts repeatedly have held, negative comments about an older employee's ability to adapt to change are classic examples of age bias. *See, e.g., Machinkchick v. PB Power, Inc.*, 398 F.3d 345, 353 (5th Cir. 20015) (finding comments in emails that employee "had a 'low motivation to adapt' to change" and that characterized employee "as 'inflexible,' 'not adaptable,' and possessing a 'business-as-usual attitude' " could "support an inference of age discrimination"); *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507 & n.4 (5th Cir. 1988) (finding supervisor's comments on employee's "inability or willingness to 'adapt' to new systems in the department" and that employee "looked 'sharp' if he was going to look for another job" could "carry[ ] an age-based pejorative implication").

The District Court refused to impute an age-based bias into Dean Hayes' comments because it believed that to do so would be "conjecture and speculation." JA1508. However, it was actually <u>*Dean Hayes*</u> who was speculating and conjecturing when he falsely ascribed to Palmer the idea that she would not be willing to "change" her teaching in order to keep her job. In fact, such a notion is directly belied by the fact that Palmer greatly changed *and improved* her professional and teaching skills as part of her efforts to be promoted. There is no reason to believe she would

not have acted in exactly the same fashion regarding digital arts if she knew doing so would let her keep her job. And while the District Court said it did not believe Hayes' comments about "change" revealed a concern about age, it failed to recognize the ageist bias that is inherently embedded in such a comment, especially when it was made so soon *after* Chair Smith had already spoken about Palmer's so-called "retiring."

### C. Palmer Satisfied All Of The Criteria Necessary For Establishing Circumstantial Evidence Of Age Under The *McDonnell Douglas* Test.

The second issue for this Court to review is whether Palmer presented circumstantial evidence of age discrimination. Again, the District Court said "No," and, again, it was wrong.

A plaintiff seeking to prove an ADEA claim through circumstantial evidence must proceed under the three-step framework from *McDonnell Douglas*. Under this analysis, "(1) the plaintiff must establish a prima facie case of discrimination; (2) if the plaintiff presents a prima facie case, then the burden shifts to the defendant to show a legitimate and non-discriminatory reason for the adverse employment action; and (3) if the defendant shows such a reason, then the burden shifts to the plaintiff to

prove that the reason is pretextual." *Waters v. Logistics Management Institute*, 716 Fed.Appx. 194, 197 (4ᵗʰ Cir. Feb. 8, 2018).

"To establish a prima facie case of unlawful age discrimination, [a plaintiff]' must show that (1) he is a member of the protected class; (2) he was qualified for the job and met [Liberty's] legitimate expectations; (3) he was discharged despite his qualifications and performance; and (4) following his discharge, he was replaced by a substantially younger individual with comparable qualifications." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4ᵗʰ Cir. 2006). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

A plaintiff's burden for establishing a prima facie case is "relatively modest," *Bryant v. Aiken Regional Medical Centers, Inc.*, 333 F.3d 536, 545 (4ᵗʰ Cir. 2003), and is "not onerous." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4ᵗʰ Cir.1995). To the contrary, all a plaintiff must do is present evidence "that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law." *Id.*

"Once a plaintiff makes out a prima facie case, the burden shifts to the employer to put forth a nondiscriminatory explanation for its actions." *Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643, 650 (4th Cir. 2021). Then, "[i]f the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was actually a pretext for discrimination." *Id.* (citations omitted).

Here, the District Court held that: (i) Palmer had failed to make out a *prima facie* case of age discrimination because she failed to show that she met Liberty's employment expectations (the third prong of the prima facie case analysis), JA1510, and (ii) even if she had made out a *prima facie* case, Palmer failed to show Liberty's proffered nondiscriminatory reason for deciding not to renew her contract was pretextual. JA1511. It erred on both counts.

    1. **The Record, When Viewed In Favor Of Palmer, Showed That Palmer Was Either Meeting Liberty's Legitimate Employment Expectations *Or* That Such Expectations Were Not Legitimate.**

        a. **The "Legitimate Employment Expectations" Prong Does Not Require An Employee To Be "Perfect" And Must Be Carefully Applied.**

First is the third prong of the *prima facie* case analysis – the "meets the employer's legitimate employment expectations" prong. "To satisfy

this factor, a plaintiff need not 'show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations.'" *Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643, 650 (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)).

This Court also has recognized the "danger that courts might apply the 'expectations' or "qualification' element of the prima face case too strictly in some cases." *Warch*, 435 F.3d at 516. As such, it has stated that "the *McDonnell Douglas* framework should not be applied in a rigid, mechanized, or ritualistic manner." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 611 (4th Cir. 1999).

> **b. The Record Evidence Overwhelmingly Showed That Palmer Was Meeting Liberty's Expectations Or That Such Expectations Were Not Legitimate.**

With the above standards in mind, the record evidence showed that Palmer was meeting Liberty's legitimate employment expectations at the time of her non-renewal or that such expectations were not legitimate. The District Court erred in concluding otherwise and, in fact, applied way too high a standard of proof in analyzing this factor.

48

The record evidence in favor of Palmer was overwhelming. Among other things, it showed: (i) in her final full evaluation at Liberty, Palmer was "Meet[ing] Expectations" as to the development of technological skills, JA945, and meeting or exceeding her expectations as to everything else; (ii) Palmer's promotion to Full Professor evidenced her excellence in teaching, including technological skills, JA1312.; (iii) Palmer's promotion to Professor negated any adverse implications associated with Smith's and Hayes's prior comments about her allegedly deficient technological skills, *see* JA945 & JA1387-1388; (iv) less than four months before Hayes decided not to renew her contract, Palmer had signed a faculty contract that gave her an almost $30,000 annual raise, JA1377; (v) Palmer had never been disciplined by Liberty for failing to meet the allegedly important digital arts requirements; (vi) Palmer had never been warned that she might be non-renewed for failing to meet any type of digital arts requirement, JA1347; (vii) even *after* Palmer was let go, *others* in her department did not have to teach digital or graphic arts classes, JA1413-1414; and (viii) Chair Smith's and Dean Hayes' age-based comments in the fall of 2017 cast doubt about the legitimacy of their expectations for Palmer, JA1341; JA1406-1408; JA1409 & JA991.

On the other hand, the District Court held that Palmer had failed to meet Liberty's expectations because Liberty "put forward substantial evidence documenting repeated attempts to *prompt* Palmer to develop a digital arts skillset" – which she did not develop. JA1510 (emphasis added). But, in doing so, it ignored <u>*all*</u> of the above evidence. Indeed, the District Court utterly failed to acknowledge, much less mention, Palmer's argument that, by *being promoted to Full Professor in <u>2016-2017</u> and by receiving a "Meets Expectations" rating in <u>2016-2017</u>*, she had negated Liberty's "prompts" about digital skills – all of which <u>*predated*</u> these key events. This, failure, by itself, defeats the District Court's holding. As this Court has noted, a district court commits reversible error when it "impermissibly 'credit[s] the evidence of the party seeking summary judgment and <u>*fail[s] properly to acknowledge key evidence offered by the party opposing that motion.*</u>'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 570 (4th Cir. 2015) (quoting *Tolan v. Cotton*, 134 S.Ct. 1861, 1867-68 (2014)) (emphasis added).[12]

---

[12] Also in this regard, the District Court made the strange assertion that in its opinion that "Palmer did not understand the Professional Development Plan as disciplinary," JA1499, as if to suggest that the characterization of the plan was somehow ambiguous or that Palmer's perception was the only factual basis for the claim that the plan was not

50

Even more, to borrow the words of a New York judge, the District Court's analysis "attempts to slice the onion way too thin." *United States ex rel. JDJ & Associates LLP v. Natixis*, 2017 WL 4357797 at *9 (S.D.N.Y. Sept. 29, 2017). The District Court simply accepted Liberty's claims about digital arts at face value, rather than putting them into the entire context for which they belong. And it assumed Liberty's expectations for Palmer were legitimate, even though the record evidence strongly showed they were not. This was error.

Indeed, the federal reporters are replete with decisions from district courts in this circuit where, based evidence equal to or lesser than that presented by Palmer here about her performance, they *denied* summary judgment to employers on this prong. *See, e.g., Foster v. Summer Village Community Association, Inc.*, 520 F. Supp.3d 734, 743 (D. Md. 2021) (holding plaintiff met burden for "expectations" prong because evidence showed "that just two months before her termination," she "received a satisfactory performance evaluation and pay raise"); *Linkous v. StellarOne Bank*, 2013 WL 2423076 at *4-5 (W.D. Va. June 4, 2013)

---

disciplinary. This is not remotely the case. Palmer's assertion that the plan was not disciplinary in nature came straight out of the mouth of her former chair, Chair Smith, from his deposition testimony. JA1399.

(denying summary judgment on this prong because "Ms. Linkous received entirely positive performance reviews for the two years immediately prior to her termination"); *Murry v. Jacobs Tech., Inc.*, 2012 WL 1145938, at *10 (M.D.N.C. Apr. 5, 2012), *aff'd,* 568 F. App'x 265 (4th Cir. 2014) (finding question of fact where plaintiff provided evidence that, prior to his termination, no one had alerted him that his performance was deficient); *El-Hage v. Levitt*, 2007 WL 9782573 at *5 (D. Md. Sept. 19, 2007) (concluding plaintiff had satisfied his burden for "expectations" prong where he "present[ed] his consistently positive performance evaluations."); *Rishel v. Nationwide Mut. Ins. Co.*, 297 F. Supp.2d 854, 869-870 (M.D.N.C. 2003) (holding that plaintiff had met expectations prong where evidence showed, *inter alia*, "[h]is performance evaluations demonstrated that he was performing his job requirements at a level that met or exceeded his employer's expectations.").[13]

The District Court's ruling on this prong is against the weight of all of this substantial authority and is contrary to this Court's admonition

---

[13] *See also Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 927 (4th Cir. 2007) (finding that there was a triable issue of fact where there was no documentation of the alleged problems with plaintiff's performance or work habits).

that when "the evidence creates a close call ..., we must remember that 'the burden of establishing a prima facie case of disparate treatment is not onerous.' "*Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 960 (4ᵗʰ Cir.1996).

### c. Precedent From This Court Confirms, If Not Magnifies, The District Court's Error As To This Prong.

Finally, precedent from this Court – including recent precedent – confirms, if not magnifies, the District Court's error on this prong.  This Court's recent decision in *Sempowich, supra*, is particularly instructive.  There, this Court *reversed* the trial court's summary judgment holding on the third prong.  In doing so, it pointed to exactly the type of evidence that Palmer has presented here.  It said:

> If an employer ***genuinely believed*** that one of its employees was performing poorly on metrics the employer perceives as critical (as Tactile claims here), it seems likely that it would at the very least ***not*** rate the employee's performance ***highly*** or give her awards, a salary raise, or an equity grant. And yet there is evidence that Tactile (1) consistently rated Sempowich's overall performance highly. . . ; (2) repeatedly gave her awards, including one for Sustained Excellence three weeks before it told her that it would reassign her position; (3) told her that it would ***give her a salary raise*** three weeks before it told her that it would reassign her position; and (4) gave her a discretionary equity grant twelve days before it told her that it would reassign her position.

53

*Sempowich*, 19 F.4th at 650-651 (emphasis added). The same is true here. If Liberty had *genuinely believed* that Palmer was performing poorly on the digital skillset metrics, it would *not* have the year before: (i) promoted her to Full Professor; (ii) given her high performance ratings; or (iii) given her an almost $30,000 raise.

What is more, this Court in *Sempowich* also applied precisely the type of logical reasoning that Palmer has espoused here – and which the District Court refused to acknowledge. There, the company's Senior Vice President of Sales testified that he had discussed problems in plaintiff's sales region "on a number of occasions" and that the problems had existed since 2015. *Id.* at 649. Since the problems – and the plaintiff's "apparent weaknesses" -- had existed since 2015 and had allegedly not changed, he said *that – and not discrimination* -- was the reason that the plaintiff was transferred to a lesser position in 2018. *Id.* at 651.

But this Court flatly rejected this assertion once all of the contrary positive evidence about plaintiff's performance was considered. It said: "[g]iven the awards, salary raise, and equity grant that Tactile has given Sempowich since 2015, a reasonable factfinder could find this *testimony not credible*." *Id.* (emphasis added). Again, the same is true here. Given all of the positive ratings, raise, and promotion for Palmer, a reasonable

factfinder could find that Dean Hayes' and Chair Smith's claims that it had to let Palmer go because of her allegedly deficient digital skillset "not credible."

By contrast, Palmer's evidence looks nothing like the mountain of bad performance evidence that existed in *Warch, supra*, where this Court held that the plaintiff there had clearly *failed* to meet the third prong. Tellingly, this Court in *Warch* said that given the fact he had received numerous warnings, a "formal" counseling form, and even probation, the plaintiff's "termination ***should not have been a surprise***."  *Warch*, 435 F.3d at 512 (emphasis added) & 512-513.  The same cannot be said here. Despite the "prompts" from Chair Smith to Palmer, absolutely nothing in the months (or even years) preceding her non-renewal – especially when compared with all of her positive performance metrics -- would have alerted Palmer that her job was in jeopardy or that her performance was deficient.  *See* JA1347-1348.

> **2. The Facts, Viewed Favorably To Palmer, Showed That Liberty's Alleged Reason For Not Renewing Her Contract Was Pretextual.**

Second is the issue of pretext – namely, whether Liberty's proffered nondiscriminatory reason for not renewing Palmer's contract was a

pretext for age discrimination. "A plaintiff can prove pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *White v. W.R. Winslow Mem'l Home, Inc.*, 211 F.3d 1266 (Table), 2000 WL 346497, at *2 (March 15, 2000) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994) (further citation omitted). "[O]nce the plaintiff offers such circumstantial evidence, the case must be decided by the trier of fact and cannot be resolved on summary judgment." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019).

   a.   **All Of The Prior *Prima Facie Case* Evidence Proves Pretext.**

Here, viewed in the light most favorable to Palmer, the record facts raise serious doubts about the veracity of Liberty's proffered basis for not renewing Palmer's contract. As was true in *Sempowich*, where the third prong of the *prima facie* case analysis substantially overlapped with the issue of pretext, "[m]uch of the evidence has already been discussed [herein] in consideration [Palmer's] prima facie case." *Sempowich*, 19 F.4th at 652. *See infra* at 47-55. Indeed, viewed in light of Palmer's *promotion* from *just a year earlier, including the criteria used for the*

*promotion and the import of what a promotion necessarily means under Liberty's own Faculty Handbook and Faculty Portfolio Tool criteria,* Liberty's claim that Palmer was not meeting its expectations is belied by a mountain of record evidence.

### b.   Hayes' Muddled *Post Facto* Explanation Of Palmer's Promotion Proves Pretext.

For its part, Liberty tried below to muddle and minimize the value and importance of Palmer's promotion, Liberty claims that "[a]s a result of meeting the ***scholarship objective alone***, Ms. Palmer was promoted to Full Professor in October of 2016." *Palmer v. Liberty University, Inc.*, 6:20cv0031 (W.D. Va.), Dkt Etry 28 at 8. This is nonsense. First, it is belied by Liberty's express criteria for promotion. Second, it is inconsistent with the express statements from both the Promotion Committee and Dean Hayes as to why Palmer was promoted, neither of which were limited solely to scholarly successes. Third and finally, the source – Dean Hayes -- of Liberty's statement about the rationale for its promotion of Palmer is incompetent to speak about the rationale for Liberty's decision. Dean Hayes was deposed as Liberty's 30(b)(6) representative on this topic and was asked "What was the factual basis upon which the promotion committee recommended that Ms. Palmer be

promoted to full professor?" JA1313. In response, he, said nothing about the decision being limited solely to scholarship, and, instead, said "I imagine that you have the document that summarizes the decision. JA1317-1319. He also admitted he had no knowledge about the promotion process beyond his own involvement. *Id.*

What this means is that when Liberty was confronted with the obvious incongruity between the fact that it promoted Palmer to Full Professor using one set of criteria and the decided not to renew her based on identical metrics, it decided, *post hoc*, to try to invent a difference between the two. This is evidence of pretext. *See E.E.O.C. v. Sears Roebuck and Co.,* 243 F.3d 846, 852–53 (4th Cir. 2001) (inconsistent reasons and post-hoc rationalizations are "probative of pretext")

### c.    The Fact That Professor Phillips Has Not Had To Teach Graphic Design Shows Pretext.

As well, the fact that since she left, at least one professor Palmer's former Department has taught *ZERO* graphic design (i.e., digital art-focused) classes shows pretext as to Liberty's claim that she needed to be able to have cross-over skills in order to remain with the University. If he has not been required to teach *any* "digital" classes in the <u>*three years*</u>

since Palmer left, there's no reason to believe that *she* could not have done the same. Since this fact greatly undermines Liberty's alleged rationale for Palmer needing cross-over skills, it is evidence of pretext. *Haynes*, 922 F.3d at 225 (a plaintiff may prove falsity by showing "that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact.").

> **d.    Liberty's Age-Related Comments Prove Pretext.**

As well, Liberty's age-based comments about trying to transition Palmer to "retirement" and Palmer being resistant to "change" are evidence that prove pretext, regardless of whether they qualify as direct evidence of discrimination. As has been explained, "[e]ven where such evidence of [age] bias proves insufficient to prove an employee's case through direct evidence, it can be relevant in the circumstantial framework to show that the employer's proffered reasons were pretextual." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 771 (11th Cir. 2005). *See also Fife v. MetLife Group, Inc.*, 411 F. Supp.3d 149, 160 (D. Mass. 2019) (employer's retirement-related comments were evidence of pretext; summary judgment denied); *King v. CVS Caremark Corp.*, 2 F. Supp.3d 1252, 1261 (N.D. Ala. 2014) (repeated retirement-

59

related questions from plaintiff's boss to plaintiff were evidence of age-related bias for purposes of showing pretext; summary judgment denied). *Marlow v. Chesterfield County School Bd.*, 749 F. Supp.2d 417, 435-436 (E.D. Va. 2010) (comments about plaintiff lacking "21st Century Skills" were evidence of age bias for purposes of showing both pretext *and* but-for causation). *See also* cases cited at pp. 43-44, *infra*.

### e.    The District Court Erred.

With all this said, the District Court erred in its "pretext" analysis. As it did with its *prima facie* case analysis, the District Court simply took Liberty's nondiscriminatory reason at face value and, again, said *nothing* about how Liberty's reason was substantially called into doubt by (i) the crucial interplay between Liberty's own promotion and rating criteria (which included Palmer's PDP and the issues of developing a digital arts skillset) and the fact that Palmer was indeed promoted according to these criteria; (ii) the fact that Palmer's former colleague, Professor Phillips, taught *no* graphic design classes after she left, despite Liberty's claim that *all* professors needed to be able to do so; and (iii) the ageist comments by Dean Hayes and Chair Smith made *while* the non-renewal process was taking place. Indeed, it is striking that *nowhere in its 19 page opinion*

60

does the District Court ever mention Professor Phillips or the incongruity of his lack of having to teach digital arts classes, on the one hand, and the claim that Palmer should be required to do so, on the other. Instead, it ignored this – and all the other above evidence and focused improperly on the "same actor inference" (discussed in the following section) to hold in favor of Liberty.  JA1512-1513. Again, this was error.

### D. The District Court Erred When It Applied, *As A Matter Of Law*, The "Same Actor Inference."

As noted above, rather than recognizing, or favorably construing, Palmer's record evidence, especially on the issue of pretext, the District Court held that Liberty was entitled to summary judgment based in large part on the same actor inference from *Proud v. Stone*, 945 F.3d 796, 797-798 (4th Cir. 1991).  This was wrong for at least three reasons.

First, the inference was not properly or timely raised by Liberty. Despite having full knowledge well before it filed its summary judgment motion of its (albeit incorrect) belief that there was an inconsistency between the notion that the same persons who promoted Palmer would then later discriminate against her[14],  Liberty did **<u>not</u>** raise this issue as

---

[14] Indeed, weeks before it filed its summary judgment motion, Liberty, through its counsel, repeatedly questioned Palmer in her deposition,

part of its main summary judgment argument and, instead, raised it for the first time in its reply memorandum. *Palmer v. Liberty University, Inc.*, 6:20cv0031 (W.D. Va), Dkt Etry 31 at 5-6. This was improper, and the District Court should never have even considered the argument. *Clawson v. FedEx Ground Package Sys. Inc.*, 451 F. Supp.2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

Second, on a substantive level, *at the very least*, a genuine dispute of material fact existed as to whether the inference even applied in this case. To be sure, Dean Hayes was partially involved in the promotion process and Chair Smith tangentially so. But their support of Palmer's promotion occurred (i) *only after* the Promotion Committee made its recommendation, (ii) *well before* the final decision was made, and (iii) largely through the involvement of Dean Mintle (who was **not** involved in the decision not to renew Palmer's contract). Indeed, Dean Hayes, in his deposition, admitted that he had no idea how the Promotion

---

about its belief that the same actor inference applied in this case. JA1259-1261.

Committee even made its recommendation and was not involved in the decision- making process.

Third, there is at least a genuine issue of material fact as to whether the inference has been rebutted in this case. In the first place, this Court has held that this inference is rebutted when a plaintiff has presented direct evidence of discrimination through derogatory comments. *Adams v. Greenbrier Oldsmobile/GMC/ Volkswagen, Inc.*, 172 F.3d 43 (4th Cir. 1999) (unpublished) (reversing the district court's judgment in part and holding the Proud inference disappeared when the employer "specifically identifi[ed] Adam's disability as the reason for the challenged termination"). We submit we have done so here.

In the second place, as was true in *Sempowich*, there is a genuine dispute of material fact as to whether Smith and Hayes recommended Palmer for promotion "under protest." *Sempowich*, 19 F.4th at 653. Each individual had long been unsupportive of Palmer, and, indeed, both had *declined* to support her for promotion *until* Dean Mintle intervened and helped develop a plan that would allow Palmer to succeed. Even more, Hayes's unfounded comments about Palmer's unwillingness to change evidenced his true feelings about Palmer – i.e., that she needed to go

63

because she was old, regardless of her promotion.  In this sense, then, it is far more likely that Smith's and Hayes' support of Palmer's promotion in 2016 was the exception, not the rule, and that, in fact, the promotion was the equivalent of the proverbial "gold watch" given to an older employee on his or her retirement.

### E.    As A Final Matter, A Genuine Dispute Of Material Fact Existed As To "But For" Causation.

As its final error, the District Court held that Palmer's evidence did not raise at least a genuine dispute of material fact as to whether age was the "but for" cause of her dismissal.  JA1514.  Like its other rulings, this too was incorrect.  As this Court explained in *Arthur*,

> Age discrimination cases often present more than one reason for an employer to take adverse action against an employee, but an employee ***need not refute each negative mark on his record or every possible legitimate ground for the employment decision*** to avoid summary judgment.

593 Fed.Appx. at 220 (emphasis added). Here, given the abundant evidence undermining the genuineness and legitimacy of Liberty's proffered nondiscriminatory reason, Palmer, at least, raised a genuine

dispute of material fact about whether, if she had not been 79 years old

(i.e., older), she would have been let go.[15]

## CONCLUSION AND REQUEST FOR RELIEF

In conclusion, for all of the reasons explained herein, the District

Court's summary judgment decision in favor of Appellee is erroneous. It

should be vacated, and this Court should remand the case for trial.

## REQUEST FOR ORAL ARGUMENT

Because of the importance of the issues raised in this appeal,

Appellant submits that oral argument should be had in this case.

/s/ Richard F. Hawkins, III
Richard F. Hawkins, III
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, VA  23220
(804) 308-3040

*Counsel for Appellant / Cross-Appellee*

---

[15] Indeed, Palmer's counsel addressed this very issue at oral argument below by comparing Palmer to a similarly-situated 30-year old.  JA1478.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

this document contains <u>12,919</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14-point Century Schoolbook</u>.

This the 15th day of April, 2022.

<u>/s/ Richard F. Hawkins, III</u>
Richard F. Hawkins, III
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, VA  23220
(804) 308-3040

*Counsel for Appellant/Cross-Appellee*