## RECORD NOS. 21-2390(L); 21-2434 XAP

In The

# United States Court Of Appeals
## For The Fourth Circuit

**EVA PALMER**

*Plaintiff – Appellant/Cross-Appellee,*

**v.**

**LIBERTY UNIVERSITY, INC.,**

*Defendant – Appellee/Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT LYNCHBURG

———————————

## AMENDED AND CORRECTED
## RESPONSE/REPLY BRIEF
## OF APPELLANT/CROSS-APPELLE

———————————

**Richard F. Hawkins, III**
THE HAWKINS LAW FIRM, PC
**2222 Monument Avenue**
**Richmond, VA 23220**
**(804) 308-3040**

*Counsel for Appellant/Cross-Appellee*

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2390    Caption: Eva Palmer v. Liberty University, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Eva Palmer
(name of party/amicus)

who is _____ appellant _____ , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____12/16/21_____

Counsel for: Eva Palmer

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION...........................................................................1

REBUTTAL ARGUMENTS (ADEA APPEAL)............................................2

I.    Liberty Gilds The Lily As To The Record In At Least Two Key
Respects.............................................................................2

    A.    Liberty Cannot Erase, Devalue, Or Minimize The Import
Of  Palmer's Promotion To Full Professor.........................2

    B.    Palmer Was Not Resistant To Change Or Hostile To
Criticism...................................................................5

II.    Liberty Cannot Escape The Direct Evidence Of Age
Discrimination That Came Right From Its Decision-Making
Employees........................................................................10

III.    Liberty's Arguments Only Confirm That Palmer Satisfied Every
Aspect Of The *McDonnell Douglas* Framework.........................17

    A.    Liberty Does Not Seriously Dispute That Palmer Satisfied
Its *Legitimate* Performance Expectations.........................17

    B.    Liberty's Allegedly "Legitimate" Business Reason For
Not Renewing Palmer Was *Not* Legitimate.  It Was A
Pretext For Discrimination...........................................20

CROSS-APPEAL............................................................................26

I.    <u>Statement Of Facts For Cross-Appeal</u>: At No Time While She
Was Employed At Liberty Did Palmer Ever Play A Key Role
Where She Taught The Faith...............................................26

A.    Palmer's Background, Her Employment History, And Her Job Duties At Liberty...................................................26

     (1)    Palmer's Background.............................................26

     (2)    Palmer's Employment Contracts With Liberty............27

     (3)    Palmer's Job Duties At Liberty As An Art Instructor And Art Professor.................................................29

B.    Relevant Faculty Handbook Provisions...........................34

C.    Liberty Embellishes Or Exaggerates Facts Related To Palmer's Actions As A Liberty Art Professor.................36

     1.    Liberty Sweeps Too Broadly.................................37

     2.    Liberty Makes Inaccurate Assumptions..................40

     3.    Liberty Makes Factually Unsupportable Statements..........................................................45

     4.    Liberty Only Tells Half The Story...........................47

II.    Summary Of Argument.....................................................50

III.    Palmer Is Not, And Never Was, A Minister Within The Meaning Of The First Amendment's "Ministerial Exception."...,..50

A.    Legal Standard.............................................................50

B.    On The Record Facts, Liberty Did Not Meet Its Burden To Show That Palmer Was A Minister, And The District Court Correctly So Concluded.......................................52

C.    The District Court's Holding Is Especially Sound Given The Higher Education Context Of This Dispute.................55

D.      Praying With Her Students At The Start Of Class Does
        Not Transform Palmer Into A Minister...........................56

E.      What Liberty Is Really Asking For In Its Appeal Is For This
        Court To Defer To Its Assertions That Palmer Performed
        Ministerial Duties, Something It Is Not Required To Do,
        Nor Should Do............................................................59

F.      A Ruling That Palmer Is Covered By The Ministerial
        Exception Will Expand The Exception Beyond Recognition
        And Will Swallow The Rule That Religious Institutions
        Are Covered By State And Federal Anti-Discrimination
        Laws...........................................................................60

CONCLUSION...............................................................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

TABLE OF AUTHORITIES

CASES                                                                    PAGE

*Barefoot v. Estell*e, 463 U.S. 880, 908 (1983)……………………………………54

*Beienkowski v. American Airlines, Inc.*, 851 F.2d 1503 (5th Cir. 1988)…22

*Beshears v. Asbill*, 930 F.2d 1348 (8th Cir. 1991)……………………………15

*Carter v. Miami*, 870 F.2d 578 (11th Cir. 1989)………………………………11

*Cline v. Roadway Express, Inc.,* 689 F.2d 481 (4th Cir.1982)……………12

*Cole v. Family Dollar Stores of Maryland, Inc.*, 811 Fed. Appx. 168 (4th Cir. April 27, 2020)……………………………………………………………………11

*DeWeese-Boyd v. Gordon College*, 163 N.E.2d 1000 (Mass. 2021)……….53

*EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000)…………12

*Gallo v. Salesian Society, Inc.*, 676 A.2d 580 (N.J. App. Div. 1996)……57

*Gordon College v. DeWeese-Boyd*, 142 S.Ct. 952 (Feb. 28. 2022)………..54

*Hawley v. L.B. Smith, Inc.*, 1985 WL 334 (S.D.N.Y. Feb. 25, 1985)...12-13

*Herx v. Diocese of Ft. Wayne-South Bend, Inc.*, 48 F.Supp.3d 1168 N.D. Ind. 2014)……………………………………………………………………..…56

*Hopkins v. Price Waterhouse*, 825 F.2d 458 (D.C. Cir. 1987), *rev'd*, *Price Waterhouse v. Hopkins*, 490 U.S. 288 (1989)………………………..13

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012)……….………………………………………………*passim*

*Hough v. Roman Catholic Diocese of Erie*, 2014 WL 834473 (W.D. Pa. Mar. 4, 2014)………………………………………………………59

*Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374 (5th Cir.2010)…..10-11

*Manning v. Hunt*, 119 F.3d 254 (4th Cir. 1997)…………………………54

*Martin v. Alumax of S.C., Inc.*, 380 F. Supp.2d 723 (D.S.C. 2005)………11

*Morgan v. Washington Metro. Area Transit Authority*, 2016 WL 6833926 (D. Md. Nov. 18, 2016)……………………………………… …25

*Our Lady of Guadalupe v. Morrissey-Berru* 591 U.S. ___, 140 S.Ct. 2049, (2020)…………..…………………………………………*passim*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)……….11

*Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 801 (4th Cir. 2000)…61

*Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46 (1st Cir.2000)…………………………………………………………....…15

*Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643 (4th Cir. 2021)……………………………………………………………23, 24

*Tanford v. Brand*, 932 F. Supp.2d 1139 (S.D. Ind. 1996)…………………59

*Teague v. Lane*, 489 U.S. 288 (1989)……………………………………54

*Tilton v. Richardson,* 403 U.S. 672 (1971)……………………………55

*United States v. Carver,* 260 U.S. 482 (1923)………..…………………54

*Walz v. Tax Comm'n,* 397 U.S. 664 (1970)……………………………55

*Westmoreland v. TWC Administration LLC*, 924 F.3d 718 (4th Cir. 2019)………………………………………………………………..24
.

**OTHER**

Joseph Capobianco, *Splitting the Difference: A Bright-Line Proposal for the Ministerial Exception*, 20 GEO. JOURNAL OF LAW & PUBLIC POLICY 451, 475 (2022)......................................................................60

INTRODUCTION

Liberty University, Inc. ("Liberty") turns this appeal on its head. Normally, an appellee responds to an appellant's opening brief by trying to defeat its opponent's position on the merits. Not so here. Instead, paying just slightly more than lip-service to Palmer's age discrimination claim, Liberty begins – and devotes most of -- its Opening/Response Brief ("Opp. Br.) trying to arrogate Palmer into a minister. That is, Liberty wants this Court – contrary to the reasoned decision of the District Court -- to extend existing precedent beyond all recognition and hold that Eva Palmer, a lay person who has never worked for Liberty as anything other than an art teacher or art professor, is such a key teacher of the Christian faith that she must be transformed into a "minister" for purposes of the First Amendment's "ministerial exception."

This Court should decline Liberty's extraordinary invitation. No court in the country has gone as far as Liberty wants to go, and this Court should not be the first. Instead, this Court should stay focused on the fact that Liberty, less than a year after it promoted her to full professor, ended Palmer's 32-year employment based on illegitimate and pretextual grounds designed to mask its motives of age discrimination.

**REBUTTAL ARGUMENTS (ADEA APPEAL)**

I.   **Liberty Gilds The Lily As To The Record In At Least Two Key Respects.**

   A.   **Liberty Cannot Erase, Devalue, Or Minimize The Import Of Palmer's Promotion To Full Professor.**

The simplest and most compelling rebuttal to virtually all of the merits-based arguments raised in Liberty's opposition brief is to remind this Court that Liberty ***promoted*** Palmer to full professor in the year immediately preceding her non-renewal. And it did so with criteria which _expressly_ demanded "teaching excellence" as the "primary consideration" for a promotion.  JA1327. This consideration is not a hollow bromide. As Liberty stated in its 30(b)(6) deposition, it would not promote a faculty member if she had not demonstrated the necessary teaching excellence. JA1308.  Thus, the _fact_ that Palmer was promoted – which, by definition, proved her excellence in teaching – in 2016, just a year prior to her non-renewal, is powerful evidence that Liberty's post-promotion assertions that she did not meet its expectations are contrived and false.

Indeed, Palmer's promotion necessarily defeats Liberty's assertion that non-renewal was justified for Palmer because she did not sufficiently obtain digital literacy skills or had problems with student complaints.

This is because all of the concerns that Liberty relied on to justify its non-renewal decision existed _prior_ to its promotion of Palmer. *See* JA940; 943. As such, the promotion wiped the slate clean as to these criticisms and necessarily invalidated them as post-promotion reasons for deciding not to renew her contract. This is even borne out by Palmer's final "Faculty Portfolio" evaluation – which occurred *as she was being promoted* – before her non-renewal. *Unlike* her pre-promotion faculty evaluations in 2014 & 2015 (which twice rated her as "Below Expectations" in the technology category), *the 2016 evaluation* rated Palmer as "Meets Expectations" in this key category.  JA945.

Nor can Liberty try to silo the basis for Palmer's promotion solely to scholarship.  Palmer, of course, addressed this as a possible argument in her opening brief, *see* Opening Br. at 57-58, but Liberty continues to press forward with this fiction.[1]  It is simply not true.  By virtue of the express written promotion criteria alone, Palmer's promotion necessarily required her to have a *minimum threshold level of teaching excellence,* which she did.  JA1327. Neither Liberty nor this Court can ignore these

---

[1] According to Liberty, "[a]s a result of meeting the scholarship objective **alone**, Palmer was promoted to Professor in October of 2016."  Opp. Br. at 25 (emphasis added).

undisputed criteria and their connection to the promotion process, and they, by themselves, negate Liberty's "scholarship only" claim.

As well, Palmer's Professional Development Plan ("PDP"), which was drafted for the sole purpose of helping Palmer achieve promotion, *see* Opening Br. at 18-19, shows that scholarship was not the *only* area that Palmer needed to address to be promoted. To the contrary, as the PDP makes clear, Palmer also had to improve her teaching effectiveness *and* her digital literacy. *See, e.g.,* JA1387-1388; JA1399; JA1400-1402. These weren't fake expectations. As Dean Mintle explained to Dean Hayes and Chair Smith, they needed to tell Palmer "what SPECIFICALLY … she [must] do to demonstrate improvement ***in the class***" in order to achieve promotion.  JA1389 (emphasis added).  Thus, since both Chair Smith and Dean Hayes said in the PDP that Palmer needed to improve her teaching and digital literacy *in addition to her scholarship*, her actual *promotion in reliance on the PDP* meant that she attained such improvement in these areas in order to show "teaching excellence." To say differently after-the-fact is dissembling and evidence of pretext.

Liberty cannot have it both ways. It cannot, on the one hand, claim that Palmer was fully aware of her alleged deficiencies in digital arts and

teaching because it told her about them *during the promotion process*, Opp. Br. at 23-25, while at the same time, claim that her promotion was only about scholarship. Either Palmer's promotion was only about scholarship, which means that Palmer was <u>not</u> sufficiently informed in her PDP that she had problems with digital literacy and teaching (a win for Palmer), or the promotion was about *all* of these professional areas, which means that the fact of promotion is evidence of Palmer's success in all areas (also a win for Palmer). Liberty simply can't selectively pick and choose from these facts.

At bottom, this issue is simple. If Palmer was so deficient with her teaching skills and digital literacy (as Liberty claims) that it was proper not to renew her contract in the fall of 2017, then she never should have been promoted to full professor in the fall of 2016.

## B.   Palmer Was Not Resistant To Change Or Hostile To Criticism.

Liberty also tries to "blame the victim" in order to defend its non-renewal decision.  Repeatedly criticizing virtually all aspects of Palmer's teaching abilities (even though *it promoted her!*), it tries mightily to paint her as resistant to change, disrespectful, and hostile to criticism. Opp. Br. at 23. None of this is true. Indeed, the only way to accept these

charges is to tell only half of the story or to take things out of context. When *Palmer's* evidence on these points – or her explanation of these charges -- is taken into account, Liberty's charges either melt away or turn into factual disputes.

Resistant To Change: Liberty strains to say that Palmer was resistant to change and never followed through on her promises to improve her technological literacy. Opp. Br. at 23 & 53. This is not true. Palmer *did* learn new technology, and she *did* evolve in her teaching skills to reflect new technology, such as using PowerPoint and Blackboard. JA1347. As she testified in her deposition, "I was told to improve my computer skills, and I did." JA1197.

For its part, Liberty tries to make much of an out-of-context quote from Palmer in her deposition, where she said she "already had the skills necessary to teach [her] classes." JA1105-06. But she was only talking about the skills she was using to teach the non-digital-arts classes she was teaching at that time – which classes did not have her students using computers. JA1106. She was <u>not</u> stating that she was rejecting computers or technology for her teaching methods. To the contrary, on the *very next page* after the quote supplied by Liberty, Palmer said:

> I used computers sometimes during instruction, instructional times, PowerPoints and outlines and that kind of thing. And even some in class, brief research into what sculptures are currently – the style of the sculptures at the time, so that they could keep current.

JA1107.[2]

Liberty also tries to turn the fact that Palmer had not taught any studio arts classes through Liberty University Online ("LUO") into some sort of assertion that she was resistant to doing so or, worse, could not do so. *See, e.g.,* Opp. Br. at 28. This too is a mischaracterization of fact. To be sure, Chair Smith asked Palmer to develop an on-line course, and she declined to do so *at that time* because of other ongoing professional obligations that she had. JA1347-1348. But she never *rejected* the notion of teaching LUO courses, and, of course, Chair Smith would never have asked Palmer to develop such a class in the first place if he had believed she was incapable of doing so. *Id.*

---

[2] Relatedly, Liberty claims that Palmer admitted it is "possible" that she didn't post her grades on Blackboard in a timely manner. Opp. Br. at 27. But that's not what she said in her testimony. Rather, she agreed that it was "possible" that a student *complained* about such a problem OR that "some" grades weren't posted until the end of the year. JA1039. She also stated just moments before this testimony that "I always put the grades on Blackboard." JA1038.

<u>Didn't Respect Authority</u>: Liberty further suggests that Palmer somehow was obstinate about supervisory instructions because "it was no secret that Palmer did not respect Chair Smith." Opp. Br. 22. The record, however, does not support this charge. Yes, *when in her deposition she was shown an e-mail from Chair Smith that she had never seen before and which contained his negative comments about her*, Palmer did testify that she did not respect Chair Smith's "lies." JA1091. In doing so, she said Chair Smith's statements were categorically false[3], JA1090-1093, and said: "I can't respect someone who would make such accusations as are listed in the e-mail. I can't respect that kind of action." *Id.* She also stated "It's a total surprise to me that he wrote such an e-mail. It's disgusting." JA1092. But, when asked whether she did not respect Chair Smith personally, Palmer said: "That's not what I said." JA1090. The fair interpretation of Palmer's deposition testimony, then, is that Palmer was shocked when she saw the false things that Chair Smith wrote about her and that she had no respect for such false statements.

---

[3] Indeed, under oath, Palmer flatly denied that she ever had any meeting where the events described in Chair Smith's e-mail at issue occurred. JA1093.

<u>Hostile To Criticism</u>: Liberty finally seeks to paint Palmer as someone who can't take criticism.  It says, for example, that she rejected student complaints, Opp. Br. 23, and that she did not put much stock in Faculty Portfolio evaluations because they were hearsay.  Opp. Br. 22. As with virtually everything else in its opposition brief, Liberty tries to make a mountain out of a molehill. Contrary to Liberty's claims, Palmer did not say that student complaints were merely negative feedback from "disgruntled students." *Id*.  Rather, she explained that she believed that average evaluation scores were "skewed" and that she did not think such scores – high or low – were valid.  JA1127.  And she was not alone in her low opinion of such evaluations, as Dean Mintle even acknowledged that a different Liberty dean who was reviewing Palmer did "not hold student evaluations in terribly high regard." JA1389.  Even so, Palmer testified: "I pay attention to them [student evaluations] because I'm always looking for areas of improvement."  JA1127.

As for Palmer's testimony about her concerns with Faculty Portfolio evaluations, it was specifically limited to those comments that were made about her which were not based on any personal observations of her. She stated: "I think it would have been a much better, much more critical

evaluation if they [her supervisors] had observed me in person." JA1033-

34. And this was certainly reasonable, since, on the very few times when

she *was personally* observed in a classroom setting, she received high

praise for her teaching abilities. *See* JA116-117.

## II. Liberty Cannot Escape The Direct Evidence Of Age Discrimination That Came Right From Its Decision-Making Employees.

As for rebutting Liberty's legal arguments on Palmer's ADEA

claim, we begin with the two sets of comments that Palmer previously

identified as direct evidence of age discrimination in this case. Opening

Br. at 40-45. Liberty does not dispute these comments but, instead, tries

to minimize them and simply say they are not blatant enough to be direct

evidence. Liberty is wrong.

To begin, in its opposition brief, Liberty makes no attempt to rebut

the sound analysis Palmer provided about direct evidence. Specifically,

Palmer's direct evidence argument rests on (i) this Court's precedents that

define "direct evidence," Opening Br. at 39-40; (ii) this Court's use of the

Fifth Circuit's "direct evidence" factors from *Jackson v. Cal–W. Packaging*

*Corp.*, 602 F.3d 374, 380 (5th Cir.2010), *Id.* at 40;[4] and (iii) Circuit-level case law showing that comments virtually identical to those here raise inferences of age discrimination. *Id.* at 44. Liberty says <u>*nothing*</u> about any of these authorities. Palmer's direct evidence analysis therefore stands unchallenged.

Palmer's unchallenged analysis also defeats the few arguments Liberty does try to make about Palmer's items of direct evidence. Four such arguments merit specific attention.

<u>First</u>, as a red herring, Liberty invokes language from a 17-year-old South Carolina district court opinion[5] -- which, in turn, quotes from a 33-year-old Eleventh Circuit opinion[6] – to say that only "blatant remarks, whose intent could be nothing other than to discriminate based on age"

---

[4] *See also Cole v. Family Dollar Stores of Maryland, Inc.*, 811 Fed. Appx. 168, 175 (4th Cir. April 27, 2020) (applying factors from *Jackson*).

[5] *Martin v. Alumax of S.C., Inc.*, 380 F. Supp.2d 723, 728 (D.S.C. 2005).

[6] *Carter v. Miami*, 870 F.2d, 578, 582 (11th Cir. 1989).  The quoted language in *Carter* focused exclusively on cases from the Eleventh Circuit or pre-October 1, 1981 Fifth Circuit cases (i.e., Fifth Circuit cases that predate the creation of the Eleventh Circuit).  Moreover, *Carter* was decided pre-*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), where the Supreme Court held that even age-related remarks by non-decisionmakers can help prove age discrimination.

can qualify as direct evidence. Opp. Br. at 49. This is neither correct, nor the proper legal standard in this Circuit as to what qualifies as direct evidence. Rather, under settled precedent, direct evidence is evidence which "announce[s], admit[s], or otherwise indicate[s]" that age was the determining factor. *Cline v. Roadway Express, Inc.,* 689 F.2d 481, 485 (4th Cir.1982). Certainly, "blatant" discriminatory remarks would be better and more compelling examples of direct evidence than non-blatant remarks, but they are not required.

Nor is Liberty correct to say that a comment about a protected category must necessarily possess a "demeaning connotation" about that category in order to qualify as direct evidence. Opp. Br. at 51. This Court has never imposed such a requirement,[7] nor should it. The federal anti-discrimination laws are broad. They prohibit discrimination that results not only from malicious motivations but also from generalized stereotypes "even where the stereotypes are benign or not grounded in group animus." *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1284 (11th Cir. 2000) (Title VII sex discrimination case). *See also Hawley v. L.B. Smith, Inc.*, 1985

---

[7] The judge in the lone district case cited by Liberty for its proposition did not do so either. *Id.*

WL 334, at *1 (S.D.N.Y. Feb. 25, 1985) (explaining that the ADEA was "meant to combat" the "classically paternal attitude toward the aged"). Indeed, an "unwitting or ingrained bias is no less injurious or worthy of eradication than blatant or calculated discrimination." *Hopkins v. Price Waterhouse*, 825 F.2d 458, 469 (D.C. Cir. 1987), *rev'd*, *Price Waterhouse v. Hopkins*, 490 U.S. 288 (1989). Thus, an employer's comments that reflect an unwitting or ingrained bias -- even if they do not show malicious or blatant animosity about a protected class – can, as here, be direct evidence.

Second, Liberty's brief ignores one of the most important pieces of direct evidence identified by Palmer – namely, Chair Smith's intentional placement of Palmer in the "Retiring" category when he recommended her for non-renewal. JA341 Critically, Chair Smith had the *option* to put Palmer in the "Non-Renewal" category. But he did not do so. Instead, he *chose* the "Retiring" category, which, by its express terms, is used for someone who is "retiring at the end of the academic year." JA1339. This choice, then, is direct evidence of Chair Smith's age-based bias against Palmer because it shows that he (even if perhaps unwittingly) considered Palmer's age *at the exact time he recommended that her contract not be*

*renewed*. Liberty may wish it could put its head in the sand as to this evidence. But such willful blindness does not make this evidence disappear – or make it any less compelling.[8]

    <u>Third</u>, Liberty tries to downplay Dean Hayes' January 10, 2018 decision to *reject* providing Palmer with a transition option (which would have given her at least another year of employment at Liberty) because, according to him, Palmer would "have great difficulty with any changes." JA991. Based on a post-litigation declaration submitted by Dean Hayes in support of Liberty's summary judgment motion, Liberty says that Dean Hayes' decision – and his statement about "changes" -- was simply based on his' "realistic" belief that Palmer would not be able to update her skillset because she had not previously developed digital technology skills over the years.  Opp. Br. at 51.

    But that's not what Dean Hayes actually wrote on his January 10, 2018 e-mail ***back at that time***.  Instead, he wrote "Prediction" – which

---

[8] For its part, Liberty tries to refocus this Court's attention only on the March 16, 2018 "Retirement" reference by Dean Hicks, *See* Opp. Br. at 50.  However, this myopic view of only one piece of evidence fails to recognize that the March 2018 reference flows directly from Chair Smith's prior (and *pre-final* non-renewal decision) November 2017 categorization of Palmer as "Retiring."

is a statement about what Dean Hayes *thinks* will happen in the future[9] -- "Professor Palmer . . . will have great difficulty with any changes." JA991. ***<u>Nowhere</u>*** in his e-mail did he say that Palmer's alleged prior failures to follow through on obtaining digital literacy, factored into his rejection decision.[10] Thus, we can rightfully view Dean Hayes' "*prediction*"[11] about Palmer's ability to change as evidence of an ingrained ageist bias[12] against Palmer and, correspondingly, view his post-litigation explanation for his statement with a serious grain of salt.[13]

---

[9] https://dictionary.cambridge.org/dictionary/english/prediction (visited on July 16, 2022).

[10] As previously noted, Liberty strains greatly to paint Palmer as someone who rebuffed efforts to embrace technology or digital literacy.

[11] As Palmer previously explained in her opening brief, Dean Hayes' "prediction" is not even factually well-founded, since the record evidence indisputably shows that when Palmer is told she needs to do something to advance her career – i.e., meet the requirements for promotion for full "Professor" – she follows through. *See* Opening Br. at

[12] *See* Opening Br. at 44. *See also Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) ("statement to the effect that older employees have problems adapting to changes and to new policies" was direct evidence of age discrimination).

[13] "A plaintiff may establish pretext by showing that an employer's 'nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action.'" *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir.2000)).

Fourth, Liberty puts all its eggs into one bad broken basket by trying to say, like the District Court did below, that none of the comments at issue are probative of age discrimination because they were allegedly made *after* Liberty had already finalized its non-renewal decision about Palmer.  This is not true.

The following undisputed sequence of events proves Liberty wrong. *First*, Chair Smith's "Retiring" designation occurred at the *exact* time he was making his *initial* non-renewal recommendation for Palmer (in **November 2017**), *see* JA1340 – ***i.e., before any final decision had been made***.  His designation was *then* sent directly to Dean Hayes at that same time – ***i.e., in* November 2017**, **again *before* any final decision was made.**  *Then*, Dean Hayes made his January 2018 "great difficulty with any changes" statement – ***still before any final decision was made.***[14]  *Finally*, Smith's retirement designation continued on through the final paperwork in March or April of 2018. JA1407-1408.

_____

[14] In fact, Dean Hayes confirmed (in his summary judgment declaration) that his January 2018 comments about Palmer having "great difficulty" with change <u>preceded</u> the "finalized non-renewal decision." JA926, ¶ 34.

In short, the ageist mindset that started in November 2017 carried through the entire time that Chair Smith, Dean Hayes, and Dean Hicks were involved in the non-renewal process – beginning to end. The only possible way to accept the notion (wrongfully put forward by Liberty and wrongly adopted by the District Court) that the ageist comments occurred after a final decision was made is to ignore all of the events and comments leading up to the March 2018 "transition to retirement" document and pretend that it exists in a vacuum. The record does not support such a myopic view of the comment.

## III.   Liberty's Arguments Only Confirm That Palmer Satisfied Every Aspect Of The *McDonnell Douglas* Framework.

### A.   Liberty Does Not Seriously Dispute That Palmer Satisfied Its *Legitimate* Performance Expectations.

In just three paragraphs covering less than two pages, Liberty says that "Palmer Failed to Perform to Expectations." Opp. Br. at 53-54. But Liberty's efforts on this point are decidedly unconvincing, especially since Palmer's burden on this *prima facie* case element is "not onerous." *See* Opening Br. at 46.

Indeed, none of Liberty's three arguments on this point have merit. Liberty first claims that Palmer was resistant to change and did not want

to embrace new technology. But we already know this argument has been debunked. *See infra*, at 6-7.

Liberty then tries to say that Palmer's negative view of student or performance evaluations means she wasn't meeting expectations. Opp. Br. at 53-54. This too gets Liberty nowhere. Indeed, Palmer's alleged view of student or performance evaluations does nothing to contradict the fact that, at the time of Liberty's non-renewal decision, Palmer had "Meets" and "Exceeds" Expectations ratings in all of the categories of her "Faculty Portfolio" Evaluation.[15]  Opening Br. at 49, *See* JA945.  While Palmer's opening brief catalogues a plethora of reasons that Palmer was meeting Liberty's employment expectations, this evidence, by itself, is sufficient to satisfy this element. *See* Opening Br. at 51-52.

Finally, Liberty bizarrely tries to say that Palmer's promotion to full professor is not proof of her meeting expectations because, according to it, she is just forming her own opinion about her promotion.  Opp. Br. 54.  To the contrary, Palmer's position is based on the *express written criteria that Liberty itself created and used* to promote Palmer. Thus, in

---

[15] Liberty strangely harps on the fact that Palmer testified that she didn't believe she had gotten any "Below Expectations" in her evaluations.  But in looking at her final evaluations, this is true.

the fall of 2016, Liberty's (not Palmer's) objective *opinion* was Palmer was demonstrating "teaching excellence" and was worthy of the highest professorial rank at the University. Opening Br. at 6-11; 20-23. This is easily sufficient to rebut any assertion that Palmer was not meeting her expectations at Liberty. *Id.* at 51-54.

As a related part of its bizarre "opinion" argument, Liberty tries to harken back to its prior incorrect claim that Palmer's promotion was "based on a narrow analysis of whether she met the scholarship objective, which is" – according to Liberty – "distinct from her overall performance at the time her supervisors evaluated the Department's needs." *Id.* at 54. This claim, of course, is demonstrably false. There is no way that Palmer would have been promoted, especially given all of the comments about digital literacy and teaching in the PDP, if she had not satisfied those key requirements and, as well, had not demonstrated "teaching excellence." *See infra,* at 2-5. Again, this is not *Palmer's opinion*, this is *Liberty's opinion of Palmer*, based on its own written criteria.

**B.    Liberty's Allegedly "Legitimate" Business Reason For Not Renewing Palmer Was *Not* Legitimate.  It Was A Pretext For Discrimination.**

In two related sections of its opposition brief, Liberty says it had a legitimate reason for choosing not to renew Palmer's contract and, as well, Palmer cannot prove its reason was pretextual.  Opp. Br. at 54-59. Palmer can address both positions with one inter-connected response: Liberty's decision was *not* based on any legitimate business reasons; instead, it was a pretext for discrimination.

 The illegitimacy of Liberty's stated reason for its non-renewal of Palmer's employment contract is perhaps best shown by examining the teaching practices of her former fellow professor, Christopher Phillips, *after* Liberty let Palmer go. Liberty's stated reason was that it needed *all* professors to be able to teach courses that required digital literacy and/or teach courses through LUO. *See* Opp. Br. at 54-55.  Those were the areas of alleged growth at Liberty, and thus professors without such skills were obsolete and unworkable.

But a funny thing happened after Palmer's exit – *one professor did* not need <u>any</u> of those skills. To the contrary, in the year immediately *after* Palmer's contract was not renewed, Christopher Phillips taught ***<u>none</u>*** of

the digital or graphics arts courses so heavily touted by Liberty. JA1419. None. Just as telling, in *all* of the years following Palmer's exit, Phillips has taught <u>zero</u> classes in graphic design. JA1413-1414.[16] In other words, the claim that Liberty needed Palmer to exit *immediately* due to the allegedly urgent needs of the Department is a smokescreen. Liberty did not *need* Palmer to urgently learn new skills or risk being terminated. Rather, it chose to put her out to pasture – accidentally calling her exit a "transition to retirement" during the process – because she was old.

As for pretext, Liberty does little to meaningfully rebut Palmer's opening arguments. Mostly, it tries to belittle Palmer's positions, saying they are mere "frustrations she has with the non-renewal *process*, such as the time and the lack of forewarning." Opp. at 57. Such false characterizations aside, Liberty has *not* substantively rebutted – nor can it — (i) the key interplay between Liberty's promotion criteria and its

---

[16] Liberty tries to downplay this damning fact by saying that Phillips has (i) *previously* taught Intro to Graphic Design; (ii) *currently* (in 2021) manages an "internship course" – where he apparently acts as more of a "proctor than a professor; and (iii) has taught at least one LUO course. Opp. Br. at 61.  But none of this refutes the fact that *immediately following* Palmer's departure, there was, in fact, the ability for Palmer to teach all of her ordinary classes *without* having to move immediately into the digital world.

Faculty Portfolio evaluation criteria; (ii) the necessary impact of Palmer's promotion had on Liberty's prior alleged criticisms of her; (iii) her almost $30,000 raise (which is ***nowhere acknowledged much less mentioned*** in Liberty's opposition brief); and (iv) the ageist comments from Chair Smith and Dean Hayes. Liberty's lack of rebuttal on these above points is sufficient, by itself, for this Court to conclude that the record sufficiently supports pretext.

On the last point above, it should be noted that *even* if Dean Hayes' "great difficulty with any changes" notation is not *direct* evidence of age discrimination, it still proves pretext. Indeed, it is virtually identical to the indirect comments at issue in *Beienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1507 (5th Cir. 1988), where, addressing such indirect comments on summary judgment, the Fifth Circuit reversed the trial court's summary judgment decision and said: "we are unwilling to assume that indirect comments about [an employee's] age and adaptability are not possibly probative of an unlawful discriminatory intent." This Court should adopt a similar unwillingness.

As well, four other points help show that Liberty's pretext arguments lack merit. First, despite Palmer's heavy reliance on it,

Liberty nowhere discusses, much less attempts to rebut, this Court's recent decision in *Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643 (4th Cir. 2021) in its brief. On evidence very similar to that here, this Court reversed a grant of summary judgment in an employment discrimination case and noted, as we submit is the proper inquiry here, "[i]f an employer ***genuinely believed*** that one of its employees was performing poorly on metrics the employer believes are critical," it would not rate her highly, give her awards (such as a promotion), or give her a salary raise. 19 F.4th at 650-651 (emphasis added). *Sempowich* is on point, and Liberty's failure to even <u>try</u> to rebut it speaks volumes.

Next, while Liberty claims that Palmer is upset that she didn't receive advance notice that she would be let go if she failed to obtain digital arts skills, this argument misses the point. Where someone such as Palmer has such a long tenure – and a strong record of success – with a company, it is relevant to consider her employment history in determining pretext. As this Court explained in *Westmoreland v. TWC Administration LLC*:

> . . . nothing bars a jury [or here, a court] from considering an
> employee's tenure and performance in evaluating whether her
> employer's justification for her termination is so flimsy as to
> be untrue or implausible, and thus asserted in an attempt to

mask a discriminatory motive.

924 F.3d 718, 728 n.4 (4th Cir. 2019). And as was true in *Westmoreland*, Palmer's "tenure and performance support a reasonable inference that [Liberty's] explanation [for her non-renewal] is 'unworthy of credence,' which in turn is 'probative of intentional discrimination.'" *Id.*

Third, Liberty cannot seek refuge in the "same actor inference." To begin, Liberty wrongly pushes back on Palmer's argument that the same people were not involved in both the decision to promote Palmer and the decision not to renew her contract. Opp. Br. at 58, n.1. While Liberty tries to say the inference should still be applied despite this incongruity, such a situation necessarily – at *worst* for Palmer – creates a dispute of fact as to whether the inference should even be applied in the first place. This dispute necessarily means the inference can't defeat Palmer's ADEA claim on summary judgment. As well, it raises a genuine dispute as to whether Smith and Hayes promoted Palmer "under protest" such that the inference would not apply. *Sempowich*, 19 F.4th at 653.

Liberty also cannot escape its own failure to timely raise the inference in its opening summary judgment brief. Liberty tries to say it was simply countering any notion that its supervisors harbored unlawful

animus.  Opp. Br. at 58, n.1.  But this is not how the inference works.  An employer must raise it first, so that it can actually be *rebutted* by the opposing party.  And where, as here, an employer fails to raise the inference in its opening brief, a court "may deem the argument waived." *Morgan v. Washington Metro. Area Transit Authority*, 2016 WL 6833926 at *16, n. 16 (D. Md. Nov. 18, 2016) (explaining that court could deem defendant's assertion of the same actor inference waived because it failed to raise the inference until its reply brief).

And Liberty's "same actor inference" wholly fails to recognize that Palmer has raised direct evidence of age discrimination such that the inference has been fully rebutted.  Opening Br. at 63.

Fourth and finally, while Liberty states as Gospel its claim that there was a growing interest in graphic design and that more students wanted such classes, it has provided no contemporaneous documents or evidence to prove such a claim.  It stands solely on the word of Liberty, which is easily rebutted given Palmer's evidence.

**CROSS-APPEAL**

I. <u>Statement Of Facts For Cross-Appeal</u>: **At No Time While She Was Employed At Liberty Did Palmer Ever Play A Key Role Where She Taught The Faith.**

    A.    **Palmer's Background, Her Employment History, And Her Job Duties At Liberty.**

        **(1)   Palmer's Background**

Palmer graduated from Old Dominion University in 1968 with a B.S. Ed. Degree, with a concentration in art. JA255.

In 1974, she obtained a Masters degree in Fine Arts from James Madison University. *Id.*

In 1991, she obtained a Masters of Fine Arts degree in Art from James Madison University. *Id.*

She did not have any graduate or post-graduate degrees in religion, theology, ministry, or divinity during the time she was employed at Liberty. *Id.*

Palmer is not, nor has she ever been, an ordained minister. *Id.*

Palmer is not, nor has she ever been, licensed by the Commonwealth of Virginia or any other jurisdiction to perform any religious ceremonies, such as weddings. *Id.*

Palmer has never been employed by any church in the capacity of

pastor or minister. JA256

She has never been employed by any church in any position where she was required to lead or direct any worship or religious services. *Id.*

She has never provided any services to any church in the capacity of a pastor or minister. *Id.*

### (2) Palmer's Employment Contracts With Liberty.

Palmer worked as a faculty member at Liberty and its predecessors from 1986 until the end of the Spring Semester 2018. *Id.*

For every year that she worked at Liberty and its predecessors during this time frame, Palmer signed an employment contract with the University. *Id.*

None of those contracts said the title of her position was "minister." *Id.* To the contrary, the contracts generally defined Palmer's "position" as an "Associate Professor of Art" or an "Art Professor" and said that she was to "faithfully perform the services for her "position." *See* JA260-283 (Palmer's employment contracts -- collectively -- at Liberty from the 2012-2013 school year though the 2017-2018 school year).

None of those contracts required Palmer to pray or lead prayers (with her students or anyone else) as part of her job duties at Liberty. *Id.*

None of those contracts required Palmer to lead her students (or anyone else) in worship services as part of her job duties at Liberty. *Id.*

None of those contracts required Palmer to teach Bible study to her students (or anyone else) or to instruct or guide them (or anyone else) as to any Biblical Scriptures as part of her job duties at Liberty. *Id.*

None of those contracts required Palmer to sing any kinds of worship songs or hymns with her students (or anyone else) as part of her job duties at Liberty. *Id.*

None of those contracts required Palmer to give sermons or homilies to her students (or anyone else) as part of her job duties at Liberty. *Id.*

None of those contracts required Palmer to select any types of liturgies to follow or use during her classes at Liberty. *Id.*

None of those contracts required Palmer to take her students or anyone else to Convocation[17] at Liberty. JA257.

None of those contracts required Palmer to take her students or

---

[17] Liberty's "Convocation is the assembling of [its] student body and staff leadership in order to inform, inspire and sometimes to simply entertain. With over 13,000 in attendance and thousands more watching online and on television, Liberty University's Convocation is the largest weekly gathering of college students in the world." https://www.liberty.edu/osd/lu-stages/convocation/faq/ (visited on July 1, 2021).

anyone else to any religious services at Liberty, including any services at Worley Chapel or the Vine Center. *Id.*

None of Palmer's contracts required her to have a graduate or post-graduate degree in religion, theology, ministry, or divinity. *Id.*

None of Palmer's contracts required her to be an ordained minister. *Id.*

None of Palmer's contracts required her to lead any religious services or select any liturgies for any religious or worship services at Liberty, including any such services at Worley Chapel, the Vine Center, or at Convocation. *Id.*

### (3) Palmer's Job Duties At Liberty As An Art Instructor And Art Professor.

At the time of Palmer's non-renewal of her employment with Liberty in 2018, she was employed as an Art Professor. *Id.*

At all times from 1986 through 2018, Palmer worked at Liberty as an Art Professor or Art Instructor. Through these years of employment, she advanced from an Art Instructor, to an Associate Professor of Art, and, finally, a full Professor of Art. *Id.*

At all times from 1986 through 2018 during her employment at Liberty, Palmer taught art courses – that is, courses which focused on art

– except that she briefly taught Humanities in the mid-1990's. *Id.*

At all times from 1986 through 2018 during her employment at Liberty, Palmer taught in the College of Arts and Sciences or the School of Visual and Performing Arts (or a similarly titled School). *Id.*

At all times from 1986 through 2018 during her employment at Liberty, Palmer taught in the Studio and Digital Arts Department (or a similarly-titled Department). *Id.*

At no time from 1986 through 2018 during her employment at Liberty did Palmer work or teach within Liberty's School of Divinity or in its Religion Department. JA258.

At no time from 1986 through 2018 during her employment at Liberty did Palmer teach any classes on religion, theology, the Bible, divinity, or ministry. *Id.*

At no time during her employment at Liberty, whether as an Art Instructor, an Art Professor, an Assistant Professor of Art, or any other position, did Palmer teach her students Bible study or instruct or guide them as to the Biblical Scriptures. *Id.*

At no time during her employment at Liberty, whether as an Art Instructor, an Art Professor, an Assistant Professor of Art, or any other

position, did Palmer ever give any sermons to her students. *Id.*

At no time during her employment at Liberty, whether as an Art Instructor, an Art Professor, an Assistant Professor of Art, or any other position, did Palmer ever give any sermons or homilies to her students. *Id.*

At no time during her employment at Liberty, whether as an Art Instructor, an Art Professor, an Assistant Professor of Art, or any other position, did Palmer ever take her students to Worley Chapel of the Vine Center for worship or religious services. *Id.*

At no time during her employment at Liberty, whether as an Art Instructor, an Art Professor, an Assistant Professor of Art, or any other position, did Palmer ever take her students to Convocation for worship or religious services. *Id.*

At no time during her employment at Liberty, whether as an Art Instructor, an Art Professor, an Assistant Professor of Art, or any other position, did Palmer ever select any liturgies for any worship or religious services of any kind at Liberty. *Id.*

Palmer typically began her classes at Liberty by reading one or two verses from the Book of Psalms or Proverbs, but she did so without comment or discussion. JA259. Palmer also asked for prayer requests from

the students at that time and either she or one of her students would pray for those requests. *Id.*

Nothing in Liberty's Palmer's job description says anything about being required to pray with students, lead students in prayer, teach Bible-study to students, worship with students, lead students in worship, select liturgies for her classes, sing hymns or religious songs as part of her classes, or take her students to any University-sponsored worship or religious services. *See* JA284-286; JA287-289; 290-292.

To the contrary, the job description describes the "***Basic Function***" of the position of Assistant Professor of Art with specific reference to having "expertise in one or more of the following [areas]: graphic design, animation, motion graphics, UI/UX design, responsive web design, and game design with some experience in studio art." JA285 (emphasis added). It also says "Liberty Universitys [sic] hiring practices and EEO statement are fully in compliance with federal and state law." JA284.

As well, nothing in Palmer's class syllabi for her courses, *see, e.g.,* JA293-345, said anything about prayer, Bible-study, Scripture, worship, liturgies, hymns or other religious songs, or attendance at any University-sponsored worship or religious services.

Finally, Liberty never expressly required Palmer -- as part of her job duties as a Full Professor the Studio and Digital Arts Department of Liberty's School of Visual and Performing Arts at Liberty – to (i) pray with her students, (ii) lead prayers; (iii) have devotionals; (iv) discuss Scripture or Bible verses in her classes; or (v) include any teachings about the Bible in her course curricula. *See* JA346-357.

Nor did Liberty require Palmer to take her students to chapel or other religious serves, select liturgies for use at Liberty at its chapel services, give sermons or homilies, or lead any religious or worship services at the University. *Id.*

Palmer's job duties stand in stark contrast to the job duties for persons, such as "LU Shepherds," who are employed in Liberty's "Office of Spiritual Development." *See, e.g.,* https://www.liberty.edu/osd/ (visited on July 1, 2021).

Indeed, unlike the secular-based job duties listed for Palmer, the duties of an LU Shepard are expressly and unambiguously ministerial, to wit:

> An LU Shepherd ***provides accountability and biblical guidance to Liberty University students through life-skills training, mentoring, discipleship, and visitation***. A Shepherd is directly responsible to and assists the Director

of LU Shepherd and/or the Office of Spiritual Development in whatever areas deemed necessary. Furthermore, it is the responsibility of the LU Shepherd office to provide direction and support for any crisis/emergency medical and chaplaincy situations. These situations require each staff member to be on call 24 hours a day for one continuous week, typically three weeks per semester. While on-call, LU Shepherd personnel can engage in normal activities outside of working hours, but cannot leave the greater Lynchburg area. The on-call schedule is published at the beginning of each semester. LU Shepherd personnel are also responsible for updating electronic files and keeping complete and accurate record of student situations. A Shepherd is also involved ***in originating, planning, coordinating, and implementing educational programs and opportunities for holistic spiritual development for the student population.***

JA358-359 (emphasis added).

## B.     Relevant Faculty Handbook Provisions.

Liberty has a Faculty Handbook that sets forth its employment policies for its faculty members. JA360-538. Nowhere in the handbook, however, does Liberty tell its faculty members – and especially not its art professors – that they are functional ministers at the University who are provided no protection by state and federal anti-discrimination or anti-retaliation law.

To the contrary, under the section 7.1 of the Handbook (titled "Equal Employment Opportunity"), Liberty tells its faculty members that:

The University is an Equal Opportunity Employer. We believe it is our moral and legal obligation to meet the responsibility of ensuring that all management practices regarding employees are conducted in a nondiscriminatory manner.
.
In compliance with Title VII of the 1964 Civil Rights Act and other applicable federal and state statutes, all recruiting, hiring, training, and promoting for all job classifications will be administered without regard to race, color, ancestry, age, sex, national origin, pregnancy or childbirth, disability, military veteran status or other applicable status protected by law, including state of employment protected classes. It is, therefore, our policy and intention to evaluate all employees and prospective employees strictly according to the requirements of the job.

All personnel related activities such as compensation, benefits, transfers, job classification, assignments, working conditions, educational assistance, terminations, layoffs, and return from layoffs, and all other terms, conditions and privileges of employment will be administered without regard to race, color, ancestry, age, sex, national origin, pregnancy or childbirth, disability, military veteran status or other applicable status protected by law, including all applicable state of employment protected classes.

The University is a Christian religious-affiliated organization; and as such, is not subject to religious discrimination requirements. The University's hiring practices and EEO discrimination practices are in full compliance with both federal and state law. Federal law creates an exception to the "religion" component of the employment discrimination laws for religious organizations (including educational institutions), and permits them to give employment practice preference to members of their own religious beliefs.

JA432.

In other words, the only religious "exception" about which Liberty tells its faculty members is its ability to give preference to applicants or employees who are members of its own religious belief-system.[18]

Separately, the Faculty Handbook expressly advises Liberty's faculty members that they have the right to academic freedom under the "1940 Statement of Principles on Academic Freedom of the American Association of University Professors." JA389-390.

The Handbook also states: "It is the policy of the University that all faculty have the right to academic freedom as defined in the Statement of Principles of Academic Freedom above. We recognize the meaningful value and importance of full discussion in resolving issues relating to academic freedom and preserving good relations between faculty and our administration." JA390.

## C. Liberty Embellishes Or Exaggerates Facts Related To Palmer's Actions As A Liberty Art Professor.

In its fact section for the Cross-Appeal, Liberty, just as it did before the District Court, takes liberties as to the true facts of Palmer's activities as a Professor of Art at Liberty. Among other things, Liberty (i) sweeps

---

[18] Liberty's job postings identify the same "exception." *See* JA284; 287; 290.

too broadly; (ii) makes faulty assumptions; (iii) makes unsupported statements; and (iv) includes only half the story. Each of these categories is discussed as follows.

### 1. Liberty Sweeps Too Broadly.

First, Liberty's brief contains many "fact" statements that may (or may not) be true in the abstract, but which are stated far too broadly to be directly connected to Palmer. For example, talking in platitudes about its students and faculty members, Liberty said below:

> Many students choose to attend Liberty because they seek the opportunity to be spiritually mentored and to learn how to integrate a Christian perspective into their respective disciplines . . . Liberty's faculty must be able to meet this expectation. . . . Many times faculty are given the opportunity to spread the Christian faith and evangelize to a non-Christian as there is no requirement for a student to be a Christian to attend to [sic] the University.

Def"s. Mem. at 4 (citations omitted) (Dkt. Entry 13-1)  This statement may (or may not) be true. Who knows?[19] But it has absolutely no factual

---

[19] As she did below, Palmer specifically objects to either Hayes or Hicks providing testimony about what is (or is not) in the heads of "many" unidentified Liberty students as to why they chose to attend Liberty. FED. R. EVID. 602 ("A witness may testify to a matter only if evidence . . . [shows he] . . . has personal knowledge of the matter.").

connection to .Palmer. And to be clear, Palmer never evangelized[20] to any students -- Christian or non-Christian -- while she taught there. JA544.

Similarly, Liberty loudly trumpets its current application process for its faculty members. Opp. Br. at 7. According to Liberty, this is a "rigorous" process which, *inter alia*, requires a "Faculty Interview Committee" to screen applicants in three key areas. *Id.* No evidence, however, connects this "rigorous" process – which was only instituted within the last eight years (i.e., almost 25 years *after* Liberty hired Ms. Palmer) – to Palmer. The most Liberty can muster is: (i) Palmer's 1983 employment application with "Liberty Baptist College" (the precursor entity to Liberty), where Palmer certified that she supported the college's purpose and agreed with its statement of doctrine, and (ii) her deposition testimony where she unremarkably said she believes that "Liberty's purpose is to be sure that they hire people who believe the same way that they do." JA194. Neither item has anything to do with Liberty's current application process.

---

[20] We use "evangelize" in this context according to its generally understood religious meaning – that is, to "preach the gospel to" or "convert to Christianity." https://www.merriam-webster.com/dictionary/evangelize (visited on July 20, 2021).

The *truth* is that when *she* was hired more than three decades ago, Palmer did not go through anything close to the process that Liberty now uses. JA544 ("The process I went through was ***very different*** from today's process") (emphasis added). In fact, during *her* process, Palmer was not even questioned about integrating the Christian faith into the classroom. *Id.* Instead, she "was questioned about her Biblical Worldview and Spiritual Disciplines" – topics that squarely are in line with the written application that she submitted when she applied. *Id.* And even more recently, no one at Liberty ever discussed with Palmer any of the spiritual criteria it now touts with when she "met with the Dean, Associate Dean and Department Chair when [she] was applying for promotion." JA544.

Finally, Liberty places great emphasis on how *it believes* its faculty should "exemplify [its] Christian worldview both inside and outside of the classroom." Opp. Br. at 9. Liberty boldly states, for example, that it "instills in faculty that they may be the only 'Bible' that some people read" *Id.* Yet, these statements mean almost nothing in the distinct context of this case.

As with the other statements in this section, these far-reaching statements may (or may not) be true. But *again*, no evidence shows that any such expansive evangelical role was ever communicated to Palmer (and, in fact, it was **not**, *see* JA544-545). To the contrary, while Palmer knew of occasional lectures about integrating Biblical truth into her classes, she received no formal training or guidance "about ***how*** to do it." JA554 (emphasis added). She also recalled "no specific instructions" in Liberty's Faculty Handbook about such integration. JA554. And she was never told by Liberty to evangelize. JA544-545

### 2. Liberty Makes Inaccurate Assumptions.

Second, several "facts" in Liberty's brief rest on inaccurate assumptions. Notably, relying on a declaration from Dean Hayes, Liberty says that "Having the platform to evangelize ***appeared important*** to Palmer," Opp. Br. at 11 (emphasis added), and that "Palmer saw herself as a spiritual mentor," Opp. Br. at 15.. These assertions, however, are not based on any evidence ***from*** Palmer. Rather, they are assumptions Dean Hayes made ***about*** Palmer. And as with most assumptions, they are incorrect.

Palmer is undeniably a follower of Christ who sought to be an example for her students while at Liberty. However, she was not – and never held herself out to be – a Christian mentor, a spiritual advisor, a messenger of the faith, or a minister of the faith to her students, either inside *or outside* of the classroom. JA545. The evidence on this point is loud and clear. Indeed, when defense counsel told Palmer in her deposition that he was going to ask her questions about her "role as a minister for the students who were in your classes at Liberty," she emphatically and unambiguously rejected any such notion, stating:

> Well, I'm not a minister. I'm sorry. I'm not a minister. I'm not ordained. I'm not licensed. I'm not legally licensed. I'm ***not a minister***.

JA547 (emphasis added). Palmer even testified that she does not even believe that women are *allowed* to be ministers in churches. JA554. She said: "Scripturally, it says **not to**." *Id.* (emphasis added).

Nor did Palmer's efforts to integrate the Bible with her art classes somehow transform her into a minister or turn her art classes into religious or spiritual fora for her students. Palmer, for example, fully acknowledged that she took a course – as part of Liberty's "Center for Teaching Excellence" professionalism programs -- called "Spiritual

41

Formation From A Distance: Paul's Formation of The Romans" in order to gain a deeper knowledge of the Bible.  JA556-558. She also readily admitted that she integrated this deeper knowledge into her life ("the way I live it"), which necessarily included her professional life as an art professor. *Id.* at 93. But she also made clear that this newfound knowledge did not translate into her "teach[ing] the book of Paul in [her] classroom." JA559.  As she stated:

> Any spiritual growth that you incorporate into your life affects – if you take it seriously, affects how you live your life, and that is an example before the students.  ***I did not teach the Bible it [sic] my class.  I did not teach the book of Romans***.  But to integrate the truths that are taught in the Bible into my own life also integrates it into anything that I do with my life, including teaching.

JA560. (emphasis added). In other words, Palmer's growth as a Christian made her a better Christian *teacher*, but it did not turn her into a teacher *of Christianity*.

And at no time did Palmer *teach the faith* to her students at Liberty, either in or outside of her classroom. Indeed, in her deposition, Palmer pointedly – *and repeatedly* – distinguished between her efforts to integrate Christianity in her classes, on the one hand, and the idea of *teaching* Christianity or the faith, on the other.  She said:

"I ***did*** integrate art and the Bible, but there's no time in the classroom …to teach Bible. ***So I did not teach Bible in my art classes.***"

JA550 (emphasis added).

This point was further underscored when defense counsel raised the topic of whether Palmer had ever "talked about" Christianity as part of her teaching art classes. He and Palmer had the following exchange:

Q:  . . . my first question going to the topic that we're on today is did you talk about Christianity as part of your teaching these art classes?

***

A: Did I talk about Christianity in my classes?

Q: Right, with your students.

A: No I did not teach Bible in my art classes.

Q: Well, that was not my question.  My question is did you talk about Christianity during the course of teaching these art classes that you just mentioned?

A: Christianity is part of the Bible.  And I did not teach Bible in my art classes.

Q: Well, I'm not asking about whether you taught Bible in your art classes.  I'm asking if you talked about Christianity with your students in the course of teaching these classes?

A: That is really a broad question.

Q: It is.  And we'll narrow down after that, but I'd like you to answer my broad question first.

A: Did I talk specifically about Christianity; **_no_**.  ***Being a person of faith and living accordingly is <u>different</u> in a sense, in a broad sense, to <u>teaching</u> or <u>talking about</u> Christianity during your classes with students.***

Q: Is it your testimony under oath, Ms. Palmer, that you did not talk about Christianity during your classes with students?

A: Specifically talking about Christianity, if you state it that way, I would say **_no._**  But I did incorporate the faith of a Christian in my classes, I did.

Q: Well, in what ways did you incorporate the faith of a Christian in your classes?

A: By living the Christian life by example.  And whenever the opportunity gave, or whenever the whatever we were going over in class gave opportunities to speak of faith to speak of living the Christian life, I did.  ***<u>But as far as teaching Christianity</u>***, I did not.

JA551-553 (emphasis added)

Finally, Palmer put a blunt and forceful exclamation point on the entire topic when she emphatically rebutted defense counsel's continued questions by saying:

A: The subject of Christianity did not come up.  ***<u>It is not taught in an art class</u>***.  But as far as living and incorporating the truth of the Bible; yes.  ***<u>But I did not teach the subject of Christianity in my classroom</u>***. ***<u>That is not integration</u>***.

JA553 (emphasis added).

### 3.   Liberty Makes Factually Unsupportable Statements.

Third, Liberty's brief contains factually unsupportable statements. Most notably, in arguing that Palmer was qualified to be a "minister" at the University by virtue of her prior studies at its Doctor of Ministry program, Liberty, citing various pages from Palmer's deposition, says that "[m]uch of this course work was related to studying the Bible itself and *evangelizing*." Opp. Br. at 10 (emphasis added).  But the referenced pages say __*nothing*__ about evangelizing. Instead, they simply reveal that Palmer testified about classes in "church history" and "history of Christianity." JA549  And while Palmer said in those pages that "some" of her coursework was "ministerial" in nature, she clarified in those very same pages that she only meant that her coursework "had to do with the church and the organization of the church, church polity."  JA548.

Similarly, Liberty's efforts to aggrandize Palmer's M.Div. coursework into some sort of "qualification" for her to "Spread the Christian Worldview" (Opp. Br. at 10) are unfounded.  To be sure, Palmer did indeed take M.Div. classes.  But she did __*not*__ do so in order to be able to spread the Word of God at Liberty.  As she explained:

45

> . . . I was not studying to be a pastor.  I did that so I could study with greater depth in the Bible.  ***I was not preparing to be a minister***. Even though the title of the Degree says Doctor of Ministry, I was not preparing to be a minister. ***I don't believe women should be ministers of churches. Scripturally it says not to***."

JA548 (emphasis added).  To the contrary, Palmer only took those courses so that she could gain a "more in-depth study of the Bible itself, for [her] ***own personal growth and understanding*** of God's word."  *Id*. at 39.

Finally, Liberty's Dean Hayes claims he was "aware" that Palmer "worked one-on-one ***to spiritually mentor students***."  Opp. Br. at 16 (emphasis added).  But this is simply not correct.  Without a doubt, Palmer met with her students on a one-on-one basis – to focus ***on art*** - outside of the classroom.  JA545. She did not, however, *spiritually mentor them*.  *Id.*  Indeed, Palmer's student interactions at Liberty stand in stark contrast to the duties of someone who actually ***is required*** to spiritually mentor students at Liberty – that is, an LU Shepherd.  ***Unlike*** anything in the job descriptions or employment documents related to Ms. Palmer, the express job function for an LU Shepherd is to "***provide[] accountability and biblical guidance to Liberty University students through life-skills training, mentoring, discipleship and visitation***."  JA358 (emphasis added). An LU Shepard is also responsible

46

for developing "education programs and opportunities for ***holistic spiritual development for the student population***." *Id.* No similar "spiritual" duties are set forth for Ms. Palmer's position.[21]

### 4.   Liberty Only Tells Half The Story.

Fourth a, Liberty lumps a bunch of facts together to try to make it seem that Palmer is engaging in certain significant religious and spiritual activities *with, or for*, her students when, in fact, that is not the case. The first key example of this is where Liberty says Dean Hayes "was aware that [Ms. Palmer] prayed with students, held devotionals in class, attended services or convocation ***with students***, discussed Christ and the Gospel in class, shared her faith and ***worked one-on-one to spiritually mentor students***." Opp. Br. at 15-16. The last item in this list -- spiritual mentoring – has already been addressed above.  But the notion -- put forward by Liberty -- that Palmer was attending services and convocations ***"with"*** her students paints only a partial picture of the actual facts related to these activities. So, here's the rest of the story.

---

[21] This fact was fully confirmed by Liberty in its 30(b)(6) deposition. JA580-581.  Indeed, Palmer was not even a "faculty shepherd" who would have had duties similar to an LU Shepherd.  JA582.

Yes, Palmer did attend services and/or convocations *with* her students. But only in a general sense. She did not, for example, *take* or *accompany* students to services or convocations. JA545. Nor did she *lead,* officiate, or even speak at such services or convocations. *Id.* And she did not sit *with* any of her students at any such services or convocations. *Id.* In other words, while it is technically true that Palmer attended services or convocations "with" her students, such a statement is no more meaningful than saying Palmer attended an Amy Grant concert "with" 15,000 other concertgoers. The simple truth is that Palmer never sat side-by-side, next to, or in communion with, any of her students during such services.

The second example of Liberty's half-story strategy is its misplaced emphasis on the fact that Palmer, when appealing her termination, wrote an e-mail where she referred to the mission of Liberty as a "ministry." Opp. Br. at 48. And she indeed used the word "ministry." But this is not evidence that Palmer believed she was a minister at Liberty. Tellingly, Palmer did not capitalize the word "ministry" in her e-mail. And when the word is examined in the overall context of the e-mail, it is clear Palmer was not saying she was acting in the role of a "minister." Instead,

she is using the word to refer to her work to teach students about art with a Christian worldview in mind.  JA545.

The final example of Liberty only telling half the story relates to Palmer's so-called "qualifications" to convey Word of God. Opp. Br. at 10. Specifically, in answering Liberty's requests for admissions, Palmer truthfully stated that she was "informally qualified" to convey the Word. Liberty now sees this as proof of a ministerial role.  It is not.  As Palmer explained when discussing this topic in her deposition:

> By "informally qualified" I mean that I have personally studied the Bible and continue to study it.  So I could convey that to my students, or to any student ***or to anybody, but I do not teach that in the classroom***.

JA561 This is also fully consistent with Palmer's belief that "Scripture directs ***all followers of Christ*** to care for/help/minister to the needs of other Christians." JA545 (emphasis added). Stated otherwise, "***All believers in Christ are ministers***." *Id.* (emphasis added).

In short, Palmer had no special "ministerial" qualifications for purposes of ministering the Word of God in her art classes.  She was simply a good Christian.

## II.     Summary Of Argument

On the fact-specific record of this case, the District Court correctly held that Palmer was not a "minister" under the First Amendment's "ministerial exception."   Throughout her entire period of employment with Liberty, Palmer never engaged in any of the kinds of tasks or duties that would have made her a teacher *of the faith*, as opposed to simply a devout believer in the faith. In other words, she did not play a "key" role or hold a "certain important" position at Liberty, as is required by the Supreme Court's precedent in *Our Lady of Guadalupe v. Morrissey-Berru* 591 U.S. ___, 140 S.Ct. 2049, 2064 (2020) in order to be a minister. Liberty obviously disagrees and states its own *preference* about how to view Palmer.  But this preference is not dispositive and, in fact, if adopted here, would mean that virtually every employee at every religious institution would be a minister.  This is a bridge too far, and the District Court's correct conclusion should be affirmed.

## III.    Palmer Is Not, And Never Was, A Minister Within The Meaning Of The First Amendment's "Ministerial Exception."

### A.    Legal Standard.

While, in general, Liberty is correct in the way it discusses the legal test for determining who qualifies as a "minister" for purposes of

the "ministerial exception," it leaves out a few important facets of the Supreme Court's analysis of the exception. Most importantly, while Liberty correctly recognizes that the Supreme Court said the exception contains an implicit recognition that "educating young people in their faith, inculcating its teaching and training them to their faith are responsibilities that lie at the very core of the mission of a private religious school," it fails to mention that the Supreme Court did *not* create or articulate a per se rule to the effect that *every* teacher (of any type, no matter the discipline) in a religious school is, by definition, a minister for purposes of the exception. *Our Lady of Guadalupe v. Morrissey-Berru* 591 U.S. ___, 140 S.Ct. 2049, 2064 (2020).

To the contrary, the Supreme Court expressly recognized that the exception only applies to those individuals "who play certain key roles" at a religious institution or those who "hold[] certain important positions" at the religious institution. *Id.* at 2061. The determination is not made based on blanket or categorical assertions by the religious institution, but instead, is a fact-based inquiry that takes "all relevant circumstances into account," *id.* at 2067, and, at bottom, focuses on "what an employee does." *Id.* at 2064. It is a functional approach and focuses on those who

"lead[] a religious organization, conduct[] worship services or important religious ceremonies or rituals, or serve[] as a messenger or *teacher of its faith*." *Id.* (emphasis in original).

As well, since the ministerial exception "operates as an affirmative defense," the employer bears the burden of showing that the exception applies. *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171, 195 n.4 (2012).

**B.    On The Record Facts, Liberty Did Not Meet Its Burden To Show That Palmer Was A Minister, And The District Court Correctly So Concluded.**

Here, despite its attempt to turn every expression of Palmer's deep and abiding Christian faith into some sort of ministerial task, Liberty cannot turn Palmer's role as an Art Professor into a *teacher of the faith*. Indeed, it is undisputed that Palmer*, unlike all three teachers* who were found to be ministers by the Supreme Court (in both *Hosanna-Tabor* and *Our Lady of Guadalupe*), never *taught religion* at Liberty. She didn't give sermons; she didn't pick liturgies; she didn't tell her students what to believe (or not believe); she didn't evangelize; she didn't *lead her students in worship or Bible-study*; she didn't lead her students to or from worship services or chapel; and she didn't use any religious liturgies in her class

curricula. And, of course, she never held herself out as a minister – informal or otherwise – in her classroom duties. The bottom line is that she was a Christian teacher, not a teacher of Christianity.

The District Court correctly reached this same conclusion. While it relied on the structure of *Hosanna-Tabor* to organize its opinion, the District Court appropriately applied the *functional test* from *Our Lady of Guadalupe* to determine that Palmer did not *function* as a minister when she taught art to her students. JA1455-1458.[22]

Nor did the District Court undervalue Palmer's integration of faith into her job duties as part of its analysis, as claimed by Liberty in its brief. Opp. Br. at 41-42. To the contrary, the District Court correctly looked at the type of duties Palmer performed and recognized, as did the Supreme Judicial Court of Massachusetts in *DeWeese-Boyd v. Gordon College*, 163 N.E.2d 1000, 1013 (Mass. 2021), when it examined a virtually identical integration argument by a religious college, that

---

[22] Liberty's quibbles with the District Court's analysis are meritless. While it accuses the District Court of falling into the "trap" of using only the four-factor test from *Hosanna-Tabor*, Opp. Br. at 40, Liberty's claim is attractive only in superficial terms. When one actually delves into the substance of the District Court's opinion, it is clear that it faithfully followed the guidance of *Our Lady of Guadalupe*. JA1455-1458.

Palmer's "responsibility to integrate the Christian faith into her teaching, scholarship, and advising was different in kind, and not degree, from the religious instruction and guidance at issue in *Our Lady of Guadalupe* and *Hosanna-Tabor*." JA1457. This decision was sound and was supported by the abundant fact-specific record evidence – not the generalizations and exaggerations argued by Liberty.

And the District Court was not wrong to rely on the analysis in *De-Weese-Boyd*. Liberty is quick to latch onto the four-Justice "Statement "Respecting The Denial Of Certiorari" issued in that same case, where four Justices criticized the Massachusetts' high court's analysis. *Gordon College v. DeWeese-Boyd*, 142 S.Ct. 952 (Feb. 28. 2022). But this statement, which was *not* made by a majority of the Supreme Court, is neither binding nor persuasive.[23] Instead, the controlling and binding precedent that governs how this Court (and the courts in this Circuit) is to decide who qualifies as a minister under the First Amendment comes

---

[23] *See Teague v. Lane*, 489 U.S. 288, 296 (1989) ("opinions accompanying the denial of certiorari cannot have the same effect as decisions on the merits"); *Barefoot v. Estell*e, 463 U.S. 880, 908 (1983) ("Denials of certiorari never have precedential value...."). *See also United States v. Carver,* 260 U.S. 482, 490 (1923) (Holmes, J.) (the "denial of a writ of certiorari imports no expression of opinion upon the merits of the case.").

from *Our Lady of Guadalupe* and *Hosanna-Tabor* and nothing else. As this Court has made clear, "[i]t is not the province of the court of appeals to predict how the Supreme Court will ultimately rule on an issue." *Manning v. Hunt*, 119 F.3d 254, 268 n.4 (4th Cir. 1997)

### C.     The District Court's Holding Is Especially Sound Given The Higher Education Context Of This Dispute.

Further, the District Court's holding is especially sound within the context of higher education (as opposed to secondary, elementary, or primary religious schools). As the Supreme Court long ago recognized: "There are generally significant differences between the religious aspects of church-related institutions of higher learning and parochial elementary and secondary schools. The 'affirmative if not dominant policy' of the instruction in pre-college church schools is 'to assure future adherents to a particular faith by having control of their total education at an early age." *Tilton v. Richardson,* 403 U.S. 672, 685-86 (1971) (quoting *Walz v. Tax Comm'n,* 397 U.S. 664, 671 (1970)). By contrast, at an institution of higher education such as Liberty, professors and students are encouraged to think for themselves, and, indeed, professors are expressly protected by the principles of Academic Freedom. In other words, in a college setting, more is required to transform a nominal

professor into a minister or a person covered by the ministerial exception. That "more" simply does not exist here.

### D.   Praying With Her Students At The Start Of Class Does Not Transform Palmer Into A Minister.

Palmer must also address the issue of prayer. Yes, Palmer sometimes read a Psalm or a Proverb or took a student's prayer request. But this did not turn her into someone who, as a "key" and "important" person at Liberty, was a "teacher of the faith." To the contrary, Palmer's prayers were not part of her art curriculum; they did not appear in her syllabi; no one was required to engage in prayer, and students were not graded on whether or not they participated in the prayers.  Indeed, if any of Palmer's students learned anything from those prayers, they did so because *they themselves* wanted to do so, not because Ms. Palmer demanded it.

In this context, then, "[l]abeling [a teacher] a 'minister' based on her attendance and participation in prayer and religious services with her students . . .  would greatly expand the scope of the ministerial exception and ultimately would qualify [almost] ***all*** of [Liberty's] teachers as ministers, a position rejected by the *Hosanna-Tabor* Court." *Herx v. Diocese of Ft. Wayne-South Bend, Inc.*, 48 F.Supp.3d 1168, 1177

(N.D. Ind. 2014). *See also Gallo v. Salesian Society, Inc.*, 676 A.2d 580, 590 (N.J. App. Div. 1996) (rejecting application of ministerial exception to a high school English and History teacher at a religious school where every teacher at the school, including the plaintiff, began each class with a prayer).

This is no understatement. If prayer is all that is required to transform a Liberty employee into a "minister," then one need look no further than "PASTOR" Hugh Freeze, the head coach of Liberty's football team who prays with his team, as Liberty's newest "minister." Would his prayers – especially at a school whose mission is to train "Champions For Christ" – somehow transform him from someone whose main goal is to decipher "X's" and "O's" every Saturday in the fall into a "minister" for purposes of the "ministerial exception"? One should hope not, but that is the inexorable consequence of any ruling in favor of Liberty based on the unremarkable instances of prayer performed by Palmer.

As well, the simple participation in devotions at Liberty would turn even lower-level (i.e., non-faculty member) employees into ministers. In its employee handbook, Liberty encourages its employees to pray at work. JA640 ("Office devotions are encouraged to give the employees of

individual offices the opportunity to meet once a week for spiritual enrichment with fellow employees. It is suggested that weekly devotionals be incorporated into regular office staff meetings."). Would it then seek to *punish* such religious behavior by turning around and seeking to deprive such employees of their rights under state and federal laws? Again, that is the consequence of Liberty's assertions.

And, finally, it must be again remembered that Liberty is not an elementary or secondary school teaching impressionable young students. This circumstance was extremely important for the Supreme Court in *Our Lady of Guadalupe*. As Justice Alito noted in the Court's majority opinion, the weight to be given to the factors that impact the application of the exception "must be evaluated in light of the age of the students taught." 140 S.Ct. at 2067-2068. Justice Alito also noted that with regard to the two teachers involved in those companion cases: "As elementary school teachers responsible for providing instruction in all subjects, including religion, they were the members of the school staff who were entrusted ***most directly*** with the responsibility of educating their students ***in the faith***." 140 S.Ct. at 2066 (emphasis added). Here, however, the notion of prayer by a professor is not nearly as significant

as prayers led by a teacher at a secondary school and is not particularly

probative as to whether the professor is acting as a "minister."[24]

**E.    What Liberty Is Really Asking For In Its Appeal Is For This Court To Defer To Its Assertions That Palmer Performed Ministerial Duties, Something It Is Not Required To Do, Nor Should Do.**

Finally, this Court should decline Liberty's invitation to allow it to

decide for itself who is  – and is not – a "minister" at the University for

purposes of the ministerial exception. This Court owes Liberty no

deference on this question, and the Supreme Court has not required

otherwise. Justice Thomas tried to get the Supreme Court to adopt such

a standard in *Hosanna-Tabor*, and he (together with Justice Gorsuch)

tried again to do so in *Our Lady of Guadalupe*.  However, this deference

standard did not carry the day, and thus, Liberty does not get the last

word as to who is a "minister" for purposes of the ministerial exception.

*See, e.g., Hough v. Roman Catholic Diocese of Erie*, 2014 WL 834473 at*4

(W.D. Pa. Mar. 4, 2014) ("This 'sincere belief' by the employer was not

---

[24] Indeed, in the analogous context of Establishment Clause jurisprudence, federal courts have routinely found that prayers within college setting do not carry the same weight or have the same force as those in a secondary school setting.  *See, e.g., Tanford v. Brand*, 932 F. Supp.2d 1139 (S.D. Ind. 1996) (denying motion to enjoin public college from saying prayers at its graduation ceremonies).

enough for the majority, despite Justice Thomas' urging, and cannot be the sole basis for the application of the ministerial exception by this Court here."). Any holding to the contrary would "obliterate[] the compelling interest reflected in antidiscrimination laws" and give religious schools such as Liberty "unmitigated power to discriminate." Joseph Capobianco, *Splitting the Difference: A Bright-Line Proposal for the Ministerial Exception*, 20 GEO. JOURNAL OF LAW & PUBLIC POLICY 451, 475 (2022).

### F.     A Ruling That Palmer Is Covered By The Ministerial Exception Will Expand The Exception Beyond Recognition And Will Swallow The Rule That Religious Institutions Are Covered By State And Federal Anti-Discrimination Laws.

This Court must also consider the consequences of establishing a rule of law that adopts Liberty's position in this case. For its part, weighing all of the record evidence and all of the applicable case law, the District Court thoughtfully observed that a ruling in Liberty's favor "would be a significant expansion of the conception of the ministerial exception." JA1458. The District Court was right. Indeed, a ruling that adopts Liberty's integration and "Christian role model" position would expand the "ministerial exception" beyond recognition and would have serious costs for employees at religious colleges and universities. Anti-

discrimination and retaliation laws at every religious organization will be illusory if all it takes to be a minister is for an employee to be a good Christian, model Christian behavior (such as praying with others), and integrate Christian values into his or her work life. There would be no limiting principle for such a position.

Although it predates the recent Supreme Court authorities on the exception, this Court's powerful admonition from its decision in *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 801 (4th Cir. 2000), remains apropos:

> While the ministerial exception promotes the most cherished principles of religious liberty, its contours are not unlimited and its application in a given case requires a fact-specific inquiry. ***The ministerial exception does not insulate wholesale the religious employer from the operation of federal anti-discrimination statutes***.

*Roman Catholic Diocese*, 213 F.3d at 801 (emphasis added). With this sentiment in mind, this Court should affirm the District Court's decision below on this issue and conclude that Palmer is not, was not, and never has been a minister at Liberty.

## CONCLUSION

For all of the reasons stated here, this Court should reverse the District Court's decision on Palmer's ADEA claim and affirm the District

Court's decision as to the applicability of the "ministerial exception"

under the First Amendment.

## CERTIFICATE OF COMPLIANCE

1.    This document complies with type-volume limits because, excluding

the parts of the document exempted by Fed. R. App. P. 32(f) (cover

page, disclosure statement, table of contents, table of citations,

statement regarding oral argument, signature block, certificates of

counsel, addendum, attachments):

    this document contains 12,825 words.

2.    This document complies with the typeface requirements because:

    this document has been prepared in a proportional spaced
    typeface using <u>Microsoft Word</u> in <u>14-point Century
    Schoolbook</u>.

Dated:  August 30, 2022        <u>/s/ Richard F. Hawkins, III</u>
                                Richard F. Hawkins, III

                                *Counsel for Appellant/Cross-Appellee*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 30, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all the registered CM/ECF users.

Dated:  August 30, 2022        /s/ Richard F. Hawkins, III
                                Richard F. Hawkins, III