**CASE NO. 21-2390(L); XAP 21-2434**

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

EVA PALMER,

*Plaintiff - Appellant/Cross-Appellee,*

v.

LIBERTY UNIVERSITY, INC.,

*Defendant - Appellee/Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA AT LYNCHBURG

## REPLY BRIEF OF
## APPELLEE/CROSS-APPELLANT

King F. Tower
WOODS ROGERS, PLC
Wells Fargo Tower
10 South Jefferson Street
P. O. Box 14125
Roanoke, VA 24038
540-983-7600
ktower@woodsrogers.com

Leah M. Stiegler
WOODS ROGERS, PLC
901 East Byrd Street
Suite 1550
Richmond, VA 23219
804-956-2050
lstiegler@woodsrogers.com

Horatio G. Mihet
Roger K. Gannam
LIBERTY COUNSEL
P. O. Box 540774
Orlando, FL 32854
407-875-1776
hmihet@lc.org
rgannam@LC.org

Mathew D. Staver
LIBERTY COUNSEL
109 Second Street NE
Washington, DC 20002
202-289-1776
court@lc.org

Daniel J. Schmid
LIBERTY COUNSEL
P. O. Box 11108
Lynchburg, VA 24506
434-592-3634
dschmid@lc.org

*Counsel for Appellee/Cross-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ...................................................................................... 1

ARGUMENT IN REPLY TO PALMER'S RESPONSE TO
LIBERTY'S CROSS-APPEAL ................................................................. 3

I.    This Court Is Not Tasked with Deciding Whether Other Employees
are Also Ministers .............................................................................. 3

II.   Liberty Was Not Required to Outline Specific Ministerial Tasks for
Palmer to Perform; It Entrusted Her with the Responsibility of
Instructing Students in the Faith ........................................................ 6

    a. Palmer engaged in religious acts to meet Liberty's expressly
required faith-based expectations ........................................... 7

    b. Palmer cannot immunize herself from the exception by now
claiming she failed to meet Liberty's faith-based expectations .......... 10

III.  Nothing About Liberty Being an Institution of Higher Education or
the Fact that its Faculty Enjoy Academic Freedom Limits the
Application of the Ministerial Exception .................................................. 12

    a. Ministering to adults is still ministering ............................................. 12

    b. Academic freedom and the ministerial exception are not
mutually exclusive ................................................................................. 13

IV.  This Court is Not Barred from Ruling on Liberty's Affirmative
Defense ................................................................................................. 17

CONCLUSION ........................................................................................ 20

CERTIFICATE OF COMPLIANCE ....................................................... 22

i

# TABLE OF AUTHORITIES

## Cases

*Biel v. St. James Sch.*,
    2017 WL 5973293 (C.D. Cal. Jan. 24, 2017) .................................................. 19

*Casa De Maryland v. U.S. Dep't of Homeland Sec.*,
    924 F.3d 684 (4th Cir. 2019) ...................................................................... 17, 18

*Curl v. Beltsville Adventist Sch.*,
    No. GJH-15-3133, 2016 WL 4382686 (D. Md. Aug. 15, 2016) ........................ 3

*Duquesne Univ. of the Holy Spirit v. Nat'l Lab. Rels. Bd.*,
    947 F.3d 824 (D.C. Cir. 2020) ................................................................... 15, 16

*E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*,
    582 F. Supp. 2d 881 (E.D. Mich. 2008) ......................................................... 19

*E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*,
    213 F.3d 795 (4th Cir. 2000) ......................................................................... 4, 5

*Foster v. Univ. of Md. E. Shore*,
    787 F.3d 243 (4th Cir. 2015) ............................................................................ 2

*Fratello v. Archdiocese of New York*,
    863 F.3d 190 (2d Cir. 2017) .............................................................................. 4

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
    565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (2012) ...................... 5, 18, 19

*Keyishian v. Bd. of Regents of Univ, of State of N.Y.*,
    385 U.S. 589, 87 S. Ct. 675 (1967) ................................................................. 14

*Kirby v. Lexington Theological Seminary*,
    426 S.W.3d 597 (Ky. 2014) ............................................................................. 18

*Lishu Yin v. Columbia Int'l Univ.*,
    335 F. Supp. 3d 803 (D.S.C. 2018) ............................................................. 4, 13

*Mahdi v. Stirling*,
    20 F.4th 846 (4th Cir. 2021) .............................................................................. 2

*Morrissey-Berru v. Our Lady of Guadalupe Sch.*,
    2017 WL 6527336 (C.D. Cal. Sept. 27, 2017) ................................................ 19

*Ostrander v. St. Columba Sch.*,
   No.: 3:21-cv-00175-W-LL, 2021 WL 3054877 (S.D. Cal. July 20, 2021) .. 9, 10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049, 207 L. Ed. 2d 870 (2020) .......................................... 6, 7, 9, 19

*Penn v. New York Methodist Hosp.*,
   884 F.3d 416 (2d Cir. 2018) ................................................................. 13, 18

*Rayburn v. Gen. Conference of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) .................................................................... 4

*Serbian E. Orthodox Diocese for the U.S. and Canada v. Milivojevich*,
   426 U.S. 696 (1976) ................................................................................. 13

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
   363 F.3d 299 (4th Cir. 2004) .................................................................... 13

*Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*,
   41 F.4th 931 (7th Cir. 2022) ................................................................. 10, 11

*Urofsky v. Gilmore*,
   216 F.3d 401 (4th Cir. 2000) .................................................................... 14

*Wahi v. Charleston Area Med. Ctr., Inc.*,
   562 F.3d 599 (4th Cir. 2009) ..................................................................... 2

**Other Authorities**

1940 Statement of Principles on Academic Freedom and Tenure, Am. Assoc. Univ.
Profs. https://www.aaup.org/report/1940-statement-principles-academic-freedom-
and-tenure .................................................................................................. 14, 16

## **INTRODUCTION**

As a professor, Palmer operated in a ministerial capacity, serving as a front-line messenger of Liberty's faith to thousands of students each year. Palmer's arguments to the contrary are unpersuasive and would require this Court to adopt a standard at odds with that created by the Supreme Court of the United States. Indeed, Palmer incorrectly asserts that, for the ministerial exception to apply, Liberty had to expressly require that Palmer carry out some religious task list, such as praying with her students and selecting liturgies. Palmer incorrectly assumes the only "requirement" Liberty had of her was for her to integrate a Christian worldview into the classroom. Palmer cautions this Court that applying the exception here would result in all employees at all religious institutions falling within the ministerial exception. Palmer also incorrectly asks this Court to apply a higher burden to Liberty because of its nature as a higher education institution and because Palmer enjoyed "academic freedom" in her teachings. In sum, Palmer's requests to this Court are inconsistent with the legal standard and are not instructive for this Court's inquiry.

What are instructive are Palmer's concessions in her writings during employment and orally during her deposition that she carried out Liberty's religious mission when performing her duties as a professor: She opened class with prayer or a reading from the Book of Psalms, she prayed with students, she advised students

1

to pray, she read Scriptures, she integrated faith, Christian principles and a Biblical worldview in the classroom, she spiritually mentored students, she spread the word of God to her students, she encouraged students to go on missions, she exhibited a Christian lifestyle, and she shared her faith with students.

Further, in its Opening Brief on its Cross-Appeal, Liberty detailed four main reasons the District Court's decision was in error and was contrary to applicable law. (Liberty Op. Cross App. Br. at Argument I(b)(i)-(iv)). Palmer seemingly failed to rebut or respond to these arguments. In fact, Palmer's sole effort to refute Liberty's detailed analysis as to why the district court's decision was in error was reduced to two sentences in a footnote. (Palmer Resp. to Liberty Cross App. at 53 n.22). As a matter of binding precedent, Palmer has waived any arguments concerning the four main analytical reasons for the district court's error. *See, e.g.*, *Mahdi v. Stirling*, 20 F.4th 846, 897 n. 36 (4th Cir. 2021) (finding argument addressed solely in a footnote is waived); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 607 (4th Cir. 2009) (holding that an issue raised solely in a footnote without any further development and addressed with only a single declarative sentence is waived); *Foster v. Univ. of Md. E. Shore*, 787 F.3d 243, 250 n.8 (4th Cir. 2015) (same).

For the foregoing reasons and those stated in Liberty's Opening Brief on its Cross-Appeal, Liberty respectfully requests this Court hold that the District Court

erred by denying its Motion for Summary Judgment, and find that the ministerial exception applies and thus bars Palmer's discrimination claim.

## ARGUMENT IN REPLY
## TO PALMER'S RESPONSE TO LIBERTY'S CROSS-APPEAL

### I.    This Court Is Not Tasked with Deciding Whether Other Employees are Also Ministers.

Palmer cautions this Court against adopting the ministerial exception here, arguing that the exception would "swallow the rule." (Palmer Resp. to Liberty Cross App. at 59-60). Palmer claims that she did nothing more than participate in prayer and religious services with her students and that by labeling her a minister, almost all of Liberty's faculty (and even Liberty's football coach) would constitute ministers within the meaning of the exception. (Palmer Resp. to Liberty Cross App. at 55-57). This Court, though, is not tasked with deciding whether the exception applies to all Liberty faculty or other employees; rather, this Court is only tasked with deciding whether Palmer falls within the exception.

The ministerial exception inquiry is case-specific, requiring the Court to analyze a number of factors as they relate to "*the employee*" in question—not all employees in a particular position. *Cf. Curl v. Beltsville Adventist Sch.*, No. GJH-15-3133, 2016 WL 4382686, at *8 (D. Md. Aug. 15, 2016) ("For the ministerial exception to bar a claim, two factors must be present: the employer must be a religious institution, and *the employee* must have been a ministerial employee.")

(citations omitted and emphasis added); *see also E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000) (("Our inquiry thus focuses on 'the function *of the position*' at issue and not on categorical notions of who is or is not a 'minister.'") (quoting *Raburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985) (emphasis added)).

The Second Circuit addressed this concern in *Fratello v. Archdiocese of New York*, explaining that, by finding school principal Joanne Fratello to be a minister within the meaning of the exception, the Second Circuit was not creating some "categorical presumption" that all parochial-school principals would qualify as ministers. 863 F.3d 190, 206 (2d Cir. 2017). The Second Circuit stated:

> In so concluding, though, we do not accept the defendants' argument that all parochial-school principals should be presumed to be ministers within the meaning of the exception. We think that any such categorical presumption runs counter to the teaching of *Hosanna-Tabor*, in which the Supreme Court looked to the specific circumstances of the plaintiff's employment to determine whether she was a minister. Although parochial-school principals may typically qualify as "ministers" within the meaning of the exception, some may perform few such religious functions—some, perhaps, none at all. In each case, therefore, we must assess the specific circumstances of employment.

*Id.* (internal citations omitted); *see also Lishu Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803, 818 (D.S.C. 2018) ("Indeed, there may be professors at CIU that perform few, if any, religious functions. Notwithstanding that consideration, the court will address those issues on a case-by-case basis.").

4

Palmer further argues that, if this Court applies the exception, "[a]nti-discrimination and retaliation laws at every religious organization will be illusory." (Palmer Resp. to Liberty Cross App. at 60). Even in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, the Supreme Court of the United States refused to consider arguments about "what could" happen to other employees and in other workplaces if the Court applied the ministerial exception to the case at bar. 565 U.S. 171, 195, 132 S. Ct. 694, 710 (2012). In referring to such hypotheticals as "a parade of horribles," the Court concluded,

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. . . . There will be time enough to address the applicability of the exception to other circumstances if and when they arise.

*Id.* at 196, 132 S. Ct. at 710. This Court need not credit Palmer's hypotheticals any more than the Supreme Court of the United States credited them in *Hosanna-Tabor*—which is to say, not at all.

Courts have, for decades, proven themselves of being perfectly capable of adjudicating this affirmative defense on a case-by-case basis. Employees that are entrusted with furthering an employer's religious mission and who perform a religious function are rightfully deemed ministers; those who do not, are not. That other employees "could be" ministers is irrelevant. *See E.E.O.C. v. Roman Catholic Diocese of Raleigh*, 213 F.3d at 801 (noting that the ministerial exception "requires

a fact-specific inquiry" and is not concerned with any "wholesale" insulation for religious employers).

## II. Liberty Was Not Required to Outline Specific Ministerial Tasks for Palmer to Perform; It Entrusted Her with the Responsibility of Instructing Students in the Faith.

Palmer premises much of her argument on what she was not *required* to do and on what she did *not* do. (Palmer Resp. to Liberty Cross App. at 26-33). Specifically, Palmer argues that neither her employment contract nor her job description required her to pray with students, lead them in worship services, teach Bible study or instruct on Scripture, give sermons or sing hymns, or engage in any other particular religious task list. (Palmer Resp. to Liberty Cross App. at 27-29, 32-33). Palmer also argues that she was never ordained, she never taught within Liberty's School of Divinity or worked in its Religion Department, that she never took students to Convocation, never gave sermons or selected liturgies, and never taught Bible study or theology. (Palmer Resp. to Liberty Cross App. at 26-27, 29-31). These arguments are unconvincing, though, because what matters, as a matter of law, is what Palmer *did*. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064, 207 L. Ed. 2d 870 (2020) ("What matters, at bottom, is what an employee does."). It is undisputed that Liberty entrusted Palmer with carrying out Liberty's religious mission and that she did just this.

a. Palmer engaged in religious acts to meet Liberty's expressly required faith-based expectations.

Palmer's argument incorrectly implies that a religious institution must expressly require that an employee engage in specific religious acts for the exception to apply. The Supreme Court already rejected this argument in *Our Lady of Guadalupe Sch.*, reasoning, "insisting in every case on rigid academic requirements could have a distorting effect." 140 S. Ct. at 2064, 207 L. Ed. 2d 870. Palmer's argument is also inconsistent with the evidence in the record, which establishes that faculty at Liberty are effectively required to engage in religious acts to meet Liberty's faith-based policies and expectations—faculty are just not held to any particular check-list standard.

Liberty required Palmer to abide by all of its faith-based policies and its Doctrinal Statement, which was incorporated into her annual Faculty Employment Agreements and the Faculty Handbook. (JA 31-32 ¶¶12-13, 61-74). Liberty also required Palmer to exhibit commitment to Christian principles and integrate a Christian worldview in the classroom, and evaluated Palmer's efforts to meet these expectations after each semester. (JA 32 ¶14, 168-69 ¶12). As Palmer herself recognized, faculty who failed to meet these expectations could face consequences, including non-renewal. (JA 166 ¶6, 247). While Liberty did not require Palmer to

7

carry out a more specific delineated list of religious tasks,[1] Liberty set expectations or parameters for actions by which Palmer could carry out its mission.  It is undisputed that Palmer was expected to use her platform as an educator to further Liberty's religious mission and she did just this.

Palmer undoubtedly integrated a Christian worldview.  (JA 34-36 ¶20, 101, 221-23, 249-52 at RFA Nos. 4-5).  She recognized integration was an "important" part of her job.  (JA 188-89, 198-203, 220, 234).  By her own admissions, "any discussing that [she] might have had with the students, would have included faith" and she gave "biblical answers" in response to questions from students.  (JA 198-200, 213, 221-23, 249-52 at RFA No. 10).  Palmer also did not refute the notion that she embodied and exhibited Christianity for her students in a manner consistent with Liberty's faith and that she incorporated faith into everything she did and everything she taught.  (JA 34-36 ¶20, 97-98, 187-89).

Palmer's situation is not unlike the situations of the teachers in *Our Lady of Guadalupe School.*  As the concurrence noted, the Our Lady of Guadalupe Faculty Handbook stated that teachers serve "special pastoral administrative roles . . . in the service of the people of God" and that they were required to model, teach, and

---

[1] Palmer's argument that Liberty required a University Shepherd in the School of Divinity to carry out specific religious duties does not in any way diminish Liberty's undisputed faith-based expectations here and Palmer's undisputed conduct in meeting those expectations.  Again, the fact that other employees may also be ministers is irrelevant.

commit "to Catholic religious and moral values" and perform their duties with a commitment to the Catholic School "in accordance with 'the doctrines, laws and norms of the Catholic Church.'" 140 S. Ct. at 2071. "The foregoing [wa]s more than enough to sustain the sincerity of petitioners' claims that [petitioner teachers] held ministerial roles in the parish schools." *Id.*

As demonstrated in *Our Lady of Guadalupe School*, the standard does not require that a religious institution expressly dictate that a teacher pray with her students, teach Bible lessons, or even spend some portion or percentage of her class time on religion. Rather, it is sufficient for a religious school to set expectations for faculty in its faculty handbook or employment agreement, and require faculty to teach their curricula in accordance with the faith-based doctrines of the institution while modeling the same.

Even if Liberty's employment contracts and job descriptions instructed Palmer to perform a litany of particular religious duties or maintained some court-endorsed language, such a focus misses the forest for the trees. In *Ostrander v. St. Columba School*, St. Columbia moved to dismiss the case on the grounds that the ministerial exception barred Sarah Ostrander's claims. No. 3:21-cv-175-W-LL, 2021 WL 3054877, at *6 (S.D. Cal. July 20, 2021). Ostrander's employment agreement required her to acknowledge acceptance of Catholicism and to affirm that, as a teacher, she was "performing a ministerial role which is important to the spiritual

9

and pastoral mission of the Roman Catholic Church and the Parish." *Id.* The court found the requirements in the employment agreement merely indicated what Ostrander was "*supposed* to do" and that was unpersuasive to whether the exception applied. *Id.* (emphasis in original). Indeed, the court wanted to know "what she *actually* did." *Id.* (emphasis in original). Thus, this Court should not be distracted by Palmer's argument that Liberty should have required Palmer to carry out a particular religious task list for the exception to apply and should instead focus on what Palmer did.

Accordingly, Liberty's expectations serve as a sufficient basis for requiring Palmer to operate in a ministerial capacity, and it is undisputed she did just this.

> b. Palmer cannot immunize herself from the exception by now claiming she failed to meet Liberty's faith-based expectations.

Palmer's long list of all the religious acts she now claims she never performed (Palmer Resp. to Liberty Cross App. at 30-31) does not insulate her from the exception's reach. If it did, religious employers could find themselves in an unfortunate Catch-22. In *Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, the employee, Lynn Starkey, argued that even though she was entrusted with religious responsibilities, she herself never engaged in religious acts. 41 F.4th 931, 941 (7th Cir. 2022). She claimed that, for instance, she never spoke on religious topics during Administrative Council meetings, prayed with or discussed religion with students during counseling sessions, and never participated in a call-and-

response prayer led by the principal. *Id.* The Seventh Circuit found that, even if Starkey never acted in a ministerial capacity, she still fell within the ministerial exception's reach because she was entrusted to do so and was supposed to do so. *Id.* Starkey could otherwise "immunize" herself from the exception by failing to perform such responsibilities. *Id.* It would further create an unintended consequence, whereby "religious institutions would then have less autonomy to remove an underperforming minister than a high-performing one," and that "an employee is still a minister if she fails to adequately perform the religious duties she was hired and entrusted to do." *Id.*

While Palmer now seemingly wants to minimize her previous admissions, the undisputed record demonstrates that she performed a variety of religious acts with her students and in the classroom. Palmer admitted that she regularly prayed and worshiped with students, expressed love for God with and to students, and started each class with a prayer or reading from the Book of Psalms or Proverbs, attended convocation with students and encouraged them to attend missions. (JA 33-34 ¶18, 97, 213-14, 249-52 at RFA Nos. 2, 6 and 8). She also shared her faith and held devotionals with her students both inside and outside the classroom. (JA 230-31, 249-52 at RFA Nos. 8 and 12). Palmer integrated principles and concepts from Scripture, and made references to Scripture in the classroom. (JA 34-36 ¶20, 101,

198-200, 203, 221-23).  It is evident from her letters of reference that Palmer spiritually mentored students.  (JA 109-11).

Liberty entrusted Palmer with carrying out its religious mission.  What matters is what Palmer did to meet that expectation.  Between integrating a Christian worldview, modeling a Christian existence, and performing religious acts with students and in the classroom, Palmer operated in a ministerial capacity.  Her attempt to focus the inquiry on what she was not expressly *required* to do and on what she did *not* do is an unavailing misdirection.

## III. Nothing About Liberty Being an Institution of Higher Education or the Fact that its Faculty Enjoy Academic Freedom Limits the Application of the Ministerial Exception.

### a. Ministering to adults is still ministering.

Palmer argues that, in higher education, faculty and students are encouraged to think for themselves and that faculty are protected by the principles of academic freedom.  (Palmer Resp. to Liberty Cross App. at 54).  Thus, Palmer believes that, "in a college setting, more is required to transform a nominal professor into a minister or a person covered by the ministerial exception." (Palmer Resp. to Liberty Cross App. at 54-55).  Palmer does not define what "more" would be needed for a university-level teacher to qualify as a minister.  Indeed, no Court has ever required "more" for a university-level teacher to qualify as a minister.

Ministering to an adult congregation versus a congregation of children is still ministering and has never changed the inquiry *See, e.g.*, *Columbia Int'l Univ.*, 335 F. Supp. 3d at 818 (applying the ministerial exception to a university-level professor); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 301 (4th Cir. 2004) (applying the ministerial exception to a kosher food director at a predominantly Jewish nursing home); *Penn v. New York Methodist Hosp.*, 884 F.3d 416, 420 (2d Cir. 2018) (applying the ministerial exception to a hospital Duty Chaplain who was required "[t]o counsel patients, families and staff as they deal with experiences of significant change, grief and loss"). Indeed, in the first case ever articulating a ministerial exception, the Supreme Court applied its requirements to a Bishop responsible for overseeing an adult congregation in the Serbian Orthodox Church. *See Serbian E. Orthodox Diocese for the U.S. and Canada v. Milivojevich*, 426 U.S. 696 (1976). Despite Palmer's desires to have this Court hold Liberty to a higher standard, a religious institution should rest assured that it maintains the same autonomy to choose the messengers of its faith irrespective of the age of the congregation.

      b.  <u>Academic freedom and the ministerial exception are not mutually exclusive.</u>

Academic Freedom is a concept that recognizes that higher education exists for the common good and not to further the interests of either an individual faculty member or the institution as a whole, and that the common good is dependent upon

the free search for "truth." *See* 1940 Statement of Principles on Academic Freedom and Tenure, Am. Assoc. Univ. Profs. (hereafter "1940 AAUP Statement of Principles") (last visited August 28, 2022), *available at* https://www.aaup.org/report/1940-statement-principles-academic-freedom-and-tenure. Academic freedom, while not a First Amendment Right, is a concept derived to protect First Amendment freedoms, just as is the ministerial exception. *See Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603, 87 S. Ct. 675, 683 (1967); *see generally Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th Cir. 2000) (discussing the history of the concept of "academic freedom" and its impact on university faculty). American classrooms are supposed to be the "marketplace of ideas" where students are "trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603, 87 S. Ct. at 683.

The fact that Liberty subscribes to principles of academic freedom does not make the University any less religious or its faculty any less subject to its religious objectives. Faculty at religious institutions can and do bring religion into the classroom. They can preach and proselytize. They can not only explore their disciplines, as would any secular faculty member, but can do so with a faith-based perspective. In short, faculty at religious institutions can and do use their platforms to minister, and such an approach (*i.e.,* not demanding that faculty engage in specific

conduct or conversations in the classroom) is fully consistent with the application of the ministerial exception.

In *Duquesne Univ. of the Holy Spirit v. Nat'l Lab. Rels. Bd.*, the University defendant argued that, because of its religious mission, it was not subject to the National Labor Relations Board's ("the Board") jurisdiction. 947 F.3d 824, 826 (D.C. Cir. 2020). The Board argued, among other things, that because Duquesne's faculty enjoyed academic freedom, the Board's ability to exercise jurisdiction over the University would not intrude on Duquesne's First Amendment rights. *Id.* at 835. The U.S. Circuit Court of Appeals for the District of Columbia rejected that argument, finding:

> This "threaten[s] to embroil the government in line-drawing and second-guessing regarding matters about which it has neither competence nor legitimacy." And the Board's distinctions refuse to accept that faculty members might contribute to a school's religious mission by exercising their academic freedom, even though many religious schools understand the work of their faculty to be religious in just this way. Indeed, 194 schools (including Duquesne) represent that academic freedom is an "essential component" of their religious identities, critical to their mission of "freely searching for all truth." This commitment to academic freedom does not become "any less religious" simply because secular schools share the same commitment, nor because it advances the school's religious mission in an "open-minded" manner as opposed to "hard-nosed proselytizing." Yet rather than accepting at face value that academic freedom serves a religious function, the Board sees academic freedom as the opposite: a sign that "religion has no bearing on faculty members' job duties." The Board may not "second-guess" or "minimize the legitimacy of the beliefs expressed by a religious entity" in this way.

*Id.* at 835-36 (internal citations omitted) (holding the Board did not have jurisdiction due to the religious nature of the University).

It is also true that Liberty faculty enjoy academic freedom subject to Liberty's faith-based policies and the religious mission of the University. Liberty's Statement on Academic Freedom is framed in a manner that distinguishes academic freedom enjoyed at Liberty with academic freedom enjoyed at a secular institution. For instance, Liberty's Statement begins with a reminder of the faculty's commitment to Liberty's "distinctive nature as a Christian institution" and lists five disclaimers that inform faculty that, while they have academic freedom, the University's religious mission and Christian identity influence all University activities. (JA 389). The Statement itself reiterates that while faculty "should be free from institutional censorship," they have a "special position in the community and their relationship with a university whose distinctive mission is defined by its identity with historic Christian faith imposes special obligations."[2] (JA 390). Liberty's Statement further advises faculty that "they should be careful not to introduce into their teaching controversial matter which has no relation to their subject," and that faculty may exercise this freedom so long as it does not result in the faculty member deviating from "agreed upon course materials or [result in the] violation of any other

---

[2] The AAUP also expressly states that there are in fact "[l]imitations of academic freedom because of religious or other aims of the institution. . . ." *See* 1940 AAUP Statement of Principles.

16

University policies or contract stipulations." (JA 389-90). It is undisputed that Liberty's policies and Employment Agreements solidify Liberty's requirements that faculty commit to Liberty's Doctrinal Statement and use their platforms as educators to carry out Liberty's religious mission. Consequently, just as there are recognized limits into a religious institutions' autonomy in their employment dealings, there are recognized limits for faculty autonomy in the classroom at religious institutions.

Palmer's argument that Liberty's burden should be higher because Palmer enjoyed academic freedom at an institution of higher education is unpersuasive when, in fact, if anything, taking Liberty academic freedom commitments into account only advances Liberty's mission. In sum, Liberty's faculty have a wide array of methodologies to employ when advancing Liberty's mission through their teachings in the classroom, and this state of affairs is in no way inconsistent with the application of the ministerial exception. Accordingly, Palmer's attempt to create a false dichotomy between ministerial duties and academic freedom fails.

## IV. This Court is Not Barred from Ruling on Liberty's Affirmative Defense.

In its Amicus Brief, Americans United for Separation of Church and State ("AUSCS") argues that this Court should only rule on Liberty's ministerial exception defense if there are no non-constitutional affirmative defenses that would bar her claim. Amicus Brief, AUSCS at 3-4. AUSCS cites *Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 706 (4th Cir. 2019) for the proposition

that the Court should not decide a constitutional question if there is some other ground upon which to dispose of the case. *Id.*

In *Casa De Maryland*, the defense before the Court was whether the government's decision to rescind the Deferred Action for Childhood Arrivals program violated the Fifth Amendment's due process and equal protection guarantees. *Id.* at 691. In contrast, the First Amendment's ministerial exception exists to prevent "government interference with an internal church decision that affects the faith and mission of the church itself," and the potential governmental inference at issue is a court's inquiry into whether a religious employer was wrong to have relieved a ministerial employee of her position. *Hosanna-Tabor*, 565 U.S. at 190, 132 S. Ct. at 698, 707. By embracing AUSCS's recommendation to rule on the substance of Palmer's ADEA claim or some other affirmative defense before considering the ministerial exception, this Court would engage in the exact governmental inference the ministerial exception exists to prevent. *See Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 608-09 (Ky. 2014) (finding application of the exception is a "threshold" inquiry, stating, "Certainly, it is important that these questions be . . . resolved expeditiously at the beginning of litigation to minimize the possibility of constitutional injury"); *Penn*, 884 F.3d at 429 ("[J]udges are ill-equipped to assess whether, and to what extent, an employment dispute between a minister and his or her religious group is premised

on religious grounds. . . .  [T]he court must dismiss the case.") (internal citations omitted).

Further, the Supreme Court of the United States was never concerned with this issue when presented with decisions by lower courts ruling first (and only) on the applicability of the ministerial exception to particular employment claims instead of considering other dispositive arguments not premised on the U.S. Constitution. *Compare E.E.O.C. v. Hosanna-Tabor Evangelical Lutheran Church & Sch.*, 582 F. Supp. 2d 881, 892 (E.D. Mich. 2008) (finding retaliation claim moot on summary judgment, holding, "Because Perich was a ministerial employee of Hosanna-Tabor, this Court can inquire no further into her claims of retaliation."), *with*  565 U.S. 171, 132 S. Ct. 694, 181 L. Ed. 2d 650 (granting certiorari to consider only whether the exception barred Perich's employment claims); *compare Biel v. St. James Sch.*, 2017 WL 5973293, at *1 (C.D. Cal. Jan. 24, 2017) (considering only the ministerial exception defense on summary judgment), and *Morrissey-Berru v. Our Lady of Guadalupe Sch.*, 2017 WL 6527336, at *1 (C.D. Cal. Sept. 27, 2017) (considering only the ministerial exception defense on summary judgment), *with Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2060, 207 L. Ed. 2d 870 (granting certiorari in both cases and finding, if the exception applies, "courts are bound to stay out of employment disputes")*.*

## <u>CONCLUSION</u>

In sum, as further detailed in Liberty's principal brief, the undisputed facts support Liberty's position that the ministerial exception applies here, and summary judgment should be granted in Liberty's favor. Liberty is a religious institution and Palmer was a minister within the meaning of the exception. Palmer was qualified to carry out Liberty's religious mission, she embraced Liberty's Doctrinal Statement and mission, she willingly embodied the very Christian Liberty wanted faculty to model, she spiritually mentored her students, performed religious acts in the classroom, and integrated a Christian worldview into her art teachings. Nothing in the briefs of Palmer or Amici should cause the Court to conclude otherwise.

Liberty requests the Court find that Palmer's ADEA claim was affirmatively barred by the ministerial exception and, therefore, the District Court erred in denying Liberty's Motion for Summary Judgment based on the ministerial exception. Liberty further requests the Court uphold the District Court's opinion granting Liberty's ADEA Motion for Summary Judgment.

Respectfully submitted,

 *King F. Tower, Esq.*
Counsel for Liberty University, Inc.

King F. Tower, Esq. (VSB No. 38767)
ktower@woodsrogers.com
WOODS ROGERS PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24011
Telephone:  (540) 983-7600
Facsimile:  (540) 983-7711

Leah M. Stiegler, Esq. (VSB No. 89602)
lstiegler@woodsrogers.com
WOODS ROGERS PLC
Riverfront Plaza, West Tower
901 East Byrd Street, Suite 1550
Richmond, Virginia 23219
TEL: (804) 956-2050
FAX: (804) 343-5021

Mathew D. Staver
LIBERTY COUNSEL
109 Second Street NE
Washington, DC 20002
Phone: (202) 289-1776
Facsimile: (407) 875-0770
Email: court@lc.org

Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 11108
Lynchburg, VA 24506
Phone: (434) 592-3634
Facsimile: (407) 592-7700
Email: dschmid@lc.org

Horatio G. Mihet
Roger K. Gannam
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: hmihet@lc.org; rgannam@lc.org

*Attorneys for Liberty University, Inc.*

## CERTIFICATE OF COMPLIANCE

1.     Liberty's Cross-Appeal Reply Brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point font.

2.     Exclusive of the cover page, disclosure statement, table of contents, table of authorities, signature block, and the certificates of compliance and service, Liberty's Reply Brief contains 4,776 words.

3.     Liberty's Reply Brief complies with the type-volume limitation of Rule 32 of the Federal Rules of Appellate Procedure.

*King F. Tower*
King F. Tower, Esq.
Dated: September 2, 2022

22