**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-2390**

———————

EVA PALMER,

> Plaintiff – Appellant,

v.

LIBERTY UNIVERSITY, INC.,

> Defendant – Appellee.

------------------------------

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE,

> Amicus Supporting Appellant/Cross-Appellee,

PEPPERDINE UNIVERSITY; BRIGHAM YOUNG UNIVERSITY; THE CATHOLIC UNIVERSITY OF AMERICA; HOUSTON BAPTIST UNIVERSITY,

> Amici Supporting Appellee/Cross-Appellant.

———————

**No. 21-2434**

———————

EVA PALMER,

> Plaintiff – Appellee,

v.

LIBERTY UNIVERSITY, INC.,

> Defendant – Appellant.

-------------------------------

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE,

Amicus Supporting Appellant/Cross-Appellee,

PEPPERDINE UNIVERSITY; BRIGHAM YOUNG UNIVERSITY; THE CATHOLIC UNIVERSITY OF AMERICA; HOUSTON BAPTIST UNIVERSITY,

Amici Supporting Appellee/Cross-Appellant.

--------

Appeals from the United States District Court for the Western District of Virginia, at Lynchburg.  Norman K. Moon, Senior District Judge.  (6:20-cv-00031-NKM-RSB)

--------

Argued:  January 26, 2023                    Decided:  June 30, 2023
Amended:  July 5, 2023

--------

Before KING and RICHARDSON, Circuit Judges, and MOTZ, Senior Circuit Judge.

--------

Appeal No. 21-2390 affirmed, and Appeal No. 21-2434 dismissed and vacated, by published opinion.  Judge King wrote the majority opinion, in which Judge Motz joined.  Judge Motz wrote a concurring opinion.  Judge Richardson wrote an opinion concurring in the judgment.

--------

**ARGUED:**  Richard F. Hawkins, III, THE HAWKINS LAW FIRM, PC, Richmond, Virginia, for Appellant/Cross-Appellee.  King Fitchett Tower, WOODS ROGERS VANDEVENTER BLACK PLC, Roanoke, Virginia, for Appellee/Cross-Appellant.  **ON BRIEF:**  Leah M. Stiegler, WOODS ROGERS PLC, Richmond, Virginia; Horatio G. Mihet, Roger K. Gannam, Orlando, Florida, Mathew D. Staver, Washington, D.C., Daniel J. Schmid, LIBERTY COUNSEL, Lynchburg, Virginia, for Appellee/Cross-Appellant.  Eric C. Rassbach, The Hugh and Hazel Darling Foundation Religious Liberty Clinic, PEPPERDINE CARUSO SCHOOL OF LAW, Malibu, California; Noel J. Francisco, Megan Lacy Owen, J. Benjamin Aguiñaga, JONES DAY, Washington, D.C., for Amici Pepperdine University, Brigham Young University, The Catholic University of America, and Houston Baptist University.  Richard B. Katskee, Bradley Girard, Gabriela Hybel, AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE, Washington, D.C., for Amicus Americans United for Separation of Church and State.

--------

2

KING, Circuit Judge:

In these consolidated appeals from the Western District of Virginia, plaintiff Eva Palmer challenges the district court's award of summary judgment to defendant Liberty University, Inc. ("Liberty") on Palmer's claim of age discrimination, pursued under provisions of the Age Discrimination in Employment Act (the "ADEA"). *See Palmer v. Liberty Univ., Inc.,* No. 6:20-cv-00031 (W.D. Va. Dec. 10, 2021), ECF No. 37 (the "Statutory Ruling"). On the other hand, Liberty, by cross-appeal, challenges an earlier award of summary judgment that was made to Palmer, in which the court ruled that Palmer was not a "minister" for purposes of the First Amendment's so-called "ministerial exception." *See Palmer v. Liberty Univ., Inc.,* No. 6:20-cv-00031 (W.D. Va. Dec. 1, 2021), ECF No. 35 (the "Constitutional Ruling").

As explained herein, we agree with the district court that Palmer failed to produce sufficient evidence of age-based discrimination to overcome Liberty's summary judgment motion on that issue. Accordingly, we are satisfied to affirm the Statutory Ruling in favor of Liberty. Moreover, in light of that disposition — and pursuant to the constitutional avoidance doctrine — we refrain from resolving whether Palmer was a minister for purposes of the First Amendment's ministerial exception. As a result, we are obliged to dismiss Liberty's cross-appeal and vacate the Constitutional Ruling.

I.

A.

Founded in 1971, Liberty is a Christian higher education institution located in Lynchburg, Virginia.[1]  With approximately 13,000 students enrolled at the main campus — and an additional 90,000 students attending online — the educational courses at Liberty "are taught from a biblical worldview and [are] designed in line with [the University's] mission to develop Christ-centered men and women."  *See* J.A. 41.[2]  To that end, the faculty members are considered by Liberty to be "messengers of Liberty's Christian worldview," with the expectation that they incorporate Christian principles into teaching.  *Id.* at 166.

For her part, Palmer — a self-professed follower of Christ — was an art professor at Liberty for more than 30 years, from 1986 to 2018.  Palmer began teaching at Liberty as a part-time art instructor in 1986, and was soon thereafter promoted to a full-time position. In 1992, Palmer was elevated to the rank of "Assistant Professor," which she maintained until her promotion to "Associate Professor" in 2006.  Finally, as discussed herein, Palmer was promoted to "Full Professor" in October 2016.  During her career at Liberty, Palmer taught "studio art courses" — i.e., traditional "ink and pen" art, such as painting, pottery,

---

[1] We accept and recite herein the relevant facts — as the district court was obliged to do — in the light most favorable to Palmer, as the nonmoving party, with respect to Liberty's summary judgment motion on Palmer's ADEA claim.  *See T.H.E. Ins. Co. v. Davis*, 54 F.4th 805, 812 n.2 (4th Cir. 2022) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)).

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

and ceramics — in the Studio & Digital Arts Department (the "Department"), a part of Liberty's School of Visual and Performing Arts ("SVPA"). While employed by Liberty, Palmer did not teach classes in the "digital arts," an area focusing on topics such as graphic design, production technology, digital illustration, and digital imaging.

B.

1.

For context, Liberty promotes its faculty members (nearly all of whom are employed on an annual basis and serve without tenure) based on certain specified criteria. As relevant here, for a faculty member to be elevated to Full Professor — the highest faculty rank attainable at Liberty — the faculty member must have, inter alia, "at least five (5) years of successful teaching experience at the associate professor rank." *See* J.A. 1328. Liberty faculty members are obliged to demonstrate "recent scholarly or professional productivity . . . in significant regional or national forums," including by publishing

> successful textbooks, scholarly monographs, scholarly articles in journals published with peer review, numerous articles in non-refereed professional magazines, numerous articles in high quality magazines aimed at segments of the general public, successful artistic performances (as recognized by other professionals in one's field), books, articles, and creative performances actually published, presented, or under contract.

*Id.* at 1328-29.

In addition to the above-referenced criteria for promotion, Liberty faculty members receive annual performance evaluations based on what is called a "Faculty Portfolio" (the "Portfolio"). *See* J.A. 917. The Portfolio consists of nine specified criteria, but only the first of those — entitled "Operational elements of instruction/administration" — is

5

pertinent here. That criterion asks the following question: "When teaching, do you record grades in Blackboard, return assignments and answer email in a timely fashion, *use technology in a manner appropriate to the discipline*, and meet all instruction-related deadlines?" *Id.* at 1331 (emphasis added).

The Portfolio requires a faculty member to initially conduct a self-evaluation of his or her own performance. Those self-evaluations are then reviewed by the faculty member's department chair, who provides additional comments and recommendations. At the final step in the evaluation process, the department chair's submissions are reviewed by the appropriate dean and, if necessary, supplemented with further recommendations. According to University policy and procedures, faculty members are expected to implement recommendations they receive in the Portfolio. Here, Palmer reported directly to a Liberty official named Smith, who served as Chair of the Department. Chair Smith reported directly to a Dean named Hayes, who had been for a time an Associate Dean of the SVPA, but in 2018 was elevated to the role of SVPA Dean. And as SVPA Dean, Hayes reported directly to Dr. Hicks, the Provost of Liberty.

2.

Starting in 2013, Palmer — then an Associate Professor — applied for promotion to the academic rank of Full Professor. Initially, Palmer's promotion efforts were unsuccessful, primarily due to her low rate of producing scholarly works and publications. Around that time, in an effort to facilitate her promotion, Palmer worked with her supervisors — Department Chair Smith and Dean Hayes — to develop a so-called "Professional Development Plan" (the "Promotion Plan"). Broadly speaking, the

6

Promotion Plan spelled out the expectations that Palmer had to satisfy to become a Full Professor. The Promotion Plan primarily emphasized that Palmer needed to substantially increase her scholarly output. Meanwhile, in another section entitled "Regarding Technology," the Promotion Plan related that Palmer should also work toward developing a digital art skillset and improve her technology skills. Recognizing that she needed to develop those types of digital art skills, Palmer likewise established personal "goals for improvement" related to technology. *See* J.A. 1134.

From 2014 to 2016, Palmer worked toward meeting the goals set forth in the Promotion Plan. Perhaps most important, Liberty administrators recognized that Palmer had substantially increased her scholarly work and presented her work at peer-reviewed conferences. As a result, Palmer was promoted to Full Professor in October 2016 — at the age of 77. At that time, Dean Hayes — who supported Palmer's promotion efforts — related in correspondence that Palmer had "satisfactorily completed a three-year plan to increase . . . the quantity and quality of her creative output, exhibit her work, present at peer-reviewed conferences, publish as appropriate, improve her teaching, and meaningfully participate in . . . university functions." *See* J.A. 979.

Around that same time period, Palmer also received annual Portfolio evaluations. Those evaluations — which contained recommendations from Department Chair Hayes and Dean Smith — recurrently emphasized the need for Palmer to improve her technology and digital art skills in order to teach digital art courses and to incorporate technology into her existing courses. *See* J.A. 938-39 (2013-14 Portfolio comment by Chair Smith recommending that Palmer "continue [taking] technology courses" and make

7

improvements regarding "incorporation of educational technology" into courses); *id.* at 940 (2014-15 Portfolio notation by Chair Smith rating Palmer as "Below Expectations" and recommending that Palmer "further develop her skills in essential areas related to digital technology and communication"); *id.* at 941 (2015-16 Portfolio notation by Chair Smith rating Palmer as "Below Expectations" in area of technology and recommending that Palmer "further develop her skills in essential areas related to digital technology"); *id.* at 945-946 (2016-17 Portfolio comment by Dean Hayes recognizing continued and ongoing issues with Palmer's teaching style); *id.* at 946 (2017-18 Portfolio comment by Palmer herself that she was continuing to "learn and utilize new technologies" in her courses); *but see id.* at 949 (2017-18 Portfolio comment by Dean Hayes advising of "significant criticisms" relating to Palmer's "teaching style effectiveness").

3.

Following Palmer's promotion to Full Professor in October 2016, Liberty experienced an increase in demand for digital art courses, along with a related need for instructors and professors qualified to teach such courses. Notwithstanding extensive Portfolio recommendations that Palmer bolster her technology and digital art skills, along with Palmer's promise to improve those skills, she was nonetheless not qualified in the Fall of 2017 to teach digital art courses for Liberty.

Beginning in the Fall of 2017, Department Chair Smith and Dean Hayes expressed reservations about whether Palmer's teaching contract should be renewed for the upcoming 2018-19 school year. In November 2017, the Dean — in consultation with the Chair — resolved that Palmer's contract for the upcoming school year should not be renewed. That

decision, according to both administrators, was predicated on the Department's need to hire more "cross-over" faculty members — i.e., those who could teach both studio and digital arts courses, either in person or online. To that end, the Dean and Chair assessed how they would handle Palmer's notice of nonrenewal. The two administrators discussed the possibility that Palmer could retire instead of facing nonrenewal (although Smith and Hayes had not discussed that option with Palmer, and she had otherwise not indicated any desire to retire). Following up on those deliberations, Chair Smith sent Dean Hayes a document identifying Palmer as "Retiring" for the 2018-19 school year, as opposed to indicating a "Non-Renewal." *See* J.A. 1341 (the "first retirement comment").

By correspondence of November 30, 2017, Dean Hayes formally notified Provost Hicks about the nonrenewal recommendation for Palmer, specifying two supporting reasons. First, the Dean related that Palmer was not qualified to teach digital arts courses — which were courses where Liberty was "struggling" to meet an increase in student demand — despite persistent Portfolio recommendations by the Dean and the Chair that Palmer "gain further skills with digital design software." *See* J.A. 988. Second, the Dean underscored that Palmer was not qualified to teach any courses on Liberty's online platform. Dean Hayes also informed the Provost that Palmer was the only faculty member in the Department who had not taught digital art courses for Liberty, and who did not possess the requisite technology skills to teach such courses.

Furthermore, the Dean's November 2017 correspondence explained the discrepancy between his October 2016 suggestion that Palmer be promoted to Full Professor, and his November 2017 recommendation against renewing Palmer's teaching contract. Dean

Hayes recognized that "Palmer was promoted last year" to Full Professor because of a "three year trend in her academic scholarship." *See* J.A. 988. But he observed that Palmer's "scholarship [had] not resulted in improving the range of content . . . [she] can teach for [the Department]," including online and digital arts-based courses. *Id.*

Soon thereafter, Provost Hicks suggested to Dean Hayes the possibility of giving Palmer a year to improve her technology and digital art skills, or consequently face nonrenewal for the following 2019-20 school year. The Dean rejected the Provost's suggestion in a December 2017 email, relating that Palmer would "have great difficulty with any changes, and this would most likely exacerbate negative student experiences." *See* J.A. 1409 (the "resistant-to-change comment"). A few months later, in March 2018, the Provost remarked that he would consider characterizing Palmer's forthcoming nonrenewal as a "retirement," but only if Palmer brought up an issue of retirement in response to the nonrenewal. *See* J.A. 1340-43, 1329 (the "second retirement comment").

4.

In April 2018, Liberty notified Palmer — who was then 79 years old — that her teaching contract would not be renewed for the upcoming 2018-19 school year. Although Palmer responded unfavorably to the nonrenewal notice, she did not raise any issue about retirement. Accordingly, Liberty did not give Palmer the option of retiring before her termination, which occurred at the end of May 2018.[3]

---

[3] Following Palmer's April 2018 nonrenewal, Liberty posted a job listing seeking an art instructor with "some experience in studio art," along with "expertise in one of the following: graphic design, animation, motion graphics, UI/UX design, responsive web (Continued)

C.

1.

After exhausting her administrative remedies with the Equal Employment Opportunity Commission, Palmer initiated this lawsuit in the Western District of Virginia in March 2020. *See Palmer v. Liberty Univ., Inc.*, No. 6:20-cv-00031 (Mar. 20, 2020), ECF No. 1. Her complaint — which solely pursues an ADEA claim of unlawful age discrimination — alleges that Liberty "discriminated against Palmer" by not "renew[ing] her employment contract for bogus reasons." *Id.* at 5.

After extensive discovery proceedings, Liberty moved for summary judgment in July 2021. In support of that request, Liberty asserted that the ministerial exception — an affirmative defense to liability rooted in the First Amendment — serves to bar Palmer's ADEA lawsuit from being pursued in federal court.[4] Liberty maintained that Palmer (as an art Professor at Liberty) qualifies as a minister under the legal principles established by the Supreme Court's recent decisions in *Hosanna-Tabor Evangelical Lutheran Church &*

_____

design, and game design." *See* J.A. 995. Between the Fall of 2019 and the Spring of 2020, Liberty hired four new graphic design instructors — all of whom had prior experience teaching graphic design courses, working in the graphic design industry, or both.

[4] As the Supreme Court has recognized, the First Amendment's ministerial exception "precludes application of [employment-discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers." *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188 (2012). The exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar[,] . . . because [it concerns] 'whether the allegations the plaintiff makes entitle him to relief,' not whether the court has 'power to hear the case.'" *Id.* (quoting *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010)).

11

*School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe v. Morrissey-Beru*, 140 S. Ct. 2049 (2020). Meanwhile, Palmer filed in July 2021 a cross-motion for summary judgment on the ministerial exception constitutional issue, maintaining that she was not a minister — either formally or informally — while employed by Liberty.

In November 2021, Liberty filed another motion for summary judgment, addressing the merits of Palmer's ADEA claim. More specifically, Liberty asserted that the ADEA claim fails as a matter of law, in that Palmer did not produce sufficient direct or circumstantial evidence of age-based discrimination by Liberty to warrant a jury trial.

2.

The district court resolved the parties' summary judgment motions by separate rulings rendered in December 2021. First, by its Constitutional Ruling, the court granted Palmer's motion for summary judgment, concluding that Palmer was not a minister for purposes of the ministerial exception. Second, by its Statutory Ruling, the court awarded summary judgment to Liberty, rejecting Palmer's ADEA claim on its merits.

a.

By its Constitutional Ruling of December 1, 2021, the district court determined that, pursuant to the Supreme Court's decisions in *Hosana-Tabor* and *Our Lady of Guadalupe*, Palmer was not a minister during her teaching career at Liberty, and thus ruled that the ministerial exception does not bar her ADEA claim. As the Ruling explained, "Liberty never referred to [Palmer] as a 'minister,' 'chaplain,' 'pastor,' or any other similar term." *See* Constitutional Ruling 9-10. The court also related that, "[a]lthough [Palmer] led

12

students in prayer before class, the evidence . . . does not support that [Palmer] did anything more ministerial, such as taking students to church services or giving religious lessons." *Id.* at 15. Thus, the court concluded that Palmer was not a minister for purposes of the First Amendment's ministerial exception.

b.

By its Statutory Ruling of December 10, 2021, the district court awarded summary judgment to Liberty on Palmer's lone claim of ADEA age discrimination. On that score, the Statutory Ruling addressed and resolved, inter alia, two related issues: "(1) whether Palmer has established direct evidence of [age] discrimination; [and] (2) if she has not established direct evidence, whether she has established sufficient indirect evidence to make out a prima facie employment discrimination case under the analysis laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *See* Statutory Ruling 2.

In explaining its Statutory Ruling, the district court first concluded that Palmer had failed to produce any direct evidence of age discrimination. In the court's view, the direct evidence that Palmer offered — i.e., the notations that Palmer was "retiring" and Hayes's comment that Palmer would "have great difficulty with any changes," *see* J.A. 948, 1409 — did not "'reflect directly the alleged discriminatory attitude'" of Liberty, nor did they "'bear directly on the contested employment decision,'" *see* Statutory Ruling 9-10 (quoting *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)). Nevertheless, the court recognized that, if those comments did "reflect age-based discrimination," Palmer yet could not show "that her age was the but-for cause of her . . . non-renewal." *Id.* at 12 (citing *Gross v. FBL Fin. Serv., Inc.*, 557 U.S. 167, 177-78 (2009)). The court emphasized that

13

"Liberty's evidence about terminating Palmer for being unable to teach digital arts courses is a legitimate motivation and Palmer has not offered sufficient evidence to show that Liberty's stated reason was not the reason for her termination." *Id.* at 13.

The district court then assessed whether Palmer's age discrimination claim could be premised on a theory of circumstantial evidence.  Against the backdrop of the Supreme Court's 1973 *McDonnell Douglas* decision — which requires a plaintiff to initially make a prima facie case in order to proceed under that evidentiary theory — the court reasoned that, although Palmer was a "member of a protected class" (i.e., age 40 or older), had "suffered an adverse employment action," and was "replaced by or treated less favorably than someone outside the protected class or someone substantially younger," she had failed to meet Liberty's legitimate expectations at the time of her 2018 nonrenewal because she failed to develop a digital art skillset.  *See* Statutory Ruling 13-14.

In that regard, the Statutory Ruling emphasized that, although Department Chair Smith and Dean Hicks repeatedly "prompt[ed] Palmer to develop a digital art skillset" by way of the Portfolio, she "never developed that skillset." *See* Statutory Ruling 14.  As to Palmer's claim that she "was not aware of the full extent of Liberty's dissatisfaction with her performance," the court deemed that fact as "irrelevant to the ADEA analysis because 'it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'"  *Id.* (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)). Because Palmer failed to make a prima facie case of age discrimination, the court concluded that her ADEA claim could not proceed on a circumstantial evidence theory. On those bases, the Statutory Ruling awarded summary judgment to Liberty.

14

3.

In December 2021, Palmer timely appealed from the Statutory Ruling. That appeal was filed in this Court as Appeal No. 21-2390. Two weeks thereafter, on December 29, 2021, Liberty noticed its cross-appeal of the Constitutional Ruling. Liberty's appeal was filed as Appeal No. 21-2434. We have consolidated those appeals, and we possess jurisdiction over them pursuant to 28 U.S.C. § 1291.

II.

We review an award of summary judgment de novo. *See Bright v. Coastal Lumber Co.*, 962 F.2d 365, 368 (4th Cir. 1992). Summary judgment is only appropriate when — viewing the facts in the light most favorable to the nonmoving party (here, Palmer) — the moving party (Liberty) has demonstrated that "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *See FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).

III.

On appeal, Palmer contends that we should vacate the Statutory Ruling and remand to the district court for a jury trial on her age discrimination claim. More specifically, Palmer maintains that she presented both direct and circumstantial evidence of age-based discrimination by Liberty, and that the district court thus erred in awarding summary judgment to Liberty on her ADEA Claim. Meanwhile, despite urging affirmance as to the

15

Statutory Ruling, Liberty urges in its cross-appeal that we should reverse the Constitutional Ruling and decide that Palmer was a minister under the First Amendment.

As explained below, Palmer has failed to produce direct or circumstantial evidence of age-based discrimination by Liberty. Accordingly, we are obliged to affirm the Statutory Ruling. In light of that affirmance, we will adhere to the constitutional avoidance doctrine and not address the constitutional question of whether Palmer was a minister during her teaching career at Liberty.

A.

1.

We begin our analysis with Palmer's appellate challenge to the propriety of the Statutory Ruling. Under the ADEA, an employer may not "discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." *See* 29 U.S.C. § 623(a)(1). An employee who alleges that her employer violated that prohibition "must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009). That is, "an employee cannot prevail . . . by showing that age was one of multiple motives for an employer's [adverse employment] decision; the employee must prove that the employer would not have fired her in the absence of age discrimination." *See Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 725 (4th Cir. 2019) (internal quotation marks omitted).

Direct evidence of age discrimination has been described in the employer/employee context as evidence that the employer "announced, or admitted, or otherwise unmistakably

indicated that age was a determining factor." *See Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982). In other words, the requisite direct evidence in an ADEA case is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *See Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted).

If a plaintiff cannot produce direct evidence of age-based discrimination, an ADEA claim can nevertheless be pursued under a circumstantial evidence theory. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-02 (1973); *Mereish v. Walker*, 359 F.3d 330, 333-35 (4th Cir. 2004) (applying *McDonnell Douglas* framework to ADEA claim). To proceed thereunder, three steps must be satisfied:

> (1) the plaintiff must first establish a prima facie case of [age discrimination]; (2) the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the adverse action; (3) the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory.

*See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

On the first step, the plaintiff can make a prima facie case of age discrimination by demonstrating that "(1) [she] is a member of a protected class, (2) [she] suffered an adverse employment action (such as discharge), (3) [she] was performing [her] job duties at a level that met the employer's legitimate expectations at the time of the adverse employment action, and (4) [her] position remained open or was filled by a similarly qualified applicant outside the protected class." *See Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006). Of importance, if the plaintiff fails to make the requisite prima face case, our inquiry under

17

the *McDonnell Douglas* framework ends at step one. *See King v. Rumsfeld*, 328 F.3d 145, 150 (4th Cir. 2003) (concluding that employer did not need to supply explanation for adverse employment action because plaintiff failed to make prima facie case).

### 2.

Against this backdrop of controlling legal principles, we will first assess whether Palmer produced direct evidence of age discrimination to pursue her ADEA claim in federal court. Because she has not, we will then assess whether Palmer has produced circumstantial evidence of age-based discrimination — more specifically, whether she has made a prima facie case of age discrimination under the *McDonnell Douglas* framework.

### a.

We have no trouble agreeing with the district court's conclusion in its Statutory Ruling that Palmer failed to produce direct evidence of age discrimination. As in the district court proceedings, Palmer emphasizes on appeal the first and second retirement comments made by the Dean and the Provost — along with the Dean's resistant-to-change comment — as constituting direct evidence of age discrimination. According to Palmer, those comments demonstrate that Liberty harbored age-based animus towards her and did not renew her contract on account of her age. As explained further below, we disagree.

### i.

Starting with the retirement comments, at least two of our sister circuits have concluded that mere comments or inquiries about retirement — without more — fail to constitute direct evidence of age discrimination. *See Moore v. Eli Lilly & Co.*, 990 F.2d 812, 818 (5th Cir. 1993) (resolving that employer's questions about employee's age and

retirement plans did not reveal discriminatory intent); *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997) (concluding that employer's questions about employee's retirement "do not amount to evidence" that age was motivation for termination); *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) (recognizing that "questions concerning an employee's retirement plans do not alone constitute direct evidence of age discrimination"). We agree with and adopt that well-reasoned proposition. As applied to the facts here, neither the first nor the second retirement comments amount to direct evidence of age-based discrimination that is attributable to Liberty.

For starters, the retirement comments were not actually presented to Palmer — rather, they were made by the Dean and by the Provost of Liberty during internal deliberations about how to handle Palmer's nonrenewal if she brought up the possibility of retirement. Second, even if those comments had been addressed directly to Palmer, they were devoid of any reference to Palmer's age. *See Halloway v. Milwaukee Cnty.*, 180 F.3d 820, 825 (7th Cir. 1999) (recognizing that employer's requests that employee retire are not reference to age). And on this record, neither the first nor the second retirement comments — without more — constitute direct evidence of age-based discrimination by Liberty.

Our conclusion that the retirement comments do not amount to direct evidence of age discrimination also finds support in a 1997 Seventh Circuit decision. *See Kaniff v. Allstate Insurance Co.*, 121 F.3d 258 (7th Cir. 1997). In *Kaniff*, a supervisor suggested that the plaintiff retire after the defendant learned that the plaintiff was not adequately performing. The *Kaniff* plaintiff asserted that the supervisor's comment amounted to direct evidence of age-based discrimination. The court of appeals disagreed, however,

emphasizing that "the suggestion of retirement was made only after" the company had determined that the plaintiff was not performing adequately. *Id.* at 263. As the Seventh Circuit explained, "the possibility of retirement was raised by [the employer] only in order to spare [the employee] the embarrassment of being terminated." *Id.* Similar to that decision, Dean Hayes and Provost Hicks contemplated retirement as an option if Palmer brought up that issue as an alternative to nonrenewal. Most notably — and again similar to the facts underlying *Kaniff* — the retirement comments emphasized here were made after the Dean and the Provost had concluded that Palmer was not meeting the University's legitimate technology-related expectations.[5]

ii.

Moving on, the resistant-to-change comment made by Dean Hayes in December 2017 also does not constitute direct evidence of age discrimination. Specifically, the Dean's comment does not "reflect directly the alleged discriminatory attitude" of Liberty. *See Warch*, 435 F.3d at 520. Similar to the two retirement comments, the resistant-to-change comment was not connected to Palmer's age. We agree with the district court's cogent point that "Palmer provides no evidence that Liberty believed Palmer was resistant to change solely, or even partially, because of her age." *See* Statutory Ruling 12. Rather,

---

[5] Addressing the two retirement comments, the Statutory Ruling explained that Palmer's case was not a "forced retirement," which the district court acknowledged can be "impermissible under the ADEA." *See* Statutory Ruling 11 (internal quotation marks omitted). We agree with that assessment. Indeed, "Liberty only contemplated offering Palmer the opportunity to retire *after* . . . deciding that it would terminate her for not developing digital skills." *Id.* (emphasis added). Thus, it cannot be said that Liberty "forced" Palmer to retire from her position as an art professor.

"Liberty believed that Palmer was resistant to change because of her demonstrated failure to develop digital skills after her supervisors repeatedly advised her to do so." *Id.*

b.

Despite Palmer's inability to present direct evidence of age discrimination on the part of Liberty, we must — pursuant to the *McDonnell Douglas* framework — also assess whether her ADEA claim can be premised on a circumstantial evidence theory. On that score, the parties mainly dispute whether Palmer has satisfied the third element of the prima facie case — whether she "was performing [her] job duties at a level that met the employer's legitimate expectations at the time" of her nonrenewal. *See Baqir*, 434 F.3d at 742.[6] To satisfy that factor, "a plaintiff need not 'show that she was a perfect or model employee.'" *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021) (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019)). Rather, "a plaintiff must show that she was qualified for the job and that she was meeting her employer's legitimate expectations." *Id.* (quoting *Haynes*, 922 F.3d at 225).

On appeal, Palmer maintains that she was meeting Liberty's legitimate expectations at the time of her 2018 nonrenewal. For support, Palmer emphasizes her October 2016 promotion to Full Professor, arguing that the 2016 promotion demonstrates her adequate performance at the time of her 2018 nonrenewal. Additionally, Palmer maintains that, in

---

[6] In the district court, Liberty argued that Palmer could not prove the fourth element of a prima facie case — i.e., that her "position remained open or was filled by a similarly qualified applicant outside the protected class." *See Baqir*, 434 F.3d at 742. Although the court ruled that Palmer satisfied the fourth element, Liberty does not challenge on appeal that aspect of the Statutory Ruling.

light of her 2016 promotion, she had no reason to believe that she was otherwise failing to meet Liberty's technology-related expectations. Meanwhile, Liberty takes the position that, although Palmer had been promoted to Full Professor in October 2016, she still did not satisfy Liberty's legitimate expectations at the time of her 2018 nonrenewal because of her failure to develop technology or digital art skills. According to Liberty, the record indisputably reflects that two of the Liberty administrators — Dean Hayes and Department Chair Smith — repeatedly informed Palmer that she needed to improve her technology and digital art skills, but Palmer inexplicably failed to develop those skills.

Put simply, we agree with the Statutory Ruling that Palmer was not meeting Liberty's legitimate expectations at the time of her 2018 nonrenewal. As the district court aptly recognized, "Liberty has put forward substantial evidence documenting repeated attempts to prompt Palmer to develop a digital art skillset," but Palmer "never developed that skillset." *See* Statutory Ruling 14. Indeed, the Portfolio evaluations — along with Palmer's own self-imposed "goals for improvement" — reflect as much. *See* J.A. 1134. Those notations tellingly reveal that the Liberty administrators repeatedly urged Palmer to develop a digital art skillset, and that Palmer was aware of that necessity. Yet Palmer failed to develop the requested skillset, either before or after her October 2016 promotion.

That conclusion notwithstanding, Palmer staunchly insists that her October 2016 promotion to Full Professor — standing alone — creates a genuine dispute of fact that precludes the Statutory Ruling's award of summary judgment to Liberty. Palmer suggests that her promotion "wiped the slate clean," and that any pre-promotion performance evaluations are irrelevant to the analysis of her case. But Palmer's "clean slate" contention

suffers from at least two crucial infirmities. First, that contention is temporally flawed. That is, Palmer has failed to explain why her performance in October 2016 means that she was performing adequately at the time of her nonrenewal — which was in April 2018.

Second, Palmer's "clean slate" contention overlooks the undisputed fact that, after her October 2016 promotion to Full Professor, Dean Hayes and Department Chair Smith had ongoing concerns about her lackluster technology and digital art skills. For example, in the 2016-17 Portfolio evaluation, the Dean pointed out that there were recurring issues with Palmer's "teaching style." *See* J.A. 946. And in the 2017-18 Portfolio evaluation, although Palmer claimed she was "learn[ing] and utliz[ing] new technologies," the Dean directly rebuffed that comment, stating that "significant criticisms [exist] pertaining to [Palmer's] communication and teaching style effectiveness." *Id.* at 946, 949.

Resisting our conclusion that she was not meeting Liberty's legitimate expectations at the time of her nonrenewal, Palmer points to our 2021 decision in *Sempowich v. Tactile Systems Technology.* In *Sempowich*, we concluded that a plaintiff-employee — who had been repeatedly rated by her employer as a high-performing employee — was satisfying the employer's legitimate expectations at the time of an adverse employment action. More specifically, we recognized in *Sempowich* that, "[i]f an employer genuinely believed that one of its employees was performing poorly on metrics the employer perceives as critical . . . it seems likely that it would at the very least not rate the employee's performance highly or give her awards, a salary raise, or an equity grant." *See* 19 F.4th at 650. And we explained that those positive evaluations and accolades — which were bestowed upon the *Sempowich* plaintiff mere "weeks before" the adverse employment action — "raised [a]

23

reasonable inference . . . that [the employee] was performing at a satisfactory level." *Id.* at 650-51 (internal quotation marks omitted). By contrast, Palmer was simply not meeting Liberty's technology-related expectations up and until the time of her 2018 nonrenewal. Unlike in *Sempowich*, the lone accolade that Palmer can point to — her October 2016 promotion — was bestowed upon her more than a year before her nonrenewal. Thus, Palmer's reliance on *Sempowich* is misplaced.

Simply put, we agree with the Statutory Ruling and Liberty that Palmer has failed to make a prima facie case of age discrimination, in that Palmer cannot show that she was meeting Liberty's legitimate expectations at the time of her 2018 nonrenewal. And because Palmer is unable to proceed beyond the first step of the *McDonnell Douglas* framework, her ADEA claim also cannot be premised on a circumstantial evidence theory.

c.

Finally, Palmer's ADEA claim suffers from yet another infirmity: if Palmer had produced direct or circumstantial evidence of age discrimination, she would nevertheless need to show that age was the but-for cause of her nonrenewal. As discussed above, the Supreme Court recognized in its 2009 *Gross* decision that "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor." *See* 557 U.S. at 173. Rather, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Id.* at 177. Pursuant to *Gross*, the "employee must prove that the employer would not have fired her in the absence of age discrimination," not prove that "age was one of multiple motives" for the adverse employment decision. *See Westmoreland*, 924 F.3d at 725.

24

USCA4 Appeal: 21-2390      Doc: 79      Filed: 07/05/2023      Pg: 25 of 57

Stated succinctly, Palmer has failed to demonstrate that age was the but-for cause of her 2018 nonrenewal. Palmer was not meeting Liberty's legitimate expectations at the time of her nonrenewal, in that she repeatedly failed to develop a digital art skillset. And Palmer has failed to contend with the fact that the comments she characterizes as evidence of age discrimination — the retirement comments plus the resistant-to-change comment — were made subsequent to the Chair and the Dean having resolved not to renew her teaching contract for the 2018-19 school year. Thus, it cannot be said that Liberty "would not have fired [Palmer] in the absence of age discrimination." *See Westmoreland*, 924 F.3d at 725.

* * *

In sum, because Palmer has failed to produce either direct or circumstantial evidence of age-based discrimination, Liberty is entitled to summary judgment on her ADEA claim. As such, we are constrained to affirm the Statutory Ruling.[7]

B.

1.

We turn next to Liberty's cross-appeal — that is, Appeal No. 21-2434 — relating to the Constitutional Ruling. Although Liberty concedes that we could resolve this

---

[7] Despite concluding that Palmer cannot make a prima facie case, the district court proceeded to analyze the second and third steps of the *McDonnell Douglas* framework — whether Liberty had articulated a legitimate nondiscriminatory reason for the nonrenewal decision and, if it had articulated such reasons, whether Palmer could show that Liberty's proffered reason was pretextual. Although we appreciate the able judge's thorough reasoning, Palmer simply cannot make a prima facie case of age discrimination, in that she failed to meet Liberty's legitimate expectations at the time of her 2018 nonrenewal. Accordingly, we refrain from analyzing the second and third steps of the *McDonnell Douglas* framework. *See King*, 328 F.3d at 150.

litigation in its favor simply by affirming the Statutory Ruling, it prefers that we also decide whether Palmer was a minister under the First Amendment's ministerial exception. Pursuant to the constitutional avoidance doctrine, however, we decline Liberty's invitation to render an advisory opinion on that issue.

As the Supreme Court has recognized, "[i]t is a well[-]established principle governing the prudent exercise of . . . jurisdiction that normally [a federal court] will not decide a constitutional question if there is some other ground upon which to dispose of the case." *See Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). To that end, Justice Brandeis emphasized in his landmark *Ashwander* concurrence that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of . . . general law, the Court will decide only the latter." *See* 297 U.S. at 347 (Brandeis, J., concurring). Almost a century later, that "cardinal principle of judicial restraint" stands for a wholly uncontroversial proposition. *See PDK Lab'ys Inc. v. U.S. Drug Enf't Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring). And as our distinguished Chief Justice — then serving on a court of appeals — explicitly recognized, "if it is not necessary to decide more, it is necessary not to decide more." *Id.*; *see also Casa de Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 706 (4th Cir. 2019) (applying constitutional avoidance doctrine and declining to decide constitutional question).

In these circumstances, we need not deviate from the strictures of the constitutional avoidance doctrine and decide whether Palmer was a minister for purposes of the ministerial exception. Foremost, the ministerial exception is an affirmative defense to

liability — not a jurisdictional bar — and there is no controlling authority to otherwise suggest that such an issue should be resolved in the first instance.  To that end, two of our sister circuits — in similar circumstances — have invoked the constitutional avoidance doctrine and declined to decide a ministerial exception issue.  *See Headley v. Church of Scientology Intern.*, 687 F.3d 1173, 1181 (9th Cir. 2012) (invoking constitutional avoidance doctrine and declining to resolve ministerial exception issue); *Penn v. New York Methodist Hosp.*, 884 F.3d 416, 427 n.5 (2d Cir. 2018) (same).  Our exercise of judicial restraint in this situation is entirely consistent with the Supreme Court's own preference: "[t]here will be time enough to address the applicability of the [ministerial] exception to other circumstances if and when they arise."  *See Hosanna-Tabor*, 565 U.S. at 196.[8]

2.

Although we are satisfied to adhere to the constitutional avoidance doctrine in this situation, we will briefly explain our decision to dismiss Liberty's cross-appeal of the

---

[8] We pause to mention an important point: adherence to the constitutional avoidance doctrine is not an indication — in any way — of agreement with Judge Richardson's unnecessary assessment of the ministerial exception issue.  *See post* at 42-56.  And that assessment is not authoritative in any manner.  Rather, in keeping with *Ashwander* and its progeny, we are obliged to resolve this cross-appeal solely on the statutory ground that does not implicate the constitutional question.  More specifically, we rule herein that Liberty is entitled to summary judgment on the merits of Palmer's ADEA claim, and we do not reach or resolve the constitutional issue of whether that claim is barred by the ministerial exception.  To reiterate, as Justice Brandeis well explained — and as a legion of subsequent decisions has consistently confirmed — "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of . . . general law, the Court will decide only the latter."  *See Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring); *see, e.g.*, *Escambia Cnty.*, 466 U.S. at 51; *Casa de Maryland*, 924 F.3d at 706.  In these circumstances, a court of appeals — much less a lone appellate judge — does not possess a roving writ to gratuitously decide an interesting constitutional issue.

Constitutional Ruling.  As we recognized in our *Norfolk Southern* precedent of 2010, "[w]e are always obliged to assure ourselves that a live dispute exists between the parties at all stages of litigation."  *See Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).  To that end, "[a] dispute is moot when the parties lack a legally cognizable interest in the outcome."  *Id.* (internal quotation marks omitted).  And "the parties lack such an interest when . . . our resolution of an issue could not possibly have any practical effect on the outcome of the matter."  *Id.*  As we observed in *Norfolk Southern*, "[t]he customary practice when a case is rendered moot on appeal is to vacate the moot aspects of the lower court's judgment," if the mootness "occurred through happenstance, rather than through the voluntary action of the losing party."  *Id.* at 161-62 (internal quotation marks omitted).

In these circumstances, a decision on the merits of the Constitutional Ruling "could not possibly have any practical effect on the outcome of the matter."  *See Norfolk S.*, 608 F.3d at 161.  That is, the resolution of a ministerial exception constitutional issue in this case would necessarily "result in an advisory opinion being rendered" on a moot issue.  *Id.* at 162.  And although a party "may desire that we render an opinion to satisfy [a] demand for vindication or curiosity about who's in the right and who's in the wrong, we may only decide cases that matter in the real world."  *Id.* at 161 (internal quotation marks omitted).

Finally, we recognize that Liberty's cross-appeal has been rendered moot "not by virtue of any voluntary action of either party, but instead by the vagaries of circumstance."  *See Norfolk S.*, 608 F.3d at 162.  As such, in addition to dismissing Liberty's cross-appeal, our *Norfolk Southern* precedent compels that we vacate the unreviewed Constitutional

28

Ruling. *See Goldman v. Brink*, 41 F.4th 366, 369 (4th Cir. 2022) (applying *Norfolk Southern* precedent, dismissing appeal, and vacating "unreviewed" constitutional ruling).

IV.

Pursuant to the foregoing, we affirm the Statutory Ruling, dismiss Liberty's cross-appeal, and vacate the Constitutional Ruling.

Appeal No. 21-2390 — *AFFIRMED*

Appeal No. 21-2434 — *DISMISSED AND VACATED*

DIANA GRIBBON MOTZ, Senior Circuit Judge, concurring:

I concur fully in Judge King's excellent opinion for the court, which thoroughly explains why the district court properly granted summary judgment to Liberty University on Eva Palmer's age discrimination claim. I write separately only in response to the discussion of the ministerial exception in Judge Richardson's concurrence, with which I respectfully disagree. In my view, this is not a case where the ministerial exception would apply, and I want to avoid any suggestion that this court would hold to the contrary.

## I.

First, a brief review of the pertinent facts. Throughout Palmer's more than three decades of employment by Liberty and Liberty-affiliated entities, she had always served as an art teacher. Palmer's educational background is in the arts: she has a bachelor's degree in education, with a concentration in art, as well as two master's degrees in the fine arts. Before her nonrenewal, Palmer worked in Liberty's Studio & Digital Arts Department, which was housed within the School of Visual & Performing Arts. In this role, Palmer taught traditional "studio arts" courses like painting, pottery, and ceramics. As her recent course syllabi confirm, she instructed her students on skills such as "stretch[ing] and prim[ing] a canvas," "[a]pplying color theory in mixing paint," and "[d]evelop[ing] a design portfolio."

Palmer never taught any courses on theology or religion. Nor did she have any experience as a minister. What is more, the position description for Studio & Digital Arts faculty members is completely secular. For example, recent art faculty position descriptions solicit applicants with a master's degree in the fine arts and expertise in

"graphic design, animation, motion graphics, UI/UX design, responsive web design, and game design with some experience in studio art." The position description's "job summary" and list of qualifications do not mention religion. Thus, as the district court noted, "nothing in Palmer's job description referred to ministerial duties." *Palmer v. Liberty Univ., Inc.*, No. 20-31, 2021 WL 6201273, at *5 (W.D. Va. Dec. 1, 2021). In short, Palmer's most recent job title, "Professor of Art," accurately and succinctly captures the role she performed for Liberty.

Liberty, of course, is a private, Christian university. In its faculty handbook, Liberty charges its faculty with "impart[ing] to students a liberal arts education which provides for academic, spiritual, personal, and professional development." The handbook states further that Liberty faculty must "be a model of biblical lifestyle, character, and relationship in every aspect of [their] lives." Additionally, one of the nine specified criteria on which Liberty faculty are evaluated is "Integration of Biblical Worldview." But as Liberty readily admits, "[f]aculty are not expressly required to engage in specific religious conduct in the classroom." Liberty Opening-Response Br. at 8.

Palmer considers herself "a follower of Jesus Christ." Palmer often began her class sessions by "reading one or two verses from the Book of Psalms or Proverbs," albeit "without [further] comment or discussion." She would also "ask for prayer requests" and pray with her students. Palmer did not, however, deliver sermons or lead her students in Bible study. Indeed, as Palmer testified during a deposition, "there's no time in the classroom for teaching the subject of art to teach Bible." Thus, as the district court concluded, the record provides "scant evidence of [Palmer] actually integrating theological

lessons into her classes." *Palmer*, 2021 WL 6201273, at \*7.  Outside of the classroom, Palmer took advantage of Liberty's many faith offerings.[1]  She frequently attended worship services and convocations.  But Palmer did not take her students to services and convocations or sit with her students if they also happened to be in attendance.

To summarize, it is undisputed that Palmer herself is deeply religious and, because she worked at a religious university, availed herself of the opportunity to pray with her students and talk openly about her faith in the classroom.  But it is also undisputed that Palmer was an art professor, that Palmer never taught religion classes, that Liberty did not require Palmer to engage in *any* specific religious conduct in her capacity as an art professor, that Palmer never considered herself a minister, and that Liberty never held Palmer out as a minister.

Liberty and Judge Richardson contend that these facts suffice to trigger the ministerial exception and defeat Palmer's age discrimination suit.  Recent guidance from the Supreme Court does not support such an expansive view of the ministerial exception.

---

[1] Judge Richardson points out that Palmer "enrolled in the university's 'Doctor of Ministry' program, earning more than 30 credit hours towards her degree."  Conc. Op. at 51 n.4.  This simply evidences Palmer's keen interest in the subject.  The record offers no indication that Liberty so much as encouraged (let alone required) her to enroll in this program.  Palmer explained that she enrolled in the program not because she wanted to become a minister, but because she wanted to study the Bible in depth.

II.

Federal courts of appeals have long recognized a ministerial exception to certain antidiscrimination lawsuits between an employee and employer.  *See, e.g.*, *EEOC v. Catholic Univ. of Am.*, 83 F.3d 455 (D.C. Cir. 1996); *Scharon v. St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360 (8th Cir. 1991); *Natal v. Christian and Missionary Alliance*, 878 F.2d 1575 (1st Cir. 1989).  But the Supreme Court did not explicitly endorse this exception until 2012 in *Hosanna-Tabor Evangelical Lutheran Church & School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012).  The Court further defined the contours of the ministerial exception in the successor case of *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020).

*Hosanna-Tabor* and *Our Lady of Guadalupe* clarify that the ministerial exception can apply even when an employee, in addition to performing religious functions, has substantial secular responsibilities.  At the same time, those cases make clear that the ministerial exception does not apply to *everyone* employed by a religious entity.  *See Our Lady of Guadalupe*, 140 S. Ct. at 2060 ("Under [the ministerial exception], courts are bound to stay out of employment disputes involving those holding important positions with churches and other religious institutions.").  After all, the ministerial exception's purpose is to ensure that religious institutions retain ultimate authority over their relationship with "certain key employees," not to entirely insulate religious entities from generally applicable antidiscrimination laws.  *See id.* at 2055, 2060.

33

Those cases thus counsel that the ministerial exception is just that — an *exception*, applicable only to a subset of a religious entity's employees. They do not provide a basis to enlarge the ministerial exception to cover this easily distinguishable case.

III.

Judge Richardson essentially concedes that Palmer did not teach religion classes. *See* Conc. Op. at 53 (noting that "Palmer did not provide formal religious instruction."). And he expressly concedes that she did not lead a religious organization, conduct worship services, or preside over important religious ceremonies and rituals. *See id.* at 50 n.3. Nonetheless, he concludes that Palmer served as "an official 'messenger' of [Liberty's] faith" and therefore is a "'minister' for First Amendment purposes." *Id.* at 42, 50.[2] But this conclusion blinks at the facts presented given the posture of this case, which comes to us as an appeal from the grant of summary judgment to Liberty. Accordingly, we must view the facts in the light most favorable to Palmer and draw all reasonable inferences in her favor. Given this standard, the facts undeniably paint a picture of Palmer's role very different from that of the teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe*, and therefore I cannot agree that the ministerial exception would apply here.

---

[2] Judge Richardson insists that Palmer is a minister because Liberty "expected Palmer to conform her classes to its religious message, and to help it spread that message." Conc. Op. at 50. For support, he cites Liberty's mission statement as reproduced in its faculty handbook and website, and notes that faculty were evaluated on, among other criteria, whether they integrate a Biblical worldview into their "teaching/administrative responsibilities." *Id.* at 51. To be sure, these sources establish that Liberty is a religious institution, but they do not establish that Palmer's day-to-day job rendered her a "key employee" who would qualify as a minister.

A.

When determining whether an employee of a religious entity qualifies for the ministerial exception, we must examine all the "circumstances of her employment," training our focus on "what [the] employee does." *Hosanna-Tabor*, 565 U.S. at 190; *Our Lady of Guadalupe*, 140 S. Ct. at 2064.

As an art professor, Palmer taught "3D Art," "Painting I," "Drawing I," "Introduction to Design," and related courses. Her course syllabi confirm that she taught the same sort of secular art lessons that one would expect to receive at a public, non-religious university. Likewise, she graded her students on the quality of original artwork they produced, as well as certain written assignments about art. Palmer did begin her classes with a short prayer and openly discussed her belief in the existence of God, but unlike the teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe*, Palmer did not teach religion classes.

Judge Richardson minimizes the undisputed fact that Palmer never taught religion, contending that this "single difference" should not matter in the end. *See* Conc. Op. at 53. But it is noteworthy that Cheryl Perich, Agnes Morrissey-Berru, and Kristen Biel — the teachers in *Hosanna-Tabor* and *Our Lady of Guadalupe* — were all considered "catechists," i.e., *teachers of religion*. 565 U.S. at 178; 140 S. Ct. at 2057, 2066–67. Thus, while the Supreme Court has declined to "adopt a rigid formula for deciding when an employee qualifies as a minister," it has only applied the ministerial exception to cases involving "teachers at religious schools who [were] entrusted with the responsibility of

35

instructing their students in the faith." *Our Lady of Guadalupe*, 140 S. Ct. at 2055, 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 190); *see also Hosanna-Tabor*, 565 U.S. at 192 (emphasizing that Perich, who "taught her students religion four days a week," served "[a]s a source of religious instruction" and "performed an important role in transmitting the Lutheran faith to the next generation").

Indeed, the *Our Lady of Guadalupe* majority highlighted that Morrisey-Berru and Biel "were Catholic elementary school *teachers*, which meant that they were their students' primary teachers of religion." 140 S. Ct. at 2067. The Court explained that "[t]he concept of a teacher of religion is loaded with religious significance," noting that in scripture "Jesus was frequently called rabbi," which means teacher. *Id.* Thus, the Supreme Court has made clear that one important factor in determining the ministerial exception's applicability is whether an employee provides religious instruction — and it is not one that should be lightly disregarded. Accordingly, even if not dispositive, it is highly relevant that Palmer did not teach religion. *See id.* at 2057, 2067 (emphasizing that Morrissey-Berru and Biel were "responsible for the faith formation of the students in their charge").

## B.

Moreover, contrary to my concurring friend's suggestion, the fact that Palmer did not teach religion is not "the only major difference" between this case and *Our Lady of Guadalupe*. *See* Conc. Op. at 53. The two teachers in *Our Lady of Guadalupe* prepared their students to participate in Mass, communion, and confession; both teachers were evaluated on whether they had religious signs and displays in their classrooms; and both attended religious services with their students. 140 S. Ct. at 2057, 2059, 2066. And, in

addition to regarding both teachers as catechists, the schools in *Our Lady of Guadalupe* also made clear that they viewed those teachers as key employees for purposes of the schools' religious mission.

One of those teachers, Morrissey-Berru, "took religious education courses at the school's request . . . and was expected to attend faculty prayer services." *Id.* at 2056. The other, Biel, taught at a school that *required* that she pray with her students on a daily basis. *Id.* at 2059. Both Morrissey-Berru and Biel were subject to the direct oversight of religious leaders within the Roman Catholic Church. In Morrissey-Berru's case, her employment was conditioned on the annual approval of "[t]he pastor of the parish, a Catholic priest." *Id.* at 2057. Biel's school principal was a Catholic nun. *Id.* at 2059.

Unlike the elementary school teachers in *Our Lady of Guadalupe*, Palmer did not instruct her students on the significance of various religious sacraments. She was not required to install religious displays in her classroom, and she was not expected to attend religious education courses or accompany her students to religious services. Moreover, Liberty did not require Palmer to report to religious leaders. Instead, she reported to the Chair of the Studio & Digital Arts Department, who in turn reported to the Associate Dean of the School of Visual & Performing Arts.

Furthermore, Palmer was not given instructions on how to implement a Christian worldview into her teaching. Unlike her *Our Lady of Guadalupe* counterparts, Palmer evidently was accorded significant discretion as to whether and to what extent she wished to integrate faith into the classroom. In fact, the record indicates that the only religious activities that Palmer engaged in were *voluntary*. Notably, Palmer did not incorporate a

single theological lesson into her course syllabi, but this apparently proved no impediment to Palmer's promotion to "Full Professor," the highest academic rank at Liberty.  In sum, it is a mistake to conflate Palmer's personal devotion to her faith with whether she was the type of key employee who performed a vital religious function for her employer.  Not only does this case not involve a teacher who was charged with teaching religion classes, it also does not involve a teacher who was given *any* concrete responsibility for integrating faith into her classroom activities.

Were that not telling enough, the record here includes ample evidence of how Liberty advertised vacant art faculty jobs to would-be applicants.  Those position descriptions said nothing about religion; rather, they focused on the technical expertise that art faculty needed in the studio and digital arts.

Thus, Palmer's case does not, as my friend Judge Richardson suggests, "look[] extremely similar" to *Our Lady of Guadalupe*.  Conc. Op. at 52.  The differences are abundant.  The ministerial exception, as interpreted by the Supreme Court, simply does not apply to Palmer.[3]

---

[3] Judge Richardson would go still further than the Supreme Court has.  He would not limit his proposed holding to Palmer, the faculty member involved in this case.  Instead, sidestepping the Court's repeated admonitions that the ministerial exception is a fact-based inquiry that must be based on the totality of the circumstances, he asserts that "every professor at Liberty" is a minister.  *See* Conc. Op. at 56.  In so doing, Judge Richardson tacitly embraces the idea "that the Religion Clauses require civil courts to defer to religious organizations' good-faith claims that a certain employee's position is 'ministerial.'"  *See Our Lady of Guadalupe*, 140 S. Ct. at 2069–70 (Thomas, J., concurring); *see also Hosanna-Tabor*, 565 U.S. at 196 (Thomas, J., concurring).  This is not a position the Court has accepted.

IV.

Make no mistake: the conception of the ministerial exception advanced by my concurring colleague is no mere application of existing precedent. It is a dramatic broadening of the ministerial exception that would swallow the rule. *Cf. DeWeese-Boyd v. Gordon Coll.*, 163 N.E.3d 1000, 1017 (Mass. 2021), *cert. denied*, 142 S. Ct. 952 (2022) (declining to apply the ministerial exception to an associate professor of social work, and explaining that doing so would mark a "significant expansion of the ministerial exception doctrine"). It is also one that if adopted would carry profound practical consequences.

The ministerial exception effectively "gives an employer free rein to discriminate because of race, sex, pregnancy, age, disability, or other traits protected by law when selecting or firing their 'ministers,' even when the discrimination is wholly unrelated to the employer's religious beliefs or practices." *Our Lady of Guadalupe*, 140 S. Ct. at 2072 (Sotomayor, J., dissenting).[4] It is no exaggeration to say that the ministerial exception "condones animus." *Id.* Thus, the necessary implication of greatly expanding the

---

[4] Let us not forget that Palmer's case is fundamentally one about alleged age-based employment discrimination. There is no suggestion anywhere in the record or briefs that Liberty terminated Palmer's employment for any religious reason. The same is true of *Hosanna-Tabor* and *Our Lady of Guadalupe*. *Hosanna-Tabor* involved an employee who was allegedly fired in retaliation for threatening to file an Americans with Disabilities Act lawsuit, 565 U.S. at 179, and in *Our Lady of Guadalupe*, "[t]wo employers fired their employees allegedly because one had breast cancer and the other was elderly," 140 S. Ct. at 2071 (Sotomayor, J., dissenting).

ministerial exception is that far fewer employees would be protected from employment discrimination.

When it comes to key religious figures, this is a necessary tradeoff. The First Amendment's Religion Clauses require that religious organizations retain the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952). "Without that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

But Palmer was not a key religious figure or a minister. She was an art professor. Indeed, if basic acts like praying with one's students and referencing God in the classroom are enough to transform an art professor into the type of key faith messenger who qualifies for the ministerial exception, one can only speculate as to who else might qualify for the exception. *See DeWeese-Boyd*, 163 N.E.3d at 1017 (observing that if integrating faith "into daily life and work" at a religious college were all that was required for the exception to apply, all of the school's employees, "whether they be coaches, food service workers, or transportation providers," would be ministers).

An employee does not shed her right to be free from workplace discrimination simply because she believes in God, prays at work, and is employed by a religious entity. Absent clear guidance from the Supreme Court, I cannot agree with a view of the ministerial exception so capacious that it entirely erodes vital antidiscrimination protections for scores of workers throughout the United States.

40

V.

That said, Judge King has more than capably explained why the constitutional avoidance doctrine cautions against reaching the ministerial exception issue in this case. Because it was unnecessary for the district court to confront this issue, I fully agree with the decision to vacate that decision and dismiss Liberty's appeal from it. I also fully agree with the decision to affirm the district court's judgment in Liberty's favor as to the substantive age discrimination claim. But, as explained above, even if I were to accept Judge Richardson's prudential argument in favor of deciding the ministerial exception issue first, I would conclude that the exception does not apply here given the facts of this case.

RICHARDSON, Circuit Judge, concurring in the judgment:

While I am inclined to agree with my friends in the majority that Palmer's age-discrimination case fails on its merits, that issue strikes me as less straightforward than they suggest. But I would not even wade into the merits here, since we must grant summary judgment to Liberty for a separate reason: The First Amendment's "ministerial exception" bars employment claims made by ministers against a religious institution. I would rest on that latter ground.

True, as a general rule, we should not decide constitutional questions when we could instead resolve a case on statutory grounds. But this rule of "constitutional avoidance" is entirely prudential; like most general rules, it has exceptions. This case warrants such an exception. The Supreme Court has admonished against the "very process of inquiry" into a religious institution's faith or governance. *NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979). Yet adjudicating the merits of Palmer's claim would force us to make that inquiry. Before biting into that apple, we should determine whether the First Amendment protects Liberty in this case.

It plainly does. The First Amendment's "ministerial exception" bars Palmer's suit. Though Palmer did not perform formal religious instruction, her job description required her to integrate a "Biblical worldview" into her teaching. And Palmer admits to regularly praying with students, indeed starting her classes with a psalm or a prayer. Accordingly, Liberty viewed her as an official "messenger" of its faith. Under the Supreme Court's recent precedent, Palmer thus qualified as a "minister." That entitles Liberty to absolute

immunity over its decision to fire her.  So I would grant Liberty summary judgment on those grounds.

## I.    Constitutional Avoidance Ought Not Bind Us Here

Like the majority, I endorse Justice Brandeis's "constitutional avoidance" principle: We generally should not "pass upon a constitutional rule although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). But the Supreme Court has been clear that this "rule" is prudential. *See, e.g.*, *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 7 (1993) (referring to the "*prudential* rule of avoiding constitutional questions" (emphasis added)).  In other words, constitutional avoidance is more like a guideline than a rule; we need not yield to it when there are "important reasons" for doing otherwise. *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193 (1909); *see also Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring) (citing *Siler*).

One reason that might justify addressing a constitutional issue over a statutory one could be federalism—for instance, deference to a state's authority to interpret its own statute. *See Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 355 (4th Cir. 2022) (Richardson, J., concurring in the judgment).  And, here too, there are "important reasons" for addressing the lurking constitutional issue of whether the First Amendment's ministerial exception bars Palmer's claims.  Swerving around that issue veers us too close to the very interests that the First Amendment protects, and risks entangling us in inherently religious questions.

To understand why, we need to explore the ministerial exception in more detail. Although not specifically recognized by the Supreme Court until its recent decisions in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 (2012), and *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), the exception has deep roots.  It grows out of the broader  "church-autonomy doctrine," which protects religious institutions' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *see also Our Lady of Guadalupe*, 140 S. Ct. at 2061 (describing *Hosanna-Tabor* and the ministerial exception as rooted in "the general principle of church autonomy").  The ministerial exception is a specific facet of the church-autonomy doctrine that guards a religious institution's authority to select certain personnel.  It prevents "the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor*, 565 U.S. at 181.

Despite its name, the ministerial exception applies to more employees than those few who are literally called "ministers."  After all, many faith traditions do not use that title. *See Our Lady of Guadalupe*, 140 S. Ct. at 2063–64.  Instead, a "minister" under the exception is any employee with "vital religious duties." *Id.* at 2066.  That includes "any 'employee' who":  (1) "leads a religious organization," (2) "conducts worship services," or (3) "serves as a messenger or teacher of its faith." *Id.* at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)) (emphasis removed).  Because these employees are either involved with "the internal governance of the church," or else serve as messengers who "personify its beliefs," the First Amendment's two Religion Clauses—both the

Establishment Clause, Clause 1 of the First Amendment, and the Free Exercise Clause, Clause 2 of the First Amendment—work together to prohibit the government from "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so."[1] *Hosanna-Tabor*, 565 U.S. at 188.

Once a court decides that the ministerial exception applies, its inquiry ends. The employer need not show that it had a "religious reason" for firing the minister. *Hosanna-Tabor*, 565 U.S. at 194. Instead, the employer may fire the minister for *any* reason— including one that, on its face, has no connection to religion and would otherwise be illegal. *See Our Lady of Guadalupe*, 140 S. Ct. at 2072 (Sotomayor, J., dissenting).

We do not demand a "religious reason" from the employer for firing their minister because their decision generally boils down to the same basic question: "Do we," the religious organization, "want this person to make doctrinal or organizational decisions for us, or to speak for us on religious matters?" When the answer is "no," whatever reason the organization gives doesn't matter. If a court imposes a minister on a congregation that doesn't want her—even if the court does so based on employment-law principles—it nonetheless impinges on the church's religious interest in choosing who speaks for it. *See*

---

[1] How is the ministerial exception grounded in *both* Religion Clauses? On the one hand, the Establishment Clause prohibits the federal government (and, post-incorporation, the states) from creating a state religion, which in England and colonial America involved, among other things, "filling ecclesiastical offices." *Hosanna-Tabor*, 565 U.S. at 184. On the other hand, the Free Exercise Clause "protects a religious group's right to shape its own faith and mission through its appointments." *Id.* at 188. Thus, although in many contexts these two clauses "exert conflicting pressures," here both converge to create the ministerial exception. *Id.* at 181 (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005)).

Douglas Laycock, *Church Autonomy Revisited*, 7 Geo. J.L. & Pub. Pol'y 253, 260–62 (2009); *see also Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 980 (7th Cir. 2021) (en banc).  In other words, simply saying "I don't want her speaking for me on religious matters" is itself, in a sense, expressing a religious motive for firing the minister.  So there is no need to delve into that question.

Some go even further.  Not only is there no *need* to inquire into a church's motives, they say, but indeed that inquiry itself may offend First Amendment interests.  *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 205–06 (Alito, J., concurring) (noting that "the mere adjudication of such questions would pose grave problems for religious autonomy").  The Supreme Court, in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979), cautioned that the "very process of inquiry" into the "good faith" of a religious employer "may impinge on rights guaranteed by the Religion Clauses," by risking excessive "entanglement" in religious affairs.  *See id.* at 501–03; *see also Our Lady of Guadalupe*, 140 S. Ct. at 2060 ("[C]ourts are bound to *stay out of* employment disputes involving those holding certain important positions with churches." (emphasis added)).  Our own Court explained that the ministerial "exception shelters certain employment decisions from the *scrutiny* of civil authorities." *EEOC v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000) (emphasis added).  And other judges have understood the ministerial exception—like qualified immunity, or the Fifth Amendment's Double Jeopardy Clause— to protect a religious institution not only from ultimate liability, but also from judicial *inquiry* itself.  *See, e.g.*, *Belya v. Kapral*, 59 F.4th 570, 577–80 (2d Cir. 2023) (Park, J.,

46

dissenting from denial of rehearing en banc); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1049–55 (10th Cir. 2022) (Bacharach, J., dissenting).

The extent to which *Catholic Bishop*'s "entanglement" concerns—as a constitutional matter—survive the demise of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), is an open question. *See Cath. Bishop*, 440 U.S. at 501 (citing *Lemon* as prohibiting "excessive governmental entanglement"). After all, "*Lemon* and its ilk are not good law" any longer. *Firewalker-Fields v. Lee*, 58 F.4th 104, 121 n.5 (4th Cir. 2023). Today, we must evaluate Establishment Clause claims using "historical practice and understanding." *Id.* at 122. But I need not say that a court's inquiry into a minister's employment is *unconstitutional* in order to say that it is—as a prudential matter—a bad idea for us to become so entangled.[2]

Deciding this case on statutory grounds would lead to exactly that kind of entanglement. Skirting the ministerial exception by dismissing an employment-

---

[2] That said, there is some historical support for the idea that the First Amendment prohibits the government from entangling itself in church leadership selection. *Hosanna-Tabor* itself noted that, when a Catholic bishop asked whom he should appoint to lead the Catholic Church in the newly acquired Louisiana Territory, then-Secretary of State James Madison declined to even weigh in. 565 U.S. at 184. In Madison's view, even "rendering an opinion," *id.*, would violate the "scrupulous policy of the Constitution in guarding against a political interference with religious affairs." Letter from James Madison to Bishop Carroll (Nov. 20, 1806), reprinted in 20 Records of the American Catholic Historical Society of Philadelphia 63–64 (1909)); *but cf.* Letter from James Madison to Bishop Carroll (Nov. 20, 1806), reprinted in 20 Records at 64–65 (offering, in a separate "Private" letter, a more detailed opinion on the Bishop's selection). So, even applying the new history-and-tradition test, *see Firewalker*, 58 F.4th at 121–22, the ministerial exception may constitutionally bar judicial inquiry into a religious employer's motives. But, because I decline—as a matter of prudence—to engage in that inquiry, I need not decide definitively whether such an inquiry would be unconstitutional.

discrimination claim on its merits forces us to inquire into the church's motives for firing its minister. But, as discussed already, the church's decision is intrinsically bound up in religious doctrine. To subject such a decision to the scrutiny of temporal courts threatens the church's "power to decide for themselves, free from state interference, matters of . . . faith." *Kedroff*, 344 U.S. at 116. And the sort of "inquiry" that entangles us in matters of faith encompasses more than just digging through a religious institution's employment files and deposing its leaders. In my view (and at the risk of sounding too metaphysical), the mere act of *questioning* the institution's motives—even if the court ultimately decides that those motives are "pure"—cheapens its authority over ecclesiastical affairs.

Suppose that a Baptist church fires one of its elderly preachers, saying that his sermons weren't quite "fire-y" enough. For the previous three years, the church had consistently warned him about the problem, reporting that congregants were dozing off while he was at the pulpit. But the preacher nonetheless turns around and sues, claiming age discrimination. We would rightly dismiss that suit as barred by the First Amendment; we would not, for a moment, entertain wading into the merits of the preacher's claim. And we certainly would not deign to decide whether he was "meeting his employer's legitimate expectations" when he was let go, and thus whether he could make out a prima facie case of discrimination. We would recognize that even asking that question goes too far.

But that is exactly what the majority does here. *See* Majority Op. at 21–24. And, if you're determined to reach the merits, asking such a question is almost inevitable. Discrimination cases center on the employer's motives, since a fundamental question in each one is whether the employer engaged in *intentional* discrimination. *See Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.").  Indeed, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), from which the prima facie case derives, is just a way of dividing "intermediate evidentiary burdens" that "serves to bring the litigants and the court expeditiously and fairly to this ultimate question":  What *motivated* the employer's decision?  *Tex. Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  And that "process of inquiry"—"not only the conclusions"—is what risks entanglement, *Cath. Bishop*, 440 U.S. at 502, and is what we ought to steer clear of.

In sum, deciding the merits of an age-discrimination case—whether we rule for the employer or not—requires us to "inquire" into that employer's motives.  But, if the plaintiff was the employer's minister, then that is precisely what we should avoid.  So—at least as a matter of prudence—we should decide if that's the case before going any further.

## II.    The Ministerial Exception Bars Palmer's Suit

Thus, before peering into the merits of Palmer's age-discrimination case, we should resolve a threshold question:  Does the First Amendment's ministerial exception bar it?  The answer:  It does.  The key issue is whether Palmer had "vital religious duties," *Our Lady of Guadalupe*, 140 S. Ct. at 2066, specifically whether she "serve[d] as a messenger"

of Liberty's religious teachings,[3] *id.* at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). Although Palmer did not teach formal religion classes, she was nonetheless expected—by both Liberty and its students—to imbue her classes with a "Biblical worldview." In other words, Liberty expected Palmer to conform her classes to its religious message, and to help it spread that message. So she was Liberty's "messenger," and thus its "minister" for First Amendment purposes. As such, Palmer's claims cannot proceed.

## A. Palmer imbued her classes with a "Biblical worldview," as Liberty required

To understand whether Palmer served as a "messenger" of Liberty's faith, we must first delve into their employment relationship.

Liberty University is an openly evangelical institution. Its mission is to "develop[ ] Christ-centered men and women with the values, knowledge, and skills essential to impact the world." J.A. 374. As part of this mission, Liberty commits to "[p]romot[ing] the synthesis of academic knowledge and Christian worldview." J.A. 374. And Liberty explicitly states its mission both in its faculty handbook and on its website. Also in its handbook is Liberty's statement on its worldview: "Liberty University embraces a worldview that is both historically Christian and Biblical." J.A. 64. The handbook

---

[3] As discussed above, other such duties would include "lead[ing] a religious organization" and "conduct[ing] worship services or important religious ceremonies or rituals." *Our Lady of Guadalupe*, 140 S. Ct. at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). But nothing in the record suggests that Palmer performed either of these functions for Liberty. So, if the ministerial exception applies, it is because Palmer served as Liberty's "messenger."

continues: "At Liberty, students receive an education that integrates this Christian and Biblical worldview." J.A. 64.

Eva Palmer began working as an art professor at Liberty in 1986. She did not have a theology or ministry degree.[4] And, she never taught formal classes on religion. So she never considered herself to be a "minister," and Liberty never gave her that official title.

Yet that doesn't mean that Liberty had no religious expectations for Palmer. Indeed, her employment contract explicitly incorporated the faculty handbook's requirements. And, alongside the provisions above, the handbook required faculty to "maintain the integrity of our teaching by ensuring that its content is . . . compatible with the University's Christian worldview as reflected in the doctrinal statement." J.A. 67. Every year, Liberty enforced these expectations by evaluating its faculty—including Palmer—on their "Integration of Biblical Worldview." J.A. 1331; *see also* J.A. 32. That component of their evaluation asked: "In what ways do you actively integrate Biblical worldview in your teaching/administrative responsibilities?" J.A. 1332.

Palmer generally got good reviews in this stead. When asked whether she "exhibited commitment to Christian principles," her students—in their formal end-of-semester evaluations—apparently gave Palmer "above-average scores." J.A. 34. And one faculty evaluator noted, after observing one of Palmer's classes, that "[h]er speech is laced with references to God and comparisons of His work in creation to our work as creative

---

[4] While Palmer did not have a religious degree when joining the faculty, during her time at Liberty she enrolled in the university's "Doctor of Ministry" program, earning more than 30 credit hours towards her degree.

artists." J.A. 115. He also noted that Palmer "opens class with opportunity for prayer." J.A. 115.

Palmer's own characterization of her teaching matches up with these faculty and student reviews. She denies formally teaching religious doctrine during instructional time. But she admits that she "discussed God with her students and prayed with her students," J.A. 250, and acknowledges that she "typically began" class with a psalm or a prayer. J.A. 259. When asked how she "integrate[s] Biblical worldview" into her classes, she replied: "I integrate principles and concepts from Scripture, make Scripture references, pray with my classes and individuals, and set the example in my own standard of living." J.A. 938.

## B.    Palmer served as a "messenger" of Liberty's religious teachings

Viewing these facts in light of *Our Lady of Guadalupe* shows that Palmer was Liberty's "minister" for First Amendment purposes.

*Our Lady of Guadalupe* considered two Catholic elementary school teachers' employment-discrimination claims. In holding that the ministerial exception barred those claims, the Court found several facts to be particularly informative. First, the teachers at issue were expected, as spelled out in their employment contracts and faculty handbooks, to "'model and promote' Catholic 'faith and morals'" and "infuse[ ]" those values "through all subject areas." *Our Lady of Guadalupe*, 140 S. Ct. at 2056–57. Second, they were evaluated for compliance with these requirements. *See id.* Third, they "prayed with [their] students." *Id.* at 2057. And fourth, they "provided religious instruction." *Id.*

Palmer's case looks extremely similar. Much like the schools in *Our Lady of Guadalupe*, Liberty's mission was to "[p]romote the synthesis of academic knowledge and

Christian worldview." J.A. 374. And, like the teachers in *Our Lady of Guadalupe*, Palmer was expected to serve this mission and promote Christian values, both by acting as a role model for her students and by integrating a Biblical worldview into her art classes. Likewise, Palmer was evaluated on whether she complied with this requirement. What's more, just as in *Our Lady of Guadalupe*, Palmer admits to regularly praying with the students in class—indeed, starting class with a prayer or a psalm. So the only major difference between the two cases is that Palmer did not provide formal religious instruction.

Should that single difference matter? No. *Our Lady of Guadalupe* emphasized that there is no "rigid formula," 140 S. Ct. at 2062 (quoting *Hosanna-Tabor*, 565 U.S. at 190)), for deciding when the ministerial exception applies, and chastised the lower court for "demanding nothing less than a 'carbon copy' of the specific facts in *Hosanna-Tabor*." 140 S. Ct. at 2060 (quoting 926 F.3d 1238, 1239 (9th Cir. 2019) (Nelson, J., dissenting from denial of rehearing en banc)). The lower court erred, said *Our Lady of Guadalupe*, by treating "the circumstances that we found relevant in [*Hosanna-Tabor*] as checklist items to be assessed and weighed against each other in every case." 140 S. Ct. at 2067.

In other words, *Hosanna-Tabor* did not create an exclusive list of necessary conditions. It did not require religious institutions to bat a thousand on the factors that it identified. True, said the Court, the teachers in *Our Lady of Guadalupe* lacked certain characteristics of those from *Hosanna-Tabor*. They, like Palmer, had neither a religious title nor a religious degree, two factors that *Hosanna-Tabor* alluded to. *See Our Lady of Guadalupe*, 140 S. Ct. at 2065; *Hosanna-Tabor*, 565 U.S. at 191–92. But, while those

factors made *Hosanna-Tabor* "an especially easy" case, neither of them was "essential." *Our Lady of Guadalupe*, 140 S. Ct. at 2062, 2067 (cleaned up).

Just as it would be a mistake to treat *Hosanna-Tabor* as an exclusive "checklist" and seek out a "carbon copy" of its facts, so too with *Our Lady of Guadalupe*. The overall question that we must ask to determine whether Palmer was Liberty's "minister" is whether she "serve[d] as a messenger or teacher of its faith." *Id.* at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)) (emphasis removed). That the Catholic elementary school teachers in *Our Lady of Guadalupe* engaged in formal religious instruction—by literally teaching classes on religious doctrine and preparing students for Mass—made it "especially easy" for the Court to tell that they were "messengers" of the schools' faith. But the Court did not rest on that reason alone.

To start, the formal religion classes at issue in *Our Lady of Guadalupe* were "short." 140 S. Ct. at 2071 (Sotomayor, J., dissenting). One of the plaintiffs taught religion for only 200 minutes per week—that's less than 45 minutes per day. *See id.* at 2059. The teachers still "taught primarily secular subjects." *Id.* at 2072 (Sotomayor, J., dissenting). But the Court recognized that it was not just through *formal* "instruction about the Catholic faith" that the teachers aided the school in providing a religious education. *Id.* at 2066. Instead, the Court noted that—even in their ostensibly "secular" classes—the teachers were still "expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith." *Id.* After all, the teachers' employment agreements and faculty handbooks required them to "infuse[ ]" Catholic values "through all subject areas." *Id.* at 2056–57. So too here.

54

Further, stepping back from the specific details of the teachers' employment agreements, the Court recognized that "[t]he religious education and formation of students is the very reason for the existence of most private religious schools." *Id.* at 2055. Thus, "the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Id.* The same is true with Liberty. Students attend colleges like Liberty not with the expectation that they will get *all* of their religious education in formal classes on theology or in worship services. Instead, they expect that every class on every subject will integrate a Biblical worldview, and that every teacher will be a model of faith. *See Gordon Coll. v. DeWeese-Boyd*, 142 S. Ct. 952, 955 (2022) (Alito, J., statement respecting denial of certiorari) ("[R]eligious education at Gordon College does not end as soon as a student passes [formal religion] courses and leaves the chapel. Instead, the college asks *each* member of the faculty to 'integrate' faith and learning."). Religious faith is not confined to a time and place.

Put plainly, by announcing that it requires its professors to integrate a Biblical worldview into all of their classes, and to model their faith, Liberty is sending a religious message to its students, their parents, and the rest of the public: "These classes—and our faculty's actions—comport with our institution's reading of the Bible." In every lesson that they teach, Liberty's professors impart that message to their students. True, Liberty gives its professors "significant discretion" about how to do so: There are not specific religious lessons that professors like Palmer must teach, or specific "religious displays" that they must install in their classrooms. *See* Concurring Op. at 37. But it is nonetheless critical—from Liberty's perspective—that it has wide latitude to remove its professors for

sending the wrong message.  Otherwise, a "wayward [professor's] preaching, teaching, and counseling could contradict [Liberty's] tenets and lead the [students] away from the faith." *Our Lady of Guadalupe*, 140 S. Ct. at 2060.  Indeed, this is the entire reason that Liberty has eschewed the tenure system—to ensure that it can make "internal management decisions that are essential to the institution's central mission."  *Id.*; *see* J.A. 166.

Because Palmer—like every professor at Liberty—served as the school's religious "messenger" to its students, she was its "minister" for First Amendment purposes.  The ministerial exception thus bars her employment-discrimination claim.

*          *          *

I commend my friends' efforts to follow Justice Brandeis's advice, and to skirt unnecessary constitutional questions.    But, to borrow another Brandeisian phrase, constitutional avoidance is not an "inexorable command."  *Washington v. W.C. Dawson & Co.*, 264 U.S. 219, 238 (1924) (Brandeis, J., dissenting) (discussing stare decisis); *see also Bell v. Maryland*, 378 U.S. 226, 322 (1964) (Black, J., dissenting) (discussing constitutional avoidance).    Sometimes, "important reasons" implore us to confront a constitutional issue head-on.  *Siler*, 213 U.S. at 193.  Such is the case here.  Standing behind the First Amendment's ministerial exception is a principle that, where possible, courts should avoid even *inquiring* into a religious institution's motives for firing one of its ministers.  Weighing in on the merits of Palmer's case—even if we ultimately side with Liberty—requires us to judge its motives, and thus make that inquiry.  And Palmer was indeed Liberty's "minister," since she served as an important "messenger" for its religious teachings.  Accordingly, while I would reach the same conclusion as the majority—

56

Palmer's suit should be dismissed—I would do so on different grounds.  I thus respectfully concur only in the judgment.